## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION<br>────────────────────────────── | MDL 2724<br>16-MD-2724<br>HON. CYNTHIA M. RUFE |
| IN RE:  CLOMIPRAMINE CASES<br>────────────────────────────── | LEAD CASE: 16-CM-27240<br>END-PAYER CASE: 16-CM-27242 |
| THIS DOCUMENT RELATES TO: | |
| *ALL END-PAYER ACTIONS*<br>────────────────────────────── | JURY TRIAL DEMANDED |
| AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES DISTRICT COUNCIL 37 HEALTH & SECURITY PLAN; THE CITY OF PROVIDENCE, RHODE ISLAND; LOUISIANA HEALTH SERVICE & INDEMNITY COMPANY d/b/a BLUE CROSS AND BLUE SHIELD OF LOUISIANA AND HMO LOUISIANA, INC.; SELF-INSURED SCHOOLS OF CALIFORNIA; TWIN CITIES PIPE TRADES WELFARE FUND; UNIFORMED FIRE OFFICERS ASSOCIATION FAMILY PROTECTION PLAN LOCAL 854; UNITED FOOD & COMMERCIAL WORKERS AND EMPLOYERS ARIZONA HEALTH AND WELFARE TRUST; and UNITE HERE HEALTH, on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | |
| v. | |
| MYLAN INC.; MYLAN PHARMACEUTICALS, INC.; SANDOZ, INC.; TARO PHARMACEUTICALS USA, INC., | |
| Defendants. | |

## CONSOLIDATED AMENDED END-PAYER CLASS ACTION COMPLAINT

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## <u>TABLE OF CONTENTS</u>

**Page**

I.      NATURE OF THE ACTION ............................................................................. 1

II.     ONGOING FEDERAL AND STATE INVESTIGATIONS ................................. 5

III.    JURISDICTION AND VENUE ........................................................................ 11

IV.     PLAINTIFFS ................................................................................................... 12

V.      DEFENDANTS ................................................................................................ 18

VI.     CO-CONSPIRATORS ...................................................................................... 19

VII.    INTERSTATE AND INTRASTATE TRADE AND COMMERCE ................... 19

VIII.   BACKGROUND OF THE GENERIC DRUG INDUSTRY ............................... 20

        A.      Generic Drugs Are Commodity Products ................................................. 20

        B.      Pricing in the U.S. Prescription Drug Industry ......................................... 24

IX.     THE GENERIC CLOMIPRAMINE CONSPIRACY .......................................... 26

        A.      Congressional Responses to Generic Drug Price Increases...................... 26

        B.      The Generic Clomipramine Market ......................................................... 28

        C.      Generic Clomipramine Price Increases..................................................... 29

        D.      Defendants' Conspiracy........................................................................... 41

        E.      Defendants' Concerted Efforts to Increase Prices for Generic
                Clomipramine Yielded Supracompetitive Profits ..................................... 51

        F.      Factors Increasing the Market's Susceptibility to Collusion .................... 53

                1.      Industry Concentration.................................................................. 53

                2.      Barriers to Entry........................................................................... 55

                3.      Demand Inelasticity ...................................................................... 56

                4.      Lack of Substitutes........................................................................ 56

                5.      Standardized Product with High Degree of
                        Interchangeability ......................................................................... 57

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## TABLE OF CONTENTS
### (continued)

Page

      6.     Inter-competitor Contacts and Communications ......................... 58

X.     THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS ................................................................................................ 66

    A.     The Statutes of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Defendants' Unlawful Conspiracy ................................................................................. 66

    B.     Fraudulent Concealment Tolled the Statutes of Limitation .................... 67

        1.     Active Concealment of the Conspiracy ........................................ 68

        2.     Plaintiffs Exercised Reasonable Diligence .................................. 70

XI.    CONTINUING VIOLATIONS ........................................................... 70

XII.   DEFENDANTS' ANTITRUST VIOLATIONS.................................... 71

XIII.  CLASS ACTION ALLEGATIONS .................................................... 73

XIV.  CAUSES OF ACTION ....................................................................... 77

    FIRST COUNT: Violation of Sections 1 and 3 of the Sherman Act (on behalf of Plaintiffs and the Nationwide Class) ................................. 77

    SECOND COUNT: Violation of State Antitrust Statutes (on behalf of Plaintiffs and the Damages Class) ....................................................... 79

    THIRD COUNT: Violation of State Consumer Protection Statutes (on behalf of Plaintiffs and the Damages Class)................................... 101

    FOURTH COUNT: Unjust Enrichment (on behalf of Plaintiffs and the Damages Class) ............................................................................. 137

XV.   PRAYER FOR RELIEF ................................................................... 162

XVI.  JURY DEMAND .............................................................................. 164

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## I.   <u>NATURE OF THE ACTION</u>

1.     This suit brings claims on behalf of indirect purchasers of generic Clomipramine ("End-Payers" or "Plaintiffs") for injunctive relief and to recoup overcharges that resulted from an unlawful agreement among Defendants to allocate customers, rig bids, and fix, raise and/or stabilize the prices of generic Clomipramine.

2.     Clomipramine is a tricyclic antidepressant that restores the balance of certain natural substances in the brain.  It is commonly used to treat OCD, reducing the recurrence of unwanted thoughts and the urge to perform repeated tasks that have the potential to be disabling. Over three million people suffer from OCD in the United States.  Treatment typically consists of daily consumption of an oral tablet form of Clomipramine (25mg, 50mg, or 75mg), with the total dosage ranging from 25mg to 250mg per day.  Patients diagnosed with OCD will typically require treatment for extended periods of time.  The World Health Organization includes Clomipramine on its core list of essential medicines, which are medicines necessary to meet the minimum needs for a basic health-care system.

3.     For years, competition among sellers of generic Clomipramine kept prices stable, at low levels.  But starting in May 2013, Defendants, who dominate the market for generic Clomipramine, abruptly and inexplicably raised prices.  The price increases were extreme and unprecedented:  prices for generic Clomipramine increased to levels as much as ███ higher than pre-conspiracy prices.  Prices remain at elevated levels today.  In fact, the U.S. Government

Accountability Office ("GAO") identified generic Clomipramine as having experienced "an extraordinary price increase."[1]

4.      The price increases imposed by Defendant manufacturers of generic Clomipramine cannot be explained by supply shortages or any other market feature or shock. Nor were they the result of unilateral business decisions.  Instead, the significant increases in the prices of Clomipramine were the result of an illegal agreement among Defendants to fix prices.

5.      The market for generic Clomipramine was highly conducive to collusion, as it was controlled almost exclusively by the Defendants and is subject to high barriers to entry, including substantial manufacturing costs and regulatory requirements.  Because Clomipramine is a medically necessary product for which reasonable substitutes are not available and demand is inelastic, Defendants were able to raise prices in concert without suffering corresponding losses in sales volume.  Federal regulations require Defendants' Clomipramine products to contain the same type and amount of active pharmaceutical ingredient and to be therapeutically equivalent to one another.  They are therefore interchangeable commodity products.  Interchangeability facilitates collusion, as cartel members can easily monitor and detect deviations from a price-fixing or market allocation agreement.

6.      Because purchasers choose whose Clomipramine product to buy based primarily on price, and unilateral price increases generally result in loss of market share, it would have been economically irrational for any one Defendant to dramatically raise its prices without assurance that its competitors would do the same.

---

[1] GAO, GAO-16-706, Report to Congressional Requesters, Generic Drugs Under Medicare at Appx. III (Aug. 12, 2016) ("GAO Report"), *available at* http://www.gao.gov/assets/680/679022.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

7.     Defendants' attendance at trade association meetings, conferences, and workshops provided ample opportunities to agree on Clomipramine prices and allocate markets and customers for Clomipramine.  As alleged below, Defendants implemented their conspiracy through numerous secret meetings and communications, including trade association meetings held by the Generic Pharmaceutical Association ("GPhA") (now the Association for Accessible Medicines), the National Association of Chain Drug Stores ("NACDS"), the Healthcare Distribution Management Association (now the Healthcare Distribution alliance) ("HDMA"), and Efficient Collaborative Retail Marketing ("ECRM"), among others.

8.     Defendants' unlawful and anticompetitive conduct in the generic Clomipramine market is part of a larger conspiracy or series of conspiracies involving numerous generic pharmaceuticals and pharmaceutical manufacturers.

9.     Extreme and unprecedented price increases in the generic drug industry—like those imposed by manufacturers of Clomipramine—have prompted close scrutiny of the industry by the U.S. Congress, federal and state enforcement agencies, and private litigants.

10.     An ongoing criminal investigation by the Antitrust Division of the U.S. Department of Justice ("DOJ") has, to date, resulted in price-fixing guilty pleas from two senior executives at Heritage Pharmaceuticals, Inc. relating to the sale of doxycycline hyclate and glyburide.  But DOJ has made clear that its "investigation is ongoing"[2] and the evidence uncovered during the course of its investigation into those drugs also "implicates . . . a

---

[2] DOJ, *Division Update Spring 2017* (Mar. 28, 2017), *available at* https://www.justice.gov/atr/division-operations/division-update-spring-2017/division-secures-individual-and-corporate-guilty-pleas-collusion-industries-where-products.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

significant number of the Defendants . . . [and] a significant number of the drugs at issue" in this Multidistrict Litigation.[3]

11.     The Attorney General for the State of Connecticut ("Connecticut AG"), whose office has been pursuing an investigation of the generic drug industry parallel to that of DOJ, confirms that its price-fixing investigation extends "way beyond the two drugs and the six companies.  Way beyond. . . .  We're learning new things every day."[4]  There is "compelling evidence of collusion and anticompetitive conduct across many companies that manufacture and market generic drugs in the United States . . . [and] evidence of widespread participation in illegal conspiracies across the generic drug industry."[5]

12.     Manufacturers of generic Clomipramine are implicated in these ongoing investigations; each of the Defendants named here—including Mylan, Sandoz, and Taro—has received a federal grand jury subpoena and/or an investigative demand from the Connecticut AG as part of the generic drug price-fixing investigations.  Sun Pharmaceutical Industries, Ltd., which owns a majority stake in Taro, has disclosed that its U.S. operating company, Sun Pharmaceutical Industries, Inc., also received a grand jury subpoena as part of DOJ's generics probe.

---

[3] Intervenor United States' Motion to Stay Discovery at 1–2 (May 1, 2017), ECF No. 279.

[4] *How Martinis, Steaks, and a Golf Round Raised Your Prescription Drug Prices*, Kaiser Health News (Dec. 21, 2016), *available at* http://www.thedailybeast.com/how-martinis-steaks-and-a-golf-round-raised-your-prescription-drug-prices.

[5] Press Release, Conn. AG, Conn. Leads 20 State Coal. Filing Fed. Antitrust Lawsuit against Heritage Pharm., other Generic Drug Cos. (Dec. 15, 2016), *available at* http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

13.     As End-Payers in the chain of pharmaceutical distribution, Plaintiffs bear the brunt of Defendants' illegal conduct.  Plaintiffs have paid many millions of dollars more for generic Clomipramine than they would have paid in a competitive market.

14.     Plaintiffs bring this action against Defendants on account of their past and ongoing violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the state laws set forth below.  Plaintiffs bring this action both individually and on behalf of (a) a national injunctive class of persons and entities in the United States and its territories who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price of generic Clomipramine products manufactured by any Defendant, other than for resale, from May 2013 to the present ("Class Period"), and (b) a damages class of persons or entities in the states and territories identified herein who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price of generic Clomipramine products manufactured by any Defendant, other than for resale, from May 2013 to the present.

## II.     ONGOING FEDERAL AND STATE INVESTIGATIONS

15.     Now in its third year, the federal criminal investigation into generic drug price fixing has begun to bear fruit.  On December 12 and 13, 2016, DOJ filed criminal charges against former Heritage executives Jeffrey Glazer (CEO) and Jason Malek (President).  The government alleged that they conspired with others "to allocate customers, rig bids, and fix and maintain prices" of glyburide and doxycycline hyclate in violation of the Sherman Act (15 U.S.C. § 1).[6]

---

[6] Information ¶ 6, *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa. Dec. 12, 2016), ECF No. 1; Information ¶ 6, *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa. Dec. 13, 2016), ECF No. 1.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

16.     On January 9, 2017, Glazer and Malek pleaded guilty to those charges.[7]  Deputy Assistant Attorney General Brent Snyder of the Justice Department's Antitrust Division explained:  "These charges are an important step in correcting that injustice and in ensuring that generic pharmaceutical companies compete vigorously to provide these essential products at a price set by the market, not by collusion."[8]  As they await sentencing, Glazer and Malek are cooperating with DOJ's continuing investigation.  More criminal charges and guilty pleas are expected to follow.[9]

17.     Although initial public disclosures suggested that the federal and state investigations were focused on one or two drugs, it is now clear that both investigations are much, much broader.  The investigations reportedly cover two dozen drugs and more than a

---

[7] *See* Tr. of Plea Hr'g, *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa. Jan. 9, 2017), ECF No. 24; *see also* Tr. of Plea Hr'g, *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa. Jan. 9, 2017), ECF No. 24.

[8] Press Release, DOJ, *Former Top Generic Pharm. Execs. Charged with Price-Fixing, Bid-Rigging and Customer Allocation Conspiracies* (Dec. 14, 2016), *available at* https://www.justice.gov/opa/pr/former-top-generic-pharmaceutical-executives-charged-price-fixing-bid-rigging-and-customer.

[9] *See, e.g.*, Eric Kroh, *Generic Drug Price-Fixing Suits Just Tip Of The Iceberg*, Law360 (Jan. 6, 2017) ("'Once somebody starts cooperating, it leads to many more indictments.'"), *available at* https://www.law360.com/articles/877707/generic-drug-price-fixing-suits-just-tip-of-the-iceberg.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

dozen manufacturers.[10]  Press reports indicate that "[t]he Department of Justice (DoJ) believes price-fixing between makers of generic pharmaceuticals is widespread."[11]

18.     According to one report, prosecutors see the investigation of the generic drug industry much like DOJ's antitrust probe of the auto parts industry, which has morphed into DOJ's largest criminal antitrust probe ever.  *See In re Automotive Parts Antitrust Litig.*, No. 2:12-md-02311 (E.D. Mich.).  As in that case, prosecutors expect "to move from one drug to another in a similar cascading fashion."[12]

19.     DOJ and a federal grand jury empaneled in the Eastern District of Pennsylvania have focused on at least seventeen generic drug manufacturers as part of the growing investigation, including:  Actavis Holdco U.S., Inc. ("Actavis"); Aurobindo Pharma USA, Inc. ("Aurobindo"); Citron Pharma LLC ("Citron"); Dr. Reddy's Laboratories, Inc. ("Dr. Reddy's"); Heritage Pharmaceuticals, Inc. ("Heritage"); Impax Laboratories, Inc. ("Impax"); Lannett Company, Inc. ("Lannett"); Mayne Pharma, Inc. ("Mayne"); Mylan Inc. ("Mylan"); Par Pharmaceuticals, Inc. ("Par"); Perrigo New York, Inc. ("Perrigo"); Sandoz, Inc. ("Sandoz"); Sun Pharmaceutical Industries, Inc. ("Sun"); Taro Pharmaceuticals USA, Inc. ("Taro"); Teva Pharmaceuticals USA, Inc. ("Teva"); and Zydus Pharmaceuticals USA, Inc. ("Zydus").  And as

---

[10] David McLaughlin & Caroline Chen, *U.S. Charges in Generic-Drug Probe to Be Filed by Year-End*, Bloomberg (Nov. 3, 2016), *available at* http://www.bloomberg.com/news/articles/2016-11-03/u-s-charges-in-generic-drug-probe-said-to-be-filed-by-year-end.

[11] PaRR Report, *DoJ Believes Collusion over Generic Drug Prices Widespread* (June 26, 2015) ("PaRR Report"), *available at* http://www.mergermarket.com/pdf/DoJ-Collusion-Generic-Drug-Prices-2015.pdf.

[12] *Id.*

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

recently as August 10, 2017, Pfizer, Inc. ("Pfizer") also disclosed that DOJ is investigating its Greenstone generics business.[13]

20.     The fact that these companies and/or their employees received subpoenas from a federal grand jury is significant.  DOJ does not empanel grand juries lightly.  The *Antitrust Division Manual* admonishes that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution."  Accordingly, before a grand jury investigation proceeds, it requires a series of approvals, first by the relevant field chief, who then sends the request to the Antitrust Criminal Enforcement Division.  "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General[,]" who must give final approval and authorize all attorneys who will participate in the investigation.[14]

21.     As Mark Rosman, former assistant chief of the National Criminal Enforcement Section of DOJ's Antitrust Division, noted in an article on the "unusual" nature of the criminal subpoenas, "A DOJ investigation into the alleged exchange of pricing information in the pharmaceutical industry likely indicates that the agency anticipates uncovering criminal antitrust conduct in the form of price-fixing or customer allocation."[15]

---

[13] Further discussion of these generic drug manufacturers and their receipt of subpoenas or other inquiries from DOJ is included *infra* at ¶ 165.

[14] DOJ, Antitrust Division Manual III-81–83 (5th ed. 2015), *available at* http://www.justice.gov/atr/public/divisionmanual/chapter3.pdf.

[15] Mark Rosman & Seth Silber, *DOJ's Investigation Into Generic Pharma Pricing Is Unusual*, Law360 (Nov. 12, 2014), *available at* https://www.wsgr.com/publications/PDFSearch/rosman-1114.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

22.     Another significant indication of criminal price fixing in the generic drug industry is that DOJ has received assistance from a privately-held company that came forward as a leniency applicant:  "It is understood that Heritage is cooperating with prosecutors in exchange for amnesty from criminal prosecution under DOJ's leniency program[.]"[16]  As explained on DOJ's website, an applicant for amnesty "must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes, before it will receive a conditional leniency letter." The applicant must also establish that "[t]he confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials."[17]

23.     In addition to the federal criminal investigation, the Connecticut AG began an investigation in July 2014 into the dramatic price increases in generic drugs.  Now joined by the Attorneys General of 43 other states and the District of Columbia, the Connecticut AG has filed a civil complaint in the U.S. District Court for the District of Connecticut alleging price fixing and customer allocation.[18]  Although the States' present complaint focuses on two drugs (doxycycline hyclate delayed release and glyburide), the States make clear that they have

---

[16] Richard Vanderford, *Generic Pharma Investigation Still Broad, Prosecutor Says*, mLex (Feb. 21, 2017).

[17] DOJ, *Frequently Asked Questions about the Antitrust Division's Leniency Program* (updated Jan. 26, 2017), *available at* https://www.justice.gov/atr/page/file/926521/download.

[18] On August 3, 2017, the U.S. Judicial Panel on Multidistrict Litigation ("JPML") issued an order directing that the State AG case be transferred to this Court and coordinated as part of MDL 2724.  (ECF No. 417)

9

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

"uncovered wide-ranging conduct implicating numerous different drugs and competitors" and suggest that additional drugs and manufacturers will be added "at the appropriate time."[19]

24.     The publicly available version of the State AG Complaint is heavily redacted. Among the obscured portions are the contents of conspiratorial communications, which the Connecticut AG has described as "mind-boggling."[20]  The State AG Complaint explains that the generic drug industry is structured in a way that facilitates these types of collusive communications.   "Generic drug manufacturers operate, through their respective senior leadership and marketing and sales executives, in a manner that fosters and promotes routine and direct interaction among their competitors."  This affords them opportunities to "exploit their interactions at various and frequent industry trade shows, customer conferences and other similar events, to develop relationships and sow the seeds for their illegal agreements."[21]

25.     The criminal informations and guilty pleas relating to Glazer and Malek, the grand jury subpoenas, and evidence divulged in the State AG Complaint are merely the tip of the iceberg.   The government investigations have uncovered the existence of "a broad, well-coordinated and long-running series of schemes to fix the prices and allocate markets for a number of generic pharmaceuticals in the United States."[22]  Plaintiffs do not yet have access to all of the information available to the government enforcement agencies.   What is known is that

---

[19] *Connecticut v. Aurobindo Pharma USA, Inc.*, No. 3:16-cv-2056 (VLB) (D. Conn. Mar. 1, 2017), ECF No. 168 at ¶ 9 (State AG Complaint), *available at* http://www.ct.gov/ag/lib/ag/press_releases/2016/20161215_gdms_complain.pdf.

[20] Mark Pazniokus, *How a small-state AG's office plays in the big leagues*, CT Mirror (Jan. 27, 2017), *available at* http://ctmirror.org/2017/01/27/how-a-small-state-ags-office-plays-in-the-big-leagues/.

[21] State AG Complaint ¶ 7.

[22] State AG Complaint ¶ 1.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

in light of all the evidence described above, the large and unprecedented price increases for generic Clomipramine cannot be explained by normal, competitive market forces.   The explanation is collusion.

### III.   JURISDICTION AND VENUE

26.   Plaintiffs bring Count One of this action under Section 16 of the Clayton Act (15 U.S.C. § 26) for injunctive relief and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs and the members of the Classes described herein by reason of the violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

27.   This action is also instituted under the antitrust, consumer protection, and common laws of various states and territories for damages and equitable relief, as described in Counts Two through Four below.

28.   Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1337 and by Section 16 of the Clayton Act (15 U.S.C. § 26).  In addition, jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1332(d) and 1367.

29.   Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) & 22; 28 U.S.C §§ 1391(b)–(d) & 1407; and the MDL Order dated April 6, 2017 (ECF No. 291), and because, during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.  Venue is also proper in this District because the federal grand jury investigating the pricing of generic drugs is empaneled here and therefore it is likely that acts in furtherance of the alleged conspiracy took place here.  According to DOJ guidelines, an "investigation should be conducted by a grand jury in a judicial district where

venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred."[23]

30.    This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant:   (a) transacted business throughout the United States, including in this District; (b) sold Clomipramine throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; (d) was engaged in an illegal scheme and nationwide price-fixing conspiracy that was directed at, had the intended effect of causing injury to, and did cause injury to persons residing in, located in, or doing business throughout the United States, including in this District; and/or (e) took overt action in furtherance of the conspiracy in this District or conspired with someone who did, and by doing so could reasonably have expected to be sued in this District.   In addition, nationwide personal jurisdiction was authorized by Congress pursuant to the Clayton Act and by 28 U.S.C. § 1407.

## IV.    PLAINTIFFS

31.    Plaintiff American Federation of State, County and Municipal Employees District Council 37 Health & Security Plan ("DC 37") is a health and welfare benefit plan headquartered in New York, New York.   District Council 37 (the "Union") is New York City's largest public employee union.   The Union includes 51 local unions, representing public sector employees serving in thousands of job titles from Accountants to Zoo Keepers.   Members covered by DC 37's benefit plan work in almost every agency in New York City, including but not limited to the City's police and fire departments, hospitals, schools, libraries, social service centers, water treatment facilities, and city colleges.   DC 37 provides supplemental health benefits, including a

---

[23] DOJ, Antitrust Division Manual at III-83.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

prescription drug benefit, to approximately 313,000 individuals, including both active members and their families and 50,000 retirees, who reside in numerous locations in the United States. During the Class Period, DC 37 indirectly purchased and paid for some or all of the purchase price for one or more generic Clomipramine prescriptions, other than for resale, manufactured by the Defendants.  Plaintiff made such payments and/or reimbursements in California, Connecticut, Florida, Indiana, Kansas, Mississippi, New Jersey, New York, Pennsylvania, and Rhode Island, thereby suffering injury to its business and property.  During the Class Period, DC 37 paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for those products.  As a result of the alleged conspiracy, DC 37 was injured in its business or property by reason of the violations of law alleged herein.  DC 37 intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

32.     Plaintiff The City of Providence, Rhode Island ("Providence") is a municipal corporation.  Its principal office is located in Providence, Rhode Island.  Providence is a self-insured health and welfare benefit plan, and purchases, pays and/or provides reimbursement for its employees, retirees, and/or plan beneficiaries, who reside in numerous locations in the United States, for some or all of the purchase price of prescription drugs.  During the Class Period, Providence indirectly purchased, paid, and/or provided reimbursement for some or all of the purchase price for one or more generic Propranolol prescriptions, other than for resale, manufactured by the Defendants.  Providence made such payments and/or reimbursements in Rhode Island, thereby suffering injury to its business and property.  During the Class Period, Providence paid and/or reimbursed more for these products than it would have absent

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Defendants' anticompetitive conduct to fix, raise, maintain, and/or stabilize the prices and allocate markets and customers for those products.  As a result of the alleged conspiracy, Providence was injured in its business or property by reason of the violations of law alleged herein.  Providence intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

33.     Plaintiff Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana and HMO Louisiana, Inc. (collectively, "BCBS-LA") is headquartered in Baton Rouge, Louisiana, and is Louisiana's oldest and largest domestic health insurer, with over 1 million members.  During the Class Period, BCBS-LA indirectly purchased, paid, and/or provided reimbursement on behalf of its members for some or all of the purchase price for one or more generic Clomipramine prescriptions, other than for resale, manufactured by the Defendants. Plaintiff made such payments and/or reimbursements in Alabama, Arizona, California, Florida, Georgia, Idaho, Illinois, Indiana, Kansas, Louisiana, Maryland, Massachusetts, Minnesota, Mississippi, Missouri, Nevada, New Hampshire, New York, North Carolina, North Dakota, Pennsylvania, Tennessee, Texas, Utah, Virginia and Wisconsin, thereby suffering injury to its business and property.  During the Class Period, BCBS-LA paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for those products.  As a result of the alleged conspiracy, BCBS-LA was injured in its business or property by reason of the violations of law alleged herein.  BCBS-LA intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

34.     Plaintiff Self-Insured Schools of California ("SISC") is a Joint Powers Authority under California law that serves the interests of California public school district members.  It is headquartered in Bakersfield, California.  It provides health benefit plans to approximately 300,000 members who reside in numerous locations in the United States.  During the Class Period, SISC indirectly purchased and paid for some or all of the purchase price for one or more generic Clomipramine prescriptions, other than for resale, manufactured by the Defendants. SISC made such payments and/or reimbursements in Arizona, California, Illinois, and Oregon thereby suffering injury to its business and property.  During the Class Period, SISC paid and reimbursed more for these products more than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for those products.  As a result of the alleged conspiracy, SISC was injured in its business or property by reason of the violations of law alleged herein.  SISC intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

35.     Plaintiff Twin Cities Pipe Trades Welfare Fund is a welfare fund that provides benefits to pipe trades workers and their spouses and dependents.  It is headquartered in White Bear Lake, Minnesota.  It provides health benefits, including prescription drug benefits, to approximately 7,000 members who reside primarily in around the Twin Cities metropolitan region of Minnesota, and their family members.  During the Class Period, Twin Cities Pipe Trades Welfare Fund indirectly purchased and paid for some or all of the purchase price for one or more generic Clomipramine prescriptions, other than for resale, manufactured by the Defendants.  Plaintiff made such payments and/or reimbursements in Minnesota and Wisconsin, thereby suffering injury to its business and property.  During the Class Period, Twin Cities Pipe

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Trades Welfare Fund paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for those products.  As a result of the alleged conspiracy, Twin Cities Pipe Trades Welfare Fund was injured in its business or property by reason of the violations of law alleged herein.  Twin Cities Pipe Trades Welfare Fund intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

36.     Plaintiff Uniformed Fire Officers Association Family Protection Plan Local 854 ("UFOAFPP") is a health and welfare benefit plan headquartered and with a principal place of business in New, York, New York.  The UFOAFPP Fund administers the assets of a defined contribution plan formed by a collective bargaining agreement between the City of New York and the Uniformed Fire Officers Association to provide certain benefits including prescription drug benefits. They provide health and welfare benefits to approximately 10,000 individuals, including members and their families, throughout the United States.  During the Class Period, the UFOAFPP indirectly purchased and paid for some or all of the purchase price for one or more Clomipramine prescriptions, other than for resale, manufactured by the Defendants.  UFOAFPP made such payments and/or reimbursements in Colorado, Missouri, New Jersey, New York, and Pennsylvania.  During the Class Period, UFOAFPP paid and reimbursed more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for these products.  As a result of the alleged conspiracy, UFOAFPP was injured in its business or property by reasons of the violations of law alleged herein.  UFOAFPP intends to continue paying and/or reimbursing for

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

37.     Plaintiff United Food & Commercial Workers and Employers Arizona Health and Welfare Trust ("UFCW") is an employee welfare benefits fund with its principal place of business at Maricopa County, Arizona.  During the Class Period, UFCW indirectly purchased and paid for some or all of the purchase price for one or more generic Clomipramine prescriptions, other than for resale, manufactured by one of the Defendants.  Plaintiff made such payments and/or reimbursements in Arizona and New Mexico.  During the Class Period, UFCW purchased and paid more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for these products.  As a result of the alleged conspiracy, UFCW was injured in its business or property by reason of the violations of law alleged herein.  UFCW intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

38.     Plaintiff Unite Here Health ("UHH") is a multi-employer trust fund composed of union and employer representatives, whose mission is to provide health benefits that offer high quality, affordable healthcare to its participants at a better value and with a better service than is otherwise available in the market.  Headquartered in Aurora, Illinois, UHH has served union workers in the hospitality, food service, and gaming industries for the past several decades. During the Class Period, UHH indirectly purchased and paid for some or all of the purchase price for one or more generic Clomipramine prescriptions, other than for resale, manufactured by the Defendants. Plaintiff made such payments and/or reimbursements in Illinois, Massachusetts, Nevada, New Jersey, New York, Pennsylvania, and Washington, D.C.  During the Class Period,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

UHH purchased and paid more for these products than it would have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers for these products.  As a result of the alleged conspiracy, Plaintiff UHH was injured in its business or property by reason of the violations of law alleged herein.  UHH intends to continue purchasing and/or reimbursing for these drugs and will continue to be injured unless the Defendants are enjoined from their unlawful conduct as alleged herein.

## V.   DEFENDANTS

**Mylan Defendants**

39.    Defendant Mylan Inc. is a Pennsylvania corporation with its principal place of business in Canonsburg, Pennsylvania.

40.    Defendant Mylan Pharmaceuticals, Inc. is a West Virginia corporation with its principal place of business in Morgantown, West Virginia.  It is a subsidiary of Mylan Inc. Mylan Pharmaceuticals, Inc. is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

41.    Mylan Inc. and Mylan Pharmaceuticals, Inc. are wholly-owned subsidiaries of Mylan N.V., a Dutch pharmaceutical company.  Unless addressed individually, Mylan Inc. and Mylan Pharmaceuticals, Inc. are collectively referred to herein as "Mylan."  During the Class Period, Mylan sold generic Clomipramine to customers in this District and other locations in the United States.

**Sandoz**

42.    Defendant Sandoz, Inc. ("Sandoz") is a Colorado corporation with its principal place of business in Princeton, New Jersey.  Sandoz is a subsidiary of Novartis AG, a global pharmaceutical company based in Basel, Switzerland.   Sandoz is registered with the

Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.  During the Class Period, Sandoz sold generic Clomipramine in this District and other locations in the United States.

**Taro**

43.     Defendant Taro Pharmaceuticals U.S.A., Inc. ("Taro") is a New York corporation with its principal place of business in Hawthorne, New York.  Taro is a wholly-owned subsidiary of Taro Pharmaceutical Industries, Ltd., an Israeli entity, which in turn is majority owned by Sun Pharmaceutical Industries Ltd., an Indian entity.  During the Class Period, Taro sold generic Clomipramine to customers in this District and other locations in the United States.

## VI.   CO-CONSPIRATORS

44.     Various other persons, firms, corporations and entities have participated as co-conspirators with Defendants in the violations and conspiracy alleged herein.  In order to engage in the violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged herein.  Plaintiffs may amend this Complaint to allege the names of additional co-conspirators as they are discovered.

## VII.   INTERSTATE AND INTRASTATE TRADE AND COMMERCE

45.     During the Class Period, Defendants sold and distributed generic Clomipramine in a continuous and uninterrupted flow of interstate commerce to customers throughout the United States, including in this District.

46.     Defendants' and their co-conspirators' conduct, including the marketing and sale of generic Clomipramine, took place within the United States and has had, and was intended to have, a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce within the United States.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

47.     Defendants' anticompetitive conduct occurred in part in trade and commerce within the states and territories set forth herein, and also had substantial intrastate effects in that, *inter alia*, retailers within each state and territory were foreclosed from offering less expensive generic Clomipramine to Plaintiffs inside each respective state and territory.  The foreclosure of these less expensive generic products directly impacted and disrupted commerce for Plaintiffs within each state and territory and forced Plaintiffs to pay supracompetitive prices.

## VIII.   BACKGROUND OF THE GENERIC DRUG INDUSTRY

### A.     Generic Drugs Are Commodity Products

48.     Approximately 88% of all pharmaceutical prescriptions in the United States are filled with a generic drug.[24]  "In 2015, generic drug sales in the United States were estimated at $74.5 billion."[25]

49.     According to the U.S. Food & Drug Administration ("FDA"), "a generic drug is the same as a brand name drug in dosage, safety, strength, how it is taken, quality, performance, and intended use."[26]  Once the FDA approves a generic drug as "therapeutically equivalent" to a brand drug, the generic version "can be expected to have equal effect and no difference when substituted for the brand name product."[27]

---

[24] GPhA, *Generic Drug Savings in the U.S.* at 1 (2015) ("GPhA Report"), *available at* http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf.

[25] Press Release, Connecticut AG, Conn. Leads 20 State Coal. Filing Fed. Antitrust Lawsuit against Heritage Pharm., other Generic Drug Cos. (Dec. 15, 2016), *available at* http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341.

[26] FDA Website, *available at* http://www.fda.gov/Drugs/InformationOnDrugs/ucm079436.htm#G (last visited Aug. 9, 2017).

[27] *Id.*

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

50.     In a competitive market, generic drugs cost substantially less than branded drugs. The U.S. Congressional Budget Office ("CBO") estimates that, "[o]n average, the retail price of a generic drug is 75 percent lower than the retail price of a brand-name drug."[28]  And that may be conservative.  According to a Federal Trade Commission ("FTC") study, in a "mature generic market, generic prices are, on average, 85% lower than the pre-entry branded drug price."[29] Mature generic markets—like that of Clomipramine—typically have several manufacturers that compete for sales, hence keeping prices in check.

51.     Generic drug price competition provides enormous savings to consumers, pharmacies, and other drug purchasers, as well as to private health insurers, health and welfare funds, and state Medicaid programs.  Indeed, one study found that the use of generic medicines saved the United States healthcare system $254 billion in 2014 alone, and $1.68 trillion between 2005 and 2014.[30]

52.     The significant cost savings provided by generic drugs motivated Congress to enact the Drug Price Competition and Patent Term Restoration Act of 1984, more commonly known as the "Hatch-Waxman Act" (Pub. L. No. 98-417, 98 Stat. 1585).  The Act streamlines the regulatory hurdles that generic drug manufacturers have to clear prior to marketing and selling generic drugs.  Generic drug manufacturers may obtain FDA approval in an expedited

---

[28] CBO, *Effects of Using Generic Drugs on Medicare's Prescription Drug Spending* (Sep. 15, 2010), *available at* https://www.cbo.gov/sites/default/files/111th-congress-2009-2010/reports/09-15-prescriptiondrugs.pdf.

[29] FTC, *Pay-For-Delay: How Drug Company Pay-offs Cost Consumers Billions* (Jan. 2010), *available at* https://www.ftc.gov/sites/default/files/documents/reports/pay-delay-how-drug-company-pay-offs-cost-consumers-billions-federal-trade-commission-staff-study/100112payfordelayrpt.pdf.

[30] GPhA Report at 1.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

fashion through the filing of an Abbreviated New Drug Application ("ANDA") that establishes that its product is bioequivalent to the branded counterpart.

53.     Since passage of the Hatch-Waxman Act, every state has adopted substitution laws requiring or permitting pharmacies to substitute generic drug equivalents for branded drug prescriptions (unless the prescribing physician specifically orders otherwise by writing "dispense as written" or similar language on the prescription).

54.     Because each generic is readily substitutable for another generic of the same brand drug, pricing is the main differentiating feature.  As recognized by the FTC, "generic drugs are commodity products" and, as a consequence of that, are marketed "primarily on the basis of price."[31]  In a competitive market, generic manufacturers cannot significantly increase prices (or maintain high prices in the face of a competitor's lower price) without losing a significant volume of sales.

55.     It is well-established that competition among generic manufacturers drives down price.  Before generic drugs enter a market, the brand drug has a monopoly and captures 100% of sales.  When lower-priced generics become available, the brand drug quickly loses market share as purchasers switch to the less expensive alternatives.  Over time, the price of a generic drug approaches the manufacturers' marginal costs.  As illustrated in the following chart, the price of a generic drug tends to decrease as more generic drug manufacturers enter the market:

---

[31] FTC, *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact* (Aug. 2011), *available at* https://www.ftc.gov/sites/default/files/documents/reports/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



**Generic Competition and Drug Prices**

Source: FDA analysis of retail sales data from IMS Health, IMS National Sales
Perspective (TM), 1999-2004, extracted February 2005

56.     When new entrants join a competitive generic market, they typically will price
their product below the prevailing market price in order to gain market share.   A recent
government report confirmed this phenomenon in interviews with generic manufacturers:
"manufacturers said that if a company is bringing a generic drug into an established drug market,
it typically offers a price that is lower than the current market price in order to build its customer
base.  Manufacturers also said that as each new manufacturer enters an established generic drug
market the price of that generic will fall, with one manufacturer noting that it is typically a 20
percent price decline per entrant."[32]

57.     When there are multiple generic manufacturers in an established generic market—
as with generic Clomipramine—prices should remain low and stable, and should not increase
absent a market disruption or, as is the case here, anticompetitive conduct.

---

[32] GAO Report at 23.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### B.    Pricing in the U.S. Prescription Drug Industry

58.     In simple terms, the generic pharmaceutical supply chain flows as follows: Manufacturers sell drugs to wholesalers. Wholesalers sell drugs to pharmacies. Pharmacies dispense the drugs to consumers, who pay the full retail price if they are uninsured, or a portion of the retail price (*e.g.*, a co-pay or co-insurance) if they are insured.  The insured consumers' health plans then pay the pharmacies additional amounts that are specified in agreements between them and the pharmacies.  These agreements are sometimes arranged by middlemen known as Pharmacy Benefit Managers ("PBMs").

59.     Because the prices paid by purchasers of generic drugs differ at different levels of the market and most of the transactions occur between private parties according to terms that are not publicly disclosed, the price of a given drug is not always obvious.  Market-wide pricing for a given drug, however, may be observed through the Centers for Medicare & Medicaid Services ("CMS") survey of National Average Drug Acquisition Cost ("NADAC").   NADAC was "designed to create a national benchmark that is reflective of the prices paid by retail community pharmacies to acquire prescription . . . drugs."[33]   "NADAC is a simple average of the drug acquisition costs submitted by retail pharmacies."[34]   In effect, NADAC is "a single national average."[35]  Thus, NADAC is one way to track general price trends in the marketplace.

---

[33] CMS, Methodology for Calculating the National Average Drug Acquisition Cost (NADAC) for Medicaid Covered Outpatient Drugs at 5, *available at* https://www.medicaid.gov/medicaid-chip-program-information/by-topics/prescription-drugs/ful-nadac-downloads/nadacmethodology.pdf.

[34] *Id.* at 15.

[35] *Id.*

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

60.    While NADAC provides the average price level across all manufacturers of a given drug, other prices are manufacturer specific. Drug manufacturers typically report benchmarks-like WACs (Wholesale Acquisition Costs)-for their drugs, which are then published in compendia used by participants in the pharmaceutical industry.  The benchmarks are not actual transaction prices; rather, they are the manufacturer's reported list price.  Accordingly, WAC prices do not take into account discounts that may be provided, *e.g.*, for volume sales.[36]

61.    The amount that an end-payer will pay a pharmacy for a generic drug typically is determined with reference to a benchmark or list price like a WAC.  The end-payer pays the pharmacy an amount based on the manufacturer's list price for the drug, plus a small mark-up or dispensing fee.  Over time, third-party payers and PBMs have learned that manufacturers' list prices for some generic drugs can be substantially higher than the actual costs incurred by certain pharmacies to acquire the drugs.  As a consequence, end-payers were paying more than simply the acquisition cost plus a small amount.

62.    To combat this, some third-party payers and PBMs have implemented their own proprietary benchmark prices-Maximum Allowable Costs ("MACs")-that set the amounts they will pay pharmacies for some generic drugs.  A MAC caps the amount that an end-payer will pay a pharmacy for a given strength and dosage of a generic drug, regardless of the pharmacy's acquisition costs.

_____

[36] Average Wholesale Price ("AWP") is another benchmark price that is used in the pharmaceutical industry.  And QuintilesIMS's National Sales Perspectives ("NSP") is another measure of manufacturer specific pricing.  NSP data "captures 100% of the total U.S. pharmaceutical market, measuring sales at actual transaction prices rather than using an average wholesale price" and includes sales by manufacturers into various outlets.  IMS Institute for Healthcare Informatics, HSRN Data Brief: National Sales Perspectives at 1, *available at* https://www.imshealth.com/files/web/IMSH%20Institute/NSP_Data_Brief-.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

63.     Third-party payers and PBMs set the MAC of a drug based on several factors, one of which is believed to be the lowest acquisition cost in the market for that generic drug.  So, for example, if there are three manufacturers offering the same generic drug at three different prices, a PBM or third-party payer might set the MAC price at or near the lowest of the three prices.  A pharmacy could elect to buy from a manufacturer with a higher price, but upon resale to a customer of the PBM or third-party payer, the pharmacy would only be paid the MAC price.

64.     Drug purchasers always should have an incentive to buy the least expensive available drug.  Because MAC prices further incentivize pharmacies to choose the lowest priced option, a generic manufacturer that increases its price for a drug should expect to lose sales to a competitor with a lower price.  Consequently, in the absence of coordinated pricing activity among generic manufacturers, an individual manufacturer should not be able to significantly increase its price (or maintain a higher price in the face of a significantly lower competitor price) without incurring the loss of a significant volume of sales.  A manufacturer can only raise its price if it knows its competitors will raise their prices, too, *e.g.*, if they are conspiring.

## IX.     THE GENERIC CLOMIPRAMINE CONSPIRACY

### A.     Congressional Responses to Generic Drug Price Increases

65.     In addition to the investigations by DOJ and the Connecticut AG, Congress has raised concerns about the alarming price spikes for numerous generic pharmaceuticals.  These concerns were prompted by the very real hardship suffered by end-payers as a result of the unprecedented price increases.

66.     In the Fall of 2014, Senator Bernie Sanders and Representative Elijah Cummings requested information from manufacturers of 10 drugs that had experienced extraordinary price

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

increases.  Six of those drugs are now the subject of complaints in this MDL.[37]  Defendant

Mylan is one of the manufacturers that Sanders and Cummings singled out.  In November 2014,

Senator Sanders conducted a hearing entitled, "Why Are Some Generic Drugs Skyrocketing in

Price?" ("Senate Hearing").  Various witnesses discussed the price hikes for generic drugs, but

none of the industry executives who were invited to testify appeared.[38]

67.     Senator Sanders and Representative Cummings followed up with a request to the

Office of the Inspector General of the Department of Health & Human Services ("OIG"), asking

it to investigate the effect that price increases of generic drugs have had on the Medicare and

Medicaid programs.   The OIG issued its report in December 2015, confirming that price

increases for numerous generic drugs far out-stripped inflation.[39]

68.     In response to another Congressional request—this one from Senators Susan

Collins, Claire McCaskill, Bill Nelson and Mark Warner—the United States Government

Accountability Office ("GAO") issued a report in August 2016 entitled "Generic Drugs Under

Medicare: Part D Generic Drug Prices Declined Overall, but Some Had Extraordinary Price

Increases."[40]  The GAO investigation confirmed that in a competitive market, generic drug prices

decline and remain stable, absent shortages or other market disruptions.[41]   And this was the case

---

[37] Press Release, Sen. Sanders, Congress Investigating Why Generic Drug Prices Are Skyrocketing (Oct. 2, 2014), *available at* https://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing.

[38] Senate Hearing (Nov. 20, 2014), *available at* https://www.help.senate.gov/hearings/why-are-some-generic-drugs-skyrocketing-in-priced.

[39] HHS OIG, *Average Manufacturer Prices Increased Faster than Inflation for Many Generic Drugs* (Dec. 2015), *available at* https://oig.hhs.gov/oas/reports/region6/61500030.pdf.

[40] GAO Report.

[41] *Id.* at 23-25.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

for most generics.  But it identified numerous drugs that experienced "extraordinary" increases, which it defined as an increase of more than 100%.[42]  The investigation further revealed that price increases for Clomipramine were some of the most dramatic in the industry, "increas[ing] over 2,000 percent in 1 year, going from $0.34 per capsule in the first quarter of 2013 to $8.43 per capsule in the first quarter of 2014."[43]

> B.    **The Generic Clomipramine Market**

69.    The Swiss drug manufacturer Ciba-Geigy discovered Clomipramine in 1964, and the FDA initially approved branded Clomipramine for use in the United States in 1989 when Mallinckrodt Pharmaceuticals sold the medication under the brand name Anafranil.  Generic versions of the medication became available in the United States in 1996 and, since that time, several generic manufacturers have obtained abbreviated approval from the FDA to sell generic bioequivalents to Anafranil with the same active ingredient:  Clomipramine.

70.    Generic Clomipramine is sold throughout the United States and its territories. The market for generic Clomipramine is mature.  Defendants that operate in such a market should only be able to gain market share by competing on price.

71.    During the Class Period, Defendants Mylan, Sandoz and Taro dominated the Clomipramine market.  Defendants controlled approximately ▮▮▮▮ of the generic Clomipramine market, implying a substantial amount of market power.

72.    Defendants exercised this power to maintain supracompetitive prices for Clomipramine without losing so many sales as to make the elevated price unprofitable.  In 2014

---

[42] *Id.* at 1 & Appendix III.

[43] *Id.* at 14 & Appendix III.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

alone, Defendants' total revenue from sales of these products was approximately ▮▮▮▮▮▮▮.[44]
This compares to only ▮▮▮▮▮▮ in 2012, a year before the price-fixing conspiracy began.

73.     Defendants sold generic Clomipramine at prices in excess of marginal costs, in
excess of a competitive price, and enjoyed high profit margins.

74.     Through their market dominance, Defendants have successfully foreclosed the
market to rival competition, thereby maintaining and enhancing market power and enabling
Defendants to charge Plaintiffs supracompetitive prices for generic Clomipramine.

**C.     Generic Clomipramine Price Increases**

75.     Beginning in approximately May 2013 and continuing to the present, Defendants
formed and maintained a price-fixing cartel that included all of their generic Clomipramine
products.  Senior executives of each Defendant reached agreement and monitored compliance.
These executives included Mylan's CEO Heather Bresch.   On information and belief, these
executives also included Peter Goldschmidt of Sandoz; James Kedrowski, Taro Pharmaceutical
Industries, Ltd.'s interim CEO from September 2010 to August 2013 and President from 2012 to
2015; and Kal Sundaram, Taro Pharmaceutical Industries, Ltd.'s CEO from August 2013 to
December 2016.

76.     As the following chart indicates, prices for generic Clomipramine increased
significantly.  The chart is based on NADAC data.

77.     The prices in the chart below show the dramatic price increases for generic
Clomipramine in mid-2013, and also appear to reflect a "one-way ratchet":   prices never

---

[44] Revenue, unit sales, and effective prices are obtained from QuintilesIMS Inc. ("IMS Health").  IMS Health is the largest vendor of physician prescribing data in the United States and is widely relied upon in the generic pharmaceutical industry and elsewhere.  "Effective prices" represent actual transaction prices, as reported by IMS Health.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

decreased substantially, as one would expect if sudden price increases reflected temporary supply shortages, cost increases, or other benign market explanations.



78.     Data showing Medicaid reimbursements—the amounts that Medicaid paid to cover its beneficiaries' prescription drug purchases—provides prices by manufacturer and confirms that all three Defendants increased their prices for Clomipramine in very similar fashion over time.

79.     The following charts display the per-unit amounts that Medicaid has reimbursed for its beneficiaries' purchases of Defendants' generic Clomipramine products.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



Source: Medicaid Reimbursement Data



Source: Medicaid Reimbursement Data

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



CLOMIPRAMINE: Avg. Reimb. per Unit (CAP75MG)

Source: Medicaid Reimbursement Data

80.     The charts below, based on National Sales Perspectives (NSP) data obtained from

IMS Health, tell a similar story:

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER



33



81.  **Mylan:** For more than two years before the Class Period began, Mylan's average effective prices per unit for generic Clomipramine products were: ▮▮▮▮▮▮▮▮▮▮ for its 25 mg, 50 mg and 75 mg products respectively.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[45]

82.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮:

---

[45] Plaintiffs calculate Defendants' effective prices based on IMS Health's National Sales Perspectives (NSP) data, which "captures 100% of the total U.S. pharmaceutical market, measuring sales at actual transaction prices[.]"  IMS Institute for Healthcare Informatics, HSRN Data Brief: National Sales Perspectives at 1, *available at* https://www.imshealth.com/files/web/IMSH%20Institute/NSP_Data_Brief-.pdf.  Effective prices are calculated to multiple decimals.  For ease of reference, prices in this complaint are rounded to the nearest cent.  However, percentage increases are calculated based on the more precise calculated price.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Product | Price April 2013 | Hike Date | Hike Price | Percentage Increase |
|---------|------------------|-----------|------------|---------------------|
| CAP 25 MG | ████ | ████ | ████ | ████ |
| CAP 50 MG | ████ | ████ | ████ | ████ |
| CAP 75 MG | ████ | ████ | ████ | ████ |

83.   ████████████████████████████████████

████████████████████████████████████████

████████████████████████

| Product | Price Date | Peak Price | Percentage Increase |
|---------|-----------|------------|---------------------|
| CAP 25 MG | ████ | ████ | ████ |
| CAP 50 MG | ████ | ████ | ████ |
| CAP 75 MG | ████ | ████ | ████ |

84.   ████ ████ ████ ██ ████ ████████ ████ ████

████████████████████████████████████████

████████████████████████████████████████

████████

| Product | Price April 2013 | Price Feb. 2017 | Percentage Increase |
|---------|------------------|-----------------|---------------------|
| CAP 25 MG | ████ | ████ | ████ |
| CAP 50 MG | ████ | ████ | ████ |
| CAP 75 MG | ████ | ████ | ████ |

85.   **Taro:**  For more than two years before the Class Period began, Taro's average

effective prices per unit for its generic Clomipramine products were: ████████████ for

its 25 mg, 50 mg and 75 mg products respectively. ██████████████████████

██████████████████████████████████

86.    ██████████████████████████████████

| Product | Price April 2013 | Hike Date | Hike Price | Percentage Increase |
|---------|------------------|-----------|------------|---------------------|
| CAP 25 MG | ███ | ███ | ███ | ███ |
| CAP 50 MG | ███ | ███ | ███ | ███ |
| CAP 75 MG | ███ | ███ | ███ | ███ |

87.    ██████████████████████████████████

██████████████████████████████████████

██████████

| Product | Price Date | Peak Price | Percentage Increase |
|---------|------------|------------|---------------------|
| CAP 25 MG | ███ | ███ | ███ |
| CAP 50 MG | ███ | ███ | ███ |
| CAP 75 MG | ███ | ███ | ███ |

88.    ██████████████████████████████████

███████████████████████████████████  ██

█████████████████████████████████:

| Product | Price April 2013 | Price Feb. 2017 | Percentage Increase |
|---------|------------------|-----------------|---------------------|
| CAP 25 MG | ███ | ███ | ███ |
| CAP 50 MG | ███ | ███ | ███ |
| CAP 75 MG | ███ | ███ | ███ |

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

89.  **Sandoz:**  For more than two years before the Class Period began, the average effective prices per unit of Sandoz's generic Clomipramine products were ███████████ ████ for its 25 mg, 50 mg and 75 mg products respectively.  ████████████████████ ████████████████████████████████████████████████████████████████ ██████.[46]

90.  ████████████████████████████████████████████████████:

| Product | Price April 2013 | Hike Date | Hike Price | Percentage Increase |
|---|---|---|---|---|
| CAP 25 MG | ████ | ████ | ████ | ████ |
| CAP 50 MG | ████ | ████ | ████ | ████ |

91.  ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████

| Product | Price Date | Peak Price | Percentage Increase |
|---|---|---|---|
| CAP 25 MG | ████ | ████ | ████ |
| CAP 50 MG | ████ | ████ | ████ |
| CAP 75 MG | ████ | ████ | █ |

92.  ████ ████ ████ █ ████ ████████ ████ ████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████

---

[46] ██████████████████████████████████████████████████

██████████████

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Product | Price April 2013 | Price Feb. 2017 | Percentage Increase |
|---------|------------------|-----------------|---------------------|
| CAP 25 MG | ███ | ███ | ███ |
| CAP 50 MG | ███ | ███ | ███ |

93.    The overcharges resulting from Defendants' conduct are directly traceable through the pharmaceutical distribution chain to End-Payers.  A manufacturer first sells the drug to direct purchaser wholesalers based on the listed wholesale acquisition cost ("WAC"), minus applicable discounts.  Wholesalers then sell the drug to pharmacies, which in turn sell the drugs to End-Payers.  Thus the WAC serves as the benchmark for prices throughout the distribution chain.  Corresponding increases in Clomipramine's transactional prices (discussed above) demonstrate that increased WAC prices (discussed below) translate to increases in the prices paid by End-Payers.

94.    The following tables demonstrate that Defendants raised their WACs for generic Clomipramine products to $8.99, even though it meant increasing the previous benchmarks by as much as 3,441%.[47]

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---------|-----------|-----|---------|---------|------------------|---------------------|
| 25 mg, 30 ct. | Taro | 51672-4011-06 | $0.25 | $8.99 | 1-May-13 | 3,441% |
| 25 mg, 90 ct. | Taro | 51672-4011-05 | $0.25 | $8.99 | 1-May-13 | 3,441% |
| 25 mg, 100 ct. | Mylan | 00378-3025-01 | $0.30 | $8.99 | 16-May-13 | 2,853% |
| 25 mg, 100 ct. | Sandoz | 00781-2027-01 | $0.31 | $8.99 | 22-Jul-13 | 2,778% |

---

[47] For ease of reference, WAC prices are rounded to the nearest cent, but the percentage increases are calculated on the actual reported WACs.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 50 mg, 30 ct. | Taro | 51672-4012-06 | $0.34 | $8.99 | 1-May-13 | 2,579% |
| 50 mg, 90 ct. | Taro | 51672-4012-05 | $0.34 | $8.99 | 1-May-13 | 2,579% |
| 50 mg, 100 ct. | Mylan | 00378-3050-01 | $0.41 | $8.99 | 16-May-13 | 2,092% |
| 50 mg, 100 ct. | Sandoz | 00781-2037-01 | $0.37 | $8.99 | 22-Jul-13 | 2,325% |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---|---|---|---|---|---|---|
| 75 mg, 100 ct. | Mylan | 00378-3075-01 | $0.54 | $8.99 | 16-May-13 | 1,566% |
| 75 mg, 100 ct. | Sandoz | 00781-2047-01 | $0.48 | $8.99 | 22-Jul-13 | 1,770% |
| 75 mg, 30 ct. | Taro | 51672-4013-06 | $0.44 | $8.99 | 1-May-13 | 1,935% |
| 75 mg, 90 ct. | Taro | 51672-4013-05 | $0.44 | $8.99 | 1-May-13 | 1,935% |

95.     There are no competitive explanations for these price hikes.   There were no supply shortages or disruptions, no new patents or formulations, and no changes in drug labeling that could explain the abrupt, dramatic, and uniform price hikes.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

96.     Federal law requires mandatory drug shortage reporting for drug manufacturers.[48] Clomipramine is not listed on the FDA's list of Current and Resolved Drug Shortages and Discontinuations Reported to FDA.  Clomipramine also does not appear on any archived lists of the American Society of Health-System Pharmacists ("ASHP") Current Shortage Bulletins from July 3, 2012, through today, nor does it appear on the current list of ASHP Resolved Shortage Bulletins (which includes drug shortages dating back to August 2010).  None of the Defendants reported any drug shortages or supply disruptions to the FDA in explanation for the supracompetitive pricing of Clomipramine.

97.     Only anticompetitive activity can explain these skyrocketing prices. Pharmaceutical analyst Richard Evans at Sector & Sovereign Research explained potential causes of generic drug price hikes in a 2015 report:  "A plausible explanation is that generic manufacturers, having fallen to near historic low levels of financial performance are cooperating to raise the prices of products whose characteristics—low sales due to either very low prices or very low volumes—accommodate price inflation[.]"[49]

---

[48] FDA Safety and Innovation Act of 2012, Pub. L. No. 112-144, §§ 1001-1008, 126 Stat. 995, 1099-1108.

[49] Ed Silverman, *Generic Drug Prices Keep Rising but is a Slowdown Coming*, WSJ (Apr. 22, 2015), *available at* https://blogs.wsj.com/pharmalot/2015/04/22/generic-drug-prices-keep-rising-but-is-a-slowdown-coming/.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### D.   Defendants' Conspiracy[50]

98.   Defendants' sudden and massive price increases represented a sharp departure from the previous years of low and stable prices.   These dramatic price increases were the product of an illicit understanding among Defendants.

99.   During the Class Period, Defendants conspired, combined, and contracted to fix, maintain, and stabilize prices, rig bids, and engage in customer and market allocation concerning Clomipramine, which had the intended and actual effect of causing Plaintiffs and the other members of the proposed Class to pay artificially inflated prices above prices that would exist if a competitive market had determined prices for Clomipramine.

100.   Beginning in May 2013, Defendants collectively caused the price of Clomipramine to increase dramatically.   Defendants' conduct cannot be explained by normal competitive forces.   It was the result of an agreement among Defendants to increase pricing and restrain competition for the sale of Clomipramine in the United States.   The agreement was furthered by discussions held at meetings and industry events hosted by the GPhA, HDMA, NACDS, MMCAP, and ECRM as well as other meetings and communications.

101.   To sustain a conspiracy, conspirators often communicate to ensure that all are adhering to the collective scheme.   Here, such communications occurred primarily through (1) trade association meetings and conferences, (2) private meetings, dinners, and outings among smaller groups of employees of various generic drug manufacturers, and (3) individual private communications between and among Defendants' employees through use of the phone, electronic messaging and similar means.

---

[50] The allegations included in this section pertaining to the HDMA, NACDS, MMCAP, and ECRM are based in part upon documents produced to plaintiffs pursuant to subpoenas *duces tecum* issued in *In re: Propranolol Antitrust Litigation*, No. 16-cv-9901 (S.D.N.Y.).

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

102.     These secret, conspiratorial meetings, discussions, and communications helped to ensure that all Defendants agreed to participate in, implement, and maintain an unlawful bid rigging, price fixing, and customer and market allocation scheme.

103.     The industry intelligence-gathering reporting firm *Policy and Regulatory Report* has reportedly obtained information regarding the investigation of generic drug companies by DOJ, and has indicated that DOJ is investigating the extent to which trade associations and industry conferences have been used as forums for collusion among competing generic drug companies.[51]   The State AGs have similarly noted the centrality of trade associations and industry conferences in their investigation, stating that they have uncovered evidence that certain generic drug companies "routinely coordinated their schemes through direct interaction with their competitors at industry trade shows, customer conferences, and other events, as well as through direct email, phone, and text message communications."[52]

104.     Defendants were members of numerous trade associations, which they used to facilitate their conspiratorial communications and implement their anticompetitive scheme to raise, maintain, and stabilize the prices of Clomipramine, and to engage in market allocation concerning Clomipramine, including, but not limited to, GPhA, the NACDS, and HDMA.   In addition, Defendants regularly attended industry events hosted by the ECRM.

---

[51] Eric Palmer, *Actavis gets subpoena as DOJ probe of generic pricing moves up food chain*, FiercePharma (Aug. 7, 2015), *available at* http://www.fiercepharma.com/story/actavis-gets-subpoena-doj-probe-generic-pricing-moves-food-chain/2015-08-07.

[52] Connecticut AG, Press Release (Dec. 15, 2016), *available at* http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

105.    The GPhA (now called the Association for Accessible Medicines) is the "leading trade association for manufacturers and distributors of generic prescription drugs."[53]  GPhA was formed in 2000 from the merger of three industry trade associations: the Generic Pharmaceutical Industry Association, the National Association of Pharmaceutical Manufacturers, and the National Pharmaceutical Alliance.

106.    GPhA's website touts, "[b]y becoming part of GPhA, you can participate in shaping the policies that govern the generic industry" and lists its "valuable membership services, such as business networking opportunities, educational forums, access to lawmakers and regulators, and peer-to-peer connections."[54]   GPhA's "member companies supply approximately 90 percent of the generic prescription drugs dispensed in the U.S. each year."

107.    Defendants Mylan and Sandoz were regular members of the GPhA during the Class Period, and Taro frequently attended GPhA meetings.  Regular members "are corporations, partnerships or other legal entities whose primary United States business derives the majority of its revenues from sales of (1) finished dose drugs approved via ANDAs; (2) products sold as authorized generic drugs; (3) biosimilar/biogeneric products; or (4) DESI products."[55]

108.    Several of Defendants high-ranking corporate officers have served on GPhA's Board of Directors before and during the Class Period:

---

[53] GPhA website, *The Association*, *available at* http://web.archive.org/web/20150413013801/http://www.gphaonline.org:80/about/the-gpha-association

[54] GPhA website, *Membership*, *available at* http://web.archive.org/web/20150413013008/http://www.gphaonline.org:80/about/membership/

[55] *Id.*

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(a)     **2012 Board of Directors:** Tony Mauro, President of Mylan Inc.; Don DeGolyer, President and CEO of Sandoz;

(b)     **2013 Board of Directors:** Tony Mauro, President of Mylan Inc.; Don DeGolyer, President and CEO of Sandoz;

(c)     **2014 Board of Directors:** Tony Mauro, President of Mylan Inc.; Peter Goldschmidt, President and Head, North America at Sandoz;

(d)     **2015 Board of Directors:** Marcie McClintic Coates, VP & Head of Global Regulatory Affairs for Mylan; Peter Goldschmidt, President and Head, North America at Sandoz;

(e)     **2016 Board of Directors:** Heather Bresch, CEO of Mylan; Peter Goldschmidt, President and Head, North America at Sandoz.

109.     In addition, former Heritage CEO, Jeffrey Glazer, who pleaded guilty to federal criminal charges relating to price fixing and other anticompetitive activity concerning generic drugs, also served on GPhA's Board of Directors.

110.     The NACDS is a national trade association representing chain community pharmacies.   Its members include generic drug manufacturers, wholesalers, and retail chain pharmacies.   NACDS holds regular industry events, including annual and regional conferences, which Defendants and other generic drug manufacturers attended, including the annual Total Store Expo.

111.     The HDMA is a national trade association that represents "primary pharmaceutical distributors" which links the nation's drug manufacturers and more than 200,000

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

pharmacies, hospitals, long-term care facilities, and clinics.[56]  HDA holds regular conferences where its members, including generic drug manufacturers, meet to discuss various issues affecting the pharmaceutical industry.  HDMA members during the Class Period have included Defendants Mylan and Sandoz.

112.    According to its website, ECRM conducts Efficient Program Planning Sessions that are made up of one-on-one strategic meetings that connect decision makers in an effort to maximize time, grow sales, and uncover industry trends.

113.    At annual meetings organized by ECRM, generic drug manufacturers have scheduled meetings with generic drug buyers at chain drug stores, supermarkets, mass merchants, wholesalers, distributors, and buy groups for independents.

114.    Representatives of Defendants Sandoz and Mylan attended ECRM's Efficient Program Planning Sessions.

115.    As further set forth below, meetings and events hosted by the GPhA, HDMA, NACDS, and ECRM were frequently held during the Class Period and attended by high-level representatives from each Defendant, including employees with price-setting authority.

116.    For example, on October 1-3, 2012, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from all Defendants.

117.    On February 20-22, 2013, GPhA held its 2013 Annual Meeting in Orlando, Florida. GPhA's 2013 Annual Meeting was attended by representatives of all Defendants, including at least the following key executives:

      (a)    **Mylan:** Tony Mauro, President of Mylan Inc.; and

---

[56] HDA, About, *available at* https://www.healthcaredistribution.org/about.

45

(b)     **Sandoz:** Don DeGoyler, President.

118.     ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████

███     █████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████

███   ██████   ████   ████████   ████   ██  ████   ████████   ████   ██

██████████████████████████████████████████████████

████████████████████████.

119.     On April 20–23, 2013 NACDS held its 2013 Annual Meeting at The Breakers in Palm Beach, Florida.   NACDS's Annual Meeting was attended by representatives from all Defendants, including at least the following key executives for generic drug sales and pricing:

(a)     **Mylan**: Joe Duda, President, Mylan Pharmaceutical; Robert Potter, SVP N.A. National Accounts and Channel Development; Tony Mauro, President, Mylan, Inc.; Jim Nesta, VP, Sales;

(b)     **Sandoz:** Samuele Butera, VP & Head, Biopharmaceuticals, NA; Jeff George, Global Head; Richard Tremonte, SVP, Global Generic Pharmaceuticals; Donald DeGolyer, CEO and Board Director; and

(c)     **Taro:** Jim Kedrowski, Interim CEO; Ara Aprahamian, VP Sales & Marketing; and Michael Perfetto, Chief Commercial Officer, Generics Rx/OTC, US and Canada.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

120.    On June 2–5, 2013, HDMA held its 2013 Business Leadership Conference ("BLC") in Orlando, Florida.  HDMA's June 2013 BLC was attended by at least the following representatives from Defendants, who were key executives for generic drug sales and pricing:

(a)    **Mylan**: Janet Bell, National Accounts Director; Joseph Duda, President, Mylan Pharmaceutical; Edgar Escoto, National Accounts Director; Kevin McElfresh, Executive Director, National Accounts; James Nesta, Executive Director, National Accounts; Robert O'Neill, VP; Sean Reilly, Key Account Manager; John Shane, Director National Trade Accounts; Gary Tighe, National Accounts Director; Lance Wyatt, National Accounts Director; and

(b)    **Sandoz**: Alan Ryan, Associate Director, National Accounts; Dawn Doggett, National Trade Affairs Account Executive.

121.    On June 4–5, 2013, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from all Defendants.

122.    On August 10–13, 2013, NACDS held its 2013 Total Store Expo at the Sands Expo Convention Center in Las Vegas, Nevada.  NACDS's August 2013 Total Store Expo was attended by representatives from all Defendants, including at least the following key executives for generic drug sales and pricing:

(a)    **Mylan**: Mike Aigner, Director, National Accounts; Joe Duda, President; Kevin McElfresh, Executive Director, National Accounts; Robert O'Neill, Head of Sales, Generic NA; Robert Potter, SVP, National Accounts & Channel Development; Lance Wyatt, Director, National Accounts; Matt Cestra, Sr. Director Marketing; Rodney Emerson, Director, Pricing & Contracts; Edgar Escoto, Director National Accounts; Stephen Krinke, National

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Accounts Manager; Damon Pullman, West Regional Account Manager; Sean Reilly, National Accounts Manager;

(b)   **Sandoz:** Peter Goldchmidt, President, Sandoz US & Head NA; Steven Greenstein, Director, Key Customers; Armando Kellum, VP, Sales & Marketing; Paul Krauthauser, SVP Sales & Marketing; Della Lubke, National Account Executive

(c)   **Taro**: Ara Aprahamian, Vice President, Sales & Marketing; Sheila Curran, Vice President, Sales Operations; Howard Marcus, VP Sales & Marketing; Michael Perfetto, Group Vice President and Chief Commercial Officer of the Generic Rx Business; Doug Statler, Sr. Director/Head of Sales.

123.   On October 28-30, 2013, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from all Defendants.

124.   On December 3, 2013, NACDS held its 2013 NACDS Foundation Reception and Dinner, which was attended by at least the following representatives from Defendants, who were key executives for generic drug sales and pricing:

(a)   **Mylan:** Joe Duda, President, Mylan Pharmaceutical; Tony Mauro, Mylan Inc.; Jim Nesta, Vice President of Sales; Rob O'Neill, Head of Sales, Generic North America; Robert Potter, Senior Vice President, NA National Accounts and Channel Development; and

(b)   **Sandoz:** Peter Goldschmidt, President, Sandoz US & Head NA; Armando Kellum, Vice President, Sales & Marketing; Kirko Kirkov, Executive Director, Key Accounts.

125.   In 2014, 2015, and 2016, Defendants continued to regularly attend trade association meetings, conferences and events, including: (i) the February 19-21, 2014 GPhA Annual Meeting in Orlando, Florida; (ii) ███████████████████████████ ████████████; (iii) the April 1, 2014 HDMA Sixth Annual CEO Roundtable Fundraiser in New

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

York City; (iv) the April 26-29, 2014 NACDS Annual Meeting in Scottsdale, Arizona; (v) the June 1-4, 2014 HDMA BLC in Phoenix, Arizona; (vi) the June 3-4, 2014 GPhA meeting in Bethesda, Maryland; (vii) the August 23-26, 2014 NACDS Total Store Expo in Boston Massachusetts; (viii) the October 27-29, 2014 GPhA meeting in Bethesda, Maryland; (ix) ███ ███████████████████████████████████ (x) the December 3, 2014 NACDS Foundation Reception and Dinner; (xi) the February 9-11, 2015 GPhA Annual Meeting in Miami, Florida; (xii) the April 14, 2015 HDMA Seventh Annual CEO Roundtable Fundraiser in New York, New York; (xiii) the April 25-28, 2015 NACDS Annual Meeting in Palm Beach, Florida; (xiv) the June 7-10, 2015 HDMA BLC in San Antonio, Texas; (xv) the June 9-10, 2015 GPhA meeting in Bethesda, Maryland; (xvi) the August 22-25, 2015 NACDS Total Store Expo in Denver, Colorado; (xvii) the December 3, 2015 NACDS Week in NYC Foundation Reception and Dinner; (xviii) the April 10-14, 2016 MMCAP meeting in Minneapolis, Minnesota;;(xix) the April 12, 2016 HDMA Eighth Annual CEO Roundtable Fundraiser in New York; (xx) the April 16-19, 2016, NACDS 2016 Annual Meeting in Palm Beach, Florida; (xv) the June 12-16, 2016 HDMA BLC in Colorado Springs, Colorado; (xvi) the August 6-9, 2016, NACDS 2016 Total Store Expo in Boston, Massachusetts; and (xvii) the December 1, 2016 NACDS Reception and Dinner.

126.   As uncovered in the State AGs' ongoing investigation, at these various conferences and trade shows, representatives from Defendants, as well as other generic drug manufacturers, discussed their respective businesses and customers.  These discussions would occur at social events, including lunches, cocktail parties, dinners, and golf outings, that usually accompanied these conferences and trade shows.   Defendants' employees used these

opportunities to discuss and share upcoming bids, specific generic drug markets, pricing strategies and pricing terms in their contracts with customers.[57]

127.    In conjunction with meetings at conferences and trade shows, representatives of generic drug manufacturers get together separately, in more limited groups, allowing them to further meet face-to-face with their competitors and discuss their business.  In fact, high-level executives of many generic drug manufacturers get together periodically for what at least some of them refer to as "industry dinners."[58]

128.    A large number of generic drug manufacturers, including Defendants Mylan, Sandoz, and Taro are headquartered or have major offices in close proximity to one another in New Jersey, New York, and eastern Pennsylvania, giving them easier and more frequent opportunities to meet and collude.  For example, in January 2014, at a time when the prices of a number of generic drugs were reportedly soaring, at least thirteen high-ranking male executives, including CEOs, Presidents, and Senior Vice Presidents of various generic drug manufacturers, met at a steakhouse in Bridgewater, New Jersey.

129.    Generic drug manufacturer employees also get together regularly for what is referred to as a "Girls' Night Out" ("GNO"), or alternatively "Women in the Industry" meetings and dinners.   During these GNOs, meetings and dinners, these employees meet with their competitors and discuss competitively sensitive information.  Several different GNOs were held in 2015, including: (1) in Baltimore, Maryland in May, and (2) at the NACDS conference in August.

---

[57] *See, e.g.*, State AG Complaint ¶¶ 50–52.

[58] *Id.* ¶¶ 53–60.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

130.    Through these various interactions, Defendants' employees are often acutely aware of their competition and, more importantly, each other's current and future business plans. This familiarity and opportunity often leads to agreements among competitors to fix prices or to allocate a given market so as to avoid competing with one another on price.

131.    Defendants also routinely communicate and share information with each other about bids and pricing strategy.  This can include forwarding bid packages received from a customer (*e.g.*, a Request for Proposal or "RFP") to a competitor, either on their own initiative, at the request of a competitor, or by contacting a competitor to request that the competitor share that type of information.

132.    Additionally, Defendants share information regarding the terms of their contracts with customers, including various terms relating to pricing, price protection, and rebates. Defendants use this information from their competitors to negotiate potentially better prices or terms with their customers, which could be to the ultimate detriment of consumers.

**E.      Defendants' Concerted Efforts to Increase Prices for Generic Clomipramine Yielded Supracompetitive Profits**

133.    Defendants were aware of, and in fact praised, the lack of generic drug competition.  For example, Kal Sundaram, then-CEO of Taro Inc. said in a November 10, 2014 earnings call, "Taro's sales and earnings growth is attributable to upward price adjustments and the prudent life cycle management of our product portfolio while our overall volumes remain relatively constant. . . ."  In a competitive generic drugs market, price increases typically lead to decreased market share, yet Taro touted the ability to maintain "volumes" notwithstanding its price hikes.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

134.    Similarly, on May 2, 2013, Mylan's CEO Ms. Bresch stated in an earnings call: "From my perspective, we see the generic industry alive and well.  We still see a lot of runway room here in the United States."

135.    As demonstrated in the charts above, Defendants' agreement led to skyrocketing prices for Clomipramine, from far less than $1 per capsule to nearly $8—increasing as much as ███████ in some instances.

136.    The enormous price hikes were not accompanied by a significant change in costs to manufacturers.  Thus, the increased prices resulted in an enormous increase in profits to Defendants.

137.    For example, Taro CEO Kal Sundaram attributed the company's significant earnings growth to price increases during a November 10, 2014 earnings call held during the sustained Clomipramine price hike:

> In 2010, as per IMS data, Taro was ranked third among the gene[r]ic dermatology companies in USA.  In terms of sales, now it is ranked number one for the past three years.  U.S. remains the dominant market for Taro.  Taro's earnings per share also has grown 50% CAGR, compounded annual growth, since 2010. Taro's sales and earnings growth is attributable to upward price adjustments and the prudent life cycle management of our product portfolio while our overall volumes remain relatively constant and we remain cautious about the long-term sustainability of these prices.

138.    Sundaram again emphasized Taro's strategy of relying on high-priced generics on a May 27, 2016 quarterly earnings call, stating:  "We are a specialty generic company, so by definition, our portfolio will be obviously narrow but sort of focused.  We operate in niche markets; smaller volumes, but better priced."

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

139.    Sandoz also reported rising revenues in its United States generics business during the Class Period.  On July 21, 2015, Novartis CEO Joe Jimenez stated:  "Sandoz delivered very strong financial results with sales and profit up double-digit[;] as you can see this is driven by the division[']s increased focus on core markets particularly the U.S. which is up 23%."

140.    Similarly, on October 30, 2015, John Sheehan, Mylan's CFO, stated in an earnings call:

> With respect to gross margin, I guess I would start by pointing out that since 2010 our gross margins have increased from 45% up to the high end of the guidance range that we indicated we would be at this year of 55%.  So the gross margins have been sustained. They have steadily increased over the last five, six years. . . .  It also has been driven by the positive pricing environment that we've seen, especially over the last couple of years in North America.

**F.    Factors Increasing the Market's Susceptibility to Collusion**

141.    Publicly available data on the generic Clomipramine market in the United States demonstrate that it is susceptible to cartelization by Defendants. Factors that make a market susceptible to collusion include:    (1) a high degree of industry concentration; (2) significant barriers to entry; (3) inelastic demand; (4) the lack of available substitutes for the goods involved; (5) a standardized product with a high degree of interchangeability between the products of cartel participants; and (6) inter-competitor contacts and communication.

**1.    Industry Concentration**

142.    A high degree of concentration facilitates the operation of a cartel because it makes it easier to coordinate behavior among co-conspirators.   Here, Defendants control approximately ▆▆▆ of the generic Clomipramine market.

143.    The market for generic clomipramine was, and continues to be, extraordinarily concentrated.  The commonly accepted measure of market concentration is the Herfindahl-Hirschman Index ("HHI").  The HHI is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers.  For example, for a market consisting of three firms with shares of 20%, 30%, and 50%, the HHI is 3,800.  Federal antitrust enforcement agencies consider markets in which the HHI is above 2,500 to be highly concentrated.  In merger reviews, for instance, a proposed merger that would lead to a highly concentrated market, and an increase in the HHI of more than 200 points, creates a presumption of market power and a recognized risk of collusion.  Here, throughout the relevant period, the HHI for generic clomipramine remained at or above approximately 4,000—a concentration level significantly beyond what antitrust enforcement agencies consider to be highly concentrated and vulnerable to collusion.

144.    While the market for Clomipramine is sufficiently concentrated to facilitate collusion, the years of low and stable pricing in the market establish that the number of manufacturers in the market was sufficient to drive competition.  Absent collusion, prices would have remained at competitive levels.

145.    No departures from the market by manufacturers of Clomipramine can explain the price increases.

146.    Defendants have been able to maintain supracompetitive prices for Clomipramine without significant loss of market share to non-conspirators.  Thus, Defendants have oligopolistic market power in the market for Clomipramine.

147.    The magnitude of Defendants' price increases for Clomipramine distinguishes them from non-collusive oligopolistic pricing.  Non-collusive oligopolistic pricing would be

54

expected to proceed incrementally, as manufacturers test the waters to see if competitors will follow a price increase. But here the increases are extreme—jumping approximately █████ in some instances. Such extreme pricing moves are not rational in the absence of advance knowledge that competitors will join the increase.

### 2.    Barriers to Entry

148.    Supracompetitive pricing in a market normally attracts additional competitors who want to avail themselves of the high levels of profitability that are available. However, the presence of significant barriers to entry makes this more difficult and helps to facilitate the operation of a cartel.

149.    There are significant capital, regulatory, and intellectual property barriers to entry in the generic Clomipramine markets that make such entry time-consuming and expensive.

150.    Start-up costs and regulatory oversight represent substantial barriers to entry in the generic Clomipramine markets.

151.    In addition to the significant out-of-pocket costs required to bring a drug to market, the approval process for generic drugs takes significant time. As Kansas Senator Jerry Moran commented on September 21, 2016 during Congressional hearings on the FDA's role in the generic drug market, "there are more than 4,000 generic drug applications currently awaiting approval, and the median time it takes for the FDA to approve a generic is now 47 months or nearly four years."[59] This significant delay for new market entrants effectively precludes new competition from eroding the supracompetitive prices imposed by the conspiracy.

---

[59] Sen. Moran, Statement (Sep. 21, 2016), *available at* http://www.appropriations.senate.gov/imo/media/doc/092116-Chairman-Moran-Opening-Statement.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

### 3.      Demand Inelasticity

152.    Price elasticity of demand is defined as the measure of responsiveness in the quantity demanded for a product as a result of change in price of the same product.  It is a measure of how demand for a product reacts to a change in price.  The basic necessities of life—food, water, and shelter—are examples of goods that experience nearly perfectly inelastic demand at or near the minimums necessary to sustain life.  In other words, a person on the verge of dying of thirst will pay almost anything for water.

153.    In order for a cartel to profit from raising prices above competitive levels, demand for the product must be sufficiently inelastic such that any loss in sales will be more than offset by increases in revenue on those sales that are made.  Otherwise, increased prices would result in declining sales, revenues, and profits as customers purchased substitute products or declined to buy altogether.  Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

154.    Demand for generic Clomipramine is highly inelastic.  When doctors prescribe generic Clomipramine, patients view it as necessary to their well-being.  This gives Defendants significant pricing power, as well as an incentive to collude.

155.    Thus, generic Clomipramine is an excellent candidate for cartelization because price increases will result in more revenue, rather than less, provided that most or all manufacturers participate.

### 4.      Lack of Substitutes

156.    Clomipramine has been available in brand-name and generic versions.  In 1996, the FDA approved the substitution of generic Clomipramine for brand-name Clomipramine.  However, bioequivalence as between brand and generic Clomipramine is controversial, and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

some medical organizations recommend that patients be started and maintained on either brand or generic Clomipramine, and not switched from one to the other without repeated testing to ensure that hormone levels remain within normal ranges.  Health warnings are given to users of Clomipramine about the risks associated with discontinuing usage abruptly, including antidepressant discontinuation syndrome.

157.    In addition, branded versions of Clomipramine do not serve as economic substitutes for generic versions of these compounds because branded products generally maintain substantial price premiums over even their supra-competitively priced generic counterparts, making them inapt substitutes even when generic prices soar.

158.    Thus, purchasers of generic Clomipramine are held captive to the supracompetitive prices that resulted from Defendants' conspiracy to fix prices and allocate markets and customers.

### 5.    Standardized Product with High Degree of Interchangeability

159.    A commodity-like product is one that is standardized across suppliers and allows for a high degree of substitutability among different suppliers in the market.  When products offered by different suppliers are viewed as interchangeable by purchasers, it is easier for the suppliers to agree on prices for the goods in question and to monitor those prices effectively.

160.    Generic drugs of the same chemical composition are effectively commodity products because the primary mechanism through which they compete is price.  When approving an ANDA, the FDA confirms that a generic drug product is bioequivalent to the branded version of the drug.  This allows pharmacists to substitute that generic for the branded counterpart, as well as for any other generic that also is bioequivalent to the branded product.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

161.    Defendants' generic Clomipramine products are bioequivalent generics of their branded counterparts, enabling pharmacists to substitute them (any of them) for branded products.

162.    Moreover, because generic Clomipramine products are interchangeable, there is little utility in attempting to distinguish the products based on quality, branding or service. Accordingly, manufacturers generally spend little effort advertising or detailing (the practice of providing promotional materials and free samples to physicians) their generic compounds.  The primary means for one generic manufacturer to differentiate its product from another's is through price competition.[60]  The need to compete on price can drive producers of commodity products to conspire—as they did here—to fix prices.

### 6.    Inter-competitor Contacts and Communications

163.    As discussed above, Defendants' representatives met at conferences convened by customers and trade associations of customers (such as the ECRM and NACDS), private industry dinners, and similar events.  Moreover, Defendants are members of and/or participants of the GPhA; thus, their representatives have many opportunities to meet and conspire at industry meetings.  As noted in press reports, "prosecutors are taking a close look at trade associations as part of their investigation as having been one potential avenue for facilitating the collusion between salespeople at different generic producers."[61]

164.    The State AG Complaint alleges that Defendants routinely coordinated their schemes through direct interaction with their competitors at industry trade shows, customer

---

[60] *See, e.g.*, GAO Report at 23 ("If another manufacturer offers a lower price to a customer, manufacturers we interviewed indicated that they are usually asked to match it or risk losing market share to the other manufacturer.").

[61] PaRR Report.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

conferences, and other events.  For example, Defendants Glazer and Malek admitted at their guilty plea hearings to engaging in discussions and attending meetings with competitors, during which they reached agreements to allocate customers, rig bids and fix prices of doxycycline hyclate and glyburide.

165.    DOJ's and the Connecticut AG's investigations, and the grand jury subpoenas and investigative demands that have issued in conjunction with them, focus on inter-competitor communications.  These types of communications are not unique or isolated, but are rampant; "[g]eneric drug manufacturers operate, through their respective senior leadership and marketing and sales executives, in a manner that fosters and promotes routine and direct interaction among their competitors."[62]  The sheer number of companies implicated in the investigations highlights the prevalence in the generic drug industry of the types of contacts and communications that facilitate collusion:

(a)    **Actavis**:  In February 2016, Actavis's former parent, Allergan plc, disclosed that it received a DOJ subpoena "seeking information relating to the marketing and pricing of certain of the Company's generic products and communications with competitors about such products."[63]

---

[62] State AG Complaint ¶ 7.

[63] Allergan, SEC 2015 Form 10-K at F-106 (Feb. 26, 2016), *available at* https://www.sec.gov/Archives/edgar/data/1578845/000156459016013478/agn-10k_20151231.htm.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(b)   **Aurobindo**:   Aurobindo has disclosed receipt of a subpoena relating to DOJ's generic drug investigation.[64]  The company stated that it "received a subpoena in Mar[ch] 2016 requesting non-product specific information."[65]

(c)   **Citron**:  In December 2016, Aceto Corporation (which purchased Citron's generic drugs assets) disclosed that DOJ "executed a search warrant against the Company and also served a subpoena requesting documents and other information concerning potential antitrust violations in the sale of Glyburide, Glyburide/Metformin, and Fosinopril HCTZ products."  The Connecticut AG requested that Citron produce all documents produced to DOJ.[66]

(d)   **Dr. Reddy's**:  In November 2016, Dr. Reddy's disclosed that it received subpoenas from DOJ and the Connecticut AG "seeking information relating to the marketing, pricing and sale of certain . . . generic products and any communications with competitors about such products."[67]

(e)   **Heritage**:  As a private company, Heritage is not required to make public disclosures.   Nonetheless, in the wake of the criminal guilty pleas by two of its executives,

---

[64] Zeba Siddiqui, *India's Aurobindo shares hit nine-month low on US price-fixing lawsuit*, Reuters (Dec. 15, 2016), *available at* http://www.reuters.com/article/us-aurobindo-pharm-stocks-idUSKBN1450DV.

[65] Aurobindo, BSE Disclosure (Dec. 16, 2016), *available at* http://www.bseindia.com/xml-data/corpfiling/AttachHis/3C8E03C7_A46F_4792_AED5_197E6961A77E_125855.pdf.

[66] Aceto, SEC Form 8-K, Ex. 99.5, *available at* https://www.sec.gov/Archives/edgar/data/2034/000157104916020771/t1600804_ex99-5.htm.

[67] Dr. Reddy's, SEC Form 6-K at 57 (Dec. 31, 2016), *available at* http://www.drreddys.com/investors/reports-and-filings/sec-filings/?year=FY17.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Heritage confirmed that it is "fully cooperating" with DOJ[68] and press reports indicate that Heritage has applied to DOJ's leniency program seeking amnesty for a cartel violation.[69]

(f)   **Impax**:  In July 2014, Impax disclosed that it received a subpoena from the Connecticut AG concerning sales of generic digoxin.[70]  In November 2014, Impax disclosed that an employee received a broader federal grand jury subpoena that requested testimony and documents about "any communication or correspondence with any competitor (or an employee of any competitor) in the sale of generic prescription medications."[71]  In February 2016, Impax disclosed that it received a DOJ subpoena requesting "information and documents regarding the sales, marketing, and pricing of certain generic prescription medications.  In particular . . . digoxin tablets, terbutaline sulfate tablets, prilocaine/lidocaine cream, and calcipotriene topical solution."[72]

(g)   **Lannett**:  In July 2014, Lannett disclosed that it received a subpoena from the Connecticut AG relating to its investigation into the price fixing of digoxin.[73]  On November

---

[68] Tom Schoenberg , David McLaughlin & Sophia Pearson, *U.S. Generic Drug Probe Seen Expanding After Guilty Pleas*, Bloomberg (Dec. 14, 2016), *available at* https://www.bloomberg.com/news/articles/2016-12-14/u-s-files-first-charges-in-generic-drug-price-fixing-probe.

[69] *See supra* ¶ 22.

[70] Impax, SEC Form 8-K (July 15, 2014), *available at* https://www.sec.gov/Archives/edgar/data/1003642/000143774914012809/ipxl20140715_8k.htm.

[71] Impax, SEC Form 8-K (Nov. 6, 2014), *available at* https://www.sec.gov/Archives/edgar/data/1003642/000119312514402210/d816555d8k.htm.

[72] Impax, SEC 2015 Form 10-K at 53 (Feb. 22, 2016), *available at* https://www.sec.gov/Archives/edgar/data/1003642/000143774916025780/ipxl20151231_10k.htm.

[73] Press Release, Lannett, *Lannett Receives Inquiry From Conn. AG* (July 16, 2014), *available at* http://lannett.investorroom.com/2014-07-16-Lannett-Receives-Inquiry-From-Connecticut-Attorney-General.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

3, 2014, Lannett disclosed that a Senior Vice President of Sales and Marketing was served with a grand jury subpoena "relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act."   The subpoena also requested "corporate documents of the Company relating to communications or correspondence with competitors regarding the sale of generic prescription medications, but is not specifically directed to any particular product and is not limited to any particular time period."[74]   On August 27, 2015, Lannett further explained that DOJ sought, among other things, "communications or correspondence with competitors regarding the sale of generic prescription medications, and the marketing, sale, or pricing of certain products, generally for the period of 2005 through the dates of the subpoenas."[75]

       (h)     **Mayne**:  On August 25, 2016, Mayne Pharma Group Limited (the parent of Mayne) disclosed that it was "one of numerous generic pharmaceutical companies to receive a subpoena . . . seeking information relating to marketing, pricing and sales of select generic products" and that it had received a subpoena from the Connecticut AG seeking similar information.[76]   On November 4, 2016, Mayne Pharma Group Limited issued a press release stating:  "Previously on 28 Jun[e] 2016, Mayne Pharma Group Limited disclosed that it was one of several generic companies to receive a subpoena from the Antitrust Division of the US Department of Justice (DOJ) seeking information relating to the marketing, pricing and sales of

---

[74] Lannett, SEC Form 10-Q at 16 (Nov. 6, 2014), *available at* https://www.sec.gov/Archives/edgar/data/57725/000110465914077456/a14-20842_110q.htm.

[75] Lannett, SEC Form 10-K at 18 (Aug. 27, 2015), available at http://www.sec.gov/Archives/edgar/data/57725/000110465915062047/a15-13005_110k.htm.

[76] Mayne, 2016 Annual Report at 75 (Aug. 25, 2016), *available at* https://www.maynepharma.com/media/1788/2016-mayne-pharma-annual-report.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

select generic products.  The investigation relating to Mayne Pharma is focused on doxycycline hyclate delayed-release tablets (generic) and potassium chloride powders."[77]

(i)     **Mylan**:  In February 2016, Mylan disclosed that it received a DOJ subpoena "seeking information relating to . . . generic Doxycycline" and a similar subpoena from the Connecticut AG seeking "information relating to…certain of the Company's generic products (including Doxycycline) and communications with competitors about such products."[78] On Nov. 9, 2016, Mylan disclosed that "certain employees and a member of senior management, received subpoenas from DOJ seeking additional information relating to the marketing, pricing and sale of our generic Cidofovir, Glipizide-metformin, Propranolol and Verapamil products" and that "[r]elated search warrants also were executed" in connection with DOJ's investigation.[79]

(j)     **Par**:  In March 2015, Par disclosed that it received subpoenas from the Connecticut AG and DOJ relating to digoxin and doxycycline.[80]  In November 2015, Endo International plc, the parent company of Par, elaborated: "In December 2014, our subsidiary, Par, received a Subpoena to Testify Before Grand Jury from the Antitrust Division of DOJ and issued by the U.S. District Court for the Eastern District of Pennsylvania. The subpoena requests documents and information focused primarily on product and pricing information relating to

---

[77] Mayne, Update on DOJ Investigation (Nov. 4, 2016), *available at* http://asxcomnewspdfs.fairfaxmedia.com.au/2016/11/04/01798874-137879061.pdf.

[78] Mylan, SEC 2015 Form 10-K at 160 (Feb. 16, 2016), *available at* https://www.sec.gov/Archives/edgar/data/1623613/000162361316000046/myl10k_20151231xdoc.htm.

[79] Mylan SEC Form 10-Q at 58 (Nov. 9, 2016), *available at* https://www.sec.gov/Archives/edgar/data/1623613/000162361316000071/myl10q_20160930xdoc.htm.

[80] Par, SEC 2014 Form 10-K at 37 (Mar. 12, 2015), *available at* https://www.sec.gov/Archives/edgar/data/878088/000087808815000002/prx-20141231x10k.htm.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Par's authorized generic version of Lanoxin (digoxin) oral tablets and Par's generic doxycycline products, and on communications with competitors and others regarding those products. Par is currently cooperating fully with the investigation."[81]   Endo also disclosed that in December 2015 it "received Interrogatories and Subpoena Duces Tecum from the State of Connecticut Office of Attorney General requesting information regarding pricing of certain of its generic products, including Doxycycline Hyclate, Amitriptyline Hydrochloride, Doxazosin Mesylate, Methotrexate Sodium and Oxybutynin Chloride."[82]

(k)   **Perrigo**:   On May 2, 2017, Perrigo disclosed that "search warrants were executed at the Company's corporate offices associated with an ongoing investigation by the U.S. Department of Justice Antitrust Division related to drug pricing in the pharmaceutical industry."[83]

(l)   **Pfizer:**   On August 10, 2017, Pfizer disclosed: "As of July 2017, the U.S. Department of Justice's Antitrust Division is investigating our Greenstone generics business. We believe this is related to an ongoing antitrust investigation of the generic pharmaceutical industry. The government has been obtaining information from Greenstone."[84]

(m)   **Sandoz**:   In March 2016, Sandoz and Fougera Pharmaceuticals Inc. (a wholly-owned subsidiary of Sandoz) "received a subpoena from the Antitrust Division of the US

---

[81] Endo, SEC Form 10-Q at 30 (Mar. 31, 2016), *available at* https://www.sec.gov/Archives/edgar/data/1593034/000159303416000056/endp-3312016x10q.htm.

[82] *Id.* at 31.

[83] Press Release, Perrigo, *Perrigo Discloses Investigation* (May 2, 2017), *available at* http://perrigo.investorroom.com/2017-05-02-Perrigo-Discloses-Investigation.

[84] Pfizer, SEC Form 10-Q (Aug. 10, 2017) at 37, *available at* https://investors.pfizer.com/financials/sec-filings/sec-filings-details/default.aspx?FilingId=12225193.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Department of Justice (DoJ) requesting documents related to the marketing and pricing of generic pharmaceutical products . . . and related communications with competitors."[85]

(n)     **Sun**:  On May 27, 2016, Sun Pharmaceutical Industries, Ltd. (the parent of Taro) stated in a filing with the National Stock Exchange of India that one of its U.S subsidiaries, namely Sun Pharmaceutical Industries, Inc., "received a grand jury subpoena from the United States Department of Justice, Antitrust Division seeking documents . . . relating to corporate and employee records, generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."[86]

(o)     **Taro**:   In September 2016, Taro disclosed that the Company "and two senior officers" received DOJ subpoenas seeking documents relating to "generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."[87]

(p)     **Teva**:   In August 2016, Teva disclosed that it received subpoenas from DOJ and the Connecticut AG seeking documents and other information "relating to the marketing and pricing of certain of Teva USA's generic products and communications with competitors about such products."[88]

---

[85] Novartis, 2016 Financial Report at 217 (Jan. 24, 2017), *available at* https://www.novartis.com/sites/www.novartis.com/files/ar-2016-financial-report-en.pdf.

[86] Sun, BSE Disclosure (May 27, 2016), *available at* http://www.bseindia.com/xml-data/corpfiling/AttachHis/8E568708_8D00_472E_B052_666C76A4263D_081648.pdf.

[87] Taro, SEC Form 6-K (Sept. 9, 2016), *available at* https://www.sec.gov/Archives/edgar/data/906338/000115752316006685/a51417528.htm.

[88] Teva, SEC Form 6-K at 25 (Aug. 4, 2016), *available at* https://www.sec.gov/Archives/edgar/data/818686/000119312516671785/d187194d6k.htm.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(q)     **Zydus**:  Press reports have stated the Zydus is a target of DOJ's generic drugs price-fixing investigation.[89]

## X.     THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS

### A.     The Statutes of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Defendants' Unlawful Conspiracy

166.    Plaintiffs had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) Defendants' and other generic drug manufacturers' disclosures of the existence of the government investigations and subpoenas.  Prior to that time, no information in the public domain or available to Plaintiffs suggested that any Defendant was involved in a criminal conspiracy to fix prices for generic Clomipramine.

167.    Plaintiffs are purchasers who indirectly purchased generic Clomipramine manufactured by one or more Defendants.  They had no direct contact or interaction with any of the Defendants in this case and had no means from which they could have discovered Defendants' conspiracy.

168.    Defendants repeatedly and expressly stated throughout the Class Period, including on their public Internet websites, that they maintained antitrust/fair competition policies which prohibited the type of collusion alleged in this Complaint.  For example:

(a)     Mylan's Code of Conduct and Business Ethics states:  "Mylan is committed to complying with applicable antitrust and fair competition laws."[90]

---

[89] *See* Rupali Mukherjeel, *US polls, pricing pressure may hit Indian pharma cos*, The Times of India (Nov. 8, 2016), *available at* http://timesofindia.indiatimes.com/business/india-business/US-polls-pricing-pressure-may-hit-Indian- pharma-cos/articleshow/55301060.cms.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(b)     Novartis's (the parent of Sandoz) Code of Conduct provides:  "We are committed to fair competition and will not breach competition laws and regulations."[91]

(c)     Taro's Code of Conduct provides:  "we do not discuss any of the following topics with our competitors: prices or price fixing, customer or market allocation, bids or bid-rigging, any topic that seems to be about restricting competition.  If a competitor attempts to engage you in a discussion on any of these topics, make it clear that you do not wish to participate.   Leave the conversation immediately, and report the matter to Corporate Compliance."[92]

169.    It was reasonable for members of the Class to believe that Defendants were complying with their own antitrust policies.

170.    For these reasons, the statutes of limitations as to Plaintiffs' claims under the federal and state common laws identified herein did not begin to run, and have been tolled with respect to the claims that Plaintiffs have alleged in this Complaint.

**B.      Fraudulent Concealment Tolled the Statutes of Limitation**

171.    In the alternative, application of the doctrine of fraudulent concealment tolled the statutes of limitations on the claims asserted by Plaintiffs.  Plaintiffs had no knowledge of the combination or conspiracy alleged in this Complaint, or of facts sufficient to place them on inquiry notice of their claims, until Defendants disclosed the existence of government investigations and subpoenas.  Prior to that time, no information in the public domain or

---

[90] Mylan Code of Business Conduct and Ethics, *available at* https://www.mylan.com/-/media/mylancom/files/code%20of%20business%20conduct%20and%20ethics.pdf.

[91] Novartis Code of Conduct, *available at* https://www.novartis.com/sites/www.novartis.com/files/code-of-conduct-english.pdf.

[92] Taro Code of Conduct, *available at* http://www.taro.com/media/oMedia/TaroCOC.pdf.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

available to Plaintiffs suggested that any Defendant was involved in a criminal conspiracy to fix prices for generic Clomipramine.

172.    As described in more detail below, Defendants actively concealed, suppressed and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for generic Clomipramine.   The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Classes as they related to the cost of generic Clomipramine they purchased.   Defendants misrepresented the real cause of price increases and/or the absence of price reductions in generic Clomipramine.   Defendants' false statements and conduct concerning the prices of generic Clomipramine were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the Classes to believe that they were purchasing generic Clomipramine at prices established by a free and fair market.

### 1.    Active Concealment of the Conspiracy

173.    Defendants engaged in an illegal scheme to fix prices, allocate customers and rig bids. Criminal and civil penalties for engaging in such conduct are severe.   Not surprisingly, Defendants took affirmative measures to conceal their conspiratorial conduct.

174.    Through their misleading, deceptive, false and fraudulent statements, Defendants effectively concealed their conspiracy, thereby causing economic harm to Plaintiffs and the Classes. Defendants' misrepresentations regarding their price changes were intended to lull Plaintiffs and the Classes into accepting the price hikes as a normal result of competitive and economic market trends rather than as the consequence of Defendants' collusive acts. The public statements made by Defendants were designed to mislead Plaintiffs and the Classes into paying unjustifiably higher prices for generic Clomipramine.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

175.    As explained in the State AG complaint, the nature of the generic drug industry—which allows for frequent and repeated face-to-face meetings among competitors—means that "Most of the conspiratorial communications were intentionally done in person or by cell phone, in an attempt to avoid creating a record of their illegal conduct. The generic drug industry, through the aforementioned opportunities to collude at trade shows, customer events and smaller more intimate dinners and meetings, allowed these communications to perpetuate."[93]

176.    The Defendants also gave pretextual reasons for price increases.  For example, defendant Mylan's parent company, Mylan N.V., stated in documents filed with the SEC in 2015 that "[t]he pharmaceutical industry is highly competitive" and that it "face[s] vigorous competition from other pharmaceutical manufacturers that threatens the commercial acceptance and pricing of our products."[94]  Similarly, Taro Pharmaceutical Industries Ltd. stated in a 2014 annual filing with the SEC:  "The pharmaceutical industry in which we operate is intensely competitive.  The competition which we encounter has an effect on our product prices, market share, revenue and profitability."[95]  Sandoz's parent company, Novartis AG, told the SEC in 2014:  "Competition within the industry is intense and extends across a wide range of commercial activities, including pricing, product characteristics, customer service, sales and marketing, and research and development."[96]

---

[93] State AG Complaint ¶ 13.

[94] Mylan, SEC Form 10-Q at 76 (May 8, 2015), *available at* http://investor.mylan.com/secfiling.cfm?filingID=1623613-15-9&CIK=1623613.

[95] Taro, SEC Form 20-F at 3 (July 2, 2014), *available at* http://phx.corporate-ir.net/phoenix.zhtml?c=114698&p=irol-sec.

[96] Novartis, SEC Form 20-F at 54 (Jan. 29, 2014), *available at* https://www.sec.gov/Archives/edgar/data/1114448/000104746914000415/a2217883z20-f.htm.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

177.     These types of false statements and others made by Defendants helped conceal the illegal conspiracy entered into by Defendants to fix, stabilize, maintain and raise the price of generic Clomipramine to inflated, supracompetitive levels.

### 2.     Plaintiffs Exercised Reasonable Diligence

178.     Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Generic drugs are not exempt from antitrust regulation, and thus, before the disclosure of the government investigations, Plaintiffs reasonably considered the markets to be competitive. Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' prices before these disclosures.

179.     Because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to conceal their illicit conduct, Plaintiffs and the Classes could not have discovered the conspiracy at an earlier date by the exercise of reasonable diligence.

180.     Therefore, the running of any statutes of limitations has been tolled for all claims alleged by Plaintiffs and the Classes as a result of Defendants' anticompetitive and unlawful conduct.  Despite the exercise of reasonable diligence, Plaintiffs and Members of the Classes were unaware of Defendants' unlawful conduct, and did not know that they were paying supracompetitive prices throughout the United States during the Class Period.

181.     For these reasons, Plaintiffs' claims are timely under all of the federal, state and common laws identified herein.

### XI.     <u>CONTINUING VIOLATIONS</u>

182.     This Complaint alleges a continuing course of conduct (including conduct within the limitations periods), and defendants' unlawful conduct has inflicted continuing and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

accumulating harm within the applicable statutes of limitations. Thus, Plaintiffs and the members of the Damages Class can recover for damages that they suffered during any applicable limitations period.

## XII.   DEFENDANTS' ANTITRUST VIOLATIONS

183.   During the Class Period, set forth below, Defendants engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to allocate customers, rig bids, and fix raise and/or stabilize prices for generic Clomipramine sold in the United States.

184.   In formulating and effectuating the contract, combination or conspiracy, Defendants identified above and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to allocate customers, rig bids and artificially fix, raise, maintain, and/or stabilize the price of generic Clomipramine sold in the United States. These activities included the following:

(a)   Defendants participated in meetings and/or conversations regarding the price of generic Clomipramine in the United States;

(b)   Defendants agreed during those meetings and conversations to charge prices at specified levels and otherwise to increase and/or maintain prices of generic Clomipramine sold in the United States;

(c)   Defendants agreed during those meetings and conversations to allocate customers, rig bids, and fix the price of generic Clomipramine; and

(d)   Defendants issued price announcements and price quotations in accordance with their agreements.

185.   Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this Complaint.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

186.    During and throughout the period of the conspiracy alleged in this Complaint, Plaintiffs and members of the Classes indirectly purchased generic Clomipramine at inflated and supracompetitive prices.

187.    Defendants' contract, combination and conspiracy constitutes an unreasonable restraint of trade and commerce in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the laws of various End-Payer Damages Jurisdictions enumerated below.

188.    As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the Classes have been injured in their business and property in that they have paid more for generic Clomipramine than they would have paid in a competitive market.

189.    General economic principles recognize that any overcharge at a higher level of distribution generally results in higher prices at every level below.  Moreover, the institutional structure of pricing and regulation in the pharmaceutical drug industry assures that overcharges at the higher level of distribution are passed on to end-payers such as Plaintiffs.  Wholesalers and retailers passed on the inflated prices to Plaintiffs and members of the Class.  The impairment of generic competition at the direct purchaser level similarly injured Plaintiffs who were equally denied the opportunity to purchase less expensive generic versions of Clomipramine.

190.    The unlawful contract, combination and conspiracy has had the following effects, among others:

(a)    price competition in the market for generic Clomipramine has been artificially restrained;

(b)    prices for generic Clomipramine sold by Defendants have been raised, fixed, maintained, or stabilized at artificially high and non-competitive levels; and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(c)     end-payer purchasers of generic Clomipramine sold by Defendants have been deprived of the benefit of free and open competition in the market for generic Clomipramine.

## XIII.   CLASS ACTION ALLEGATIONS

191.   Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All persons and entities in the United States and its territories who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for Defendants' generic Clomipramine products (generic clomipramine hydrochloride 25, 50, or 75mg capsules), other than for resale, from May 2013 through the present.
>
> This class excludes:   (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for cities, towns, municipalities, or counties with self-funded prescription drug plans; (c) all persons or entities who purchased Defendants' generic Clomipramine products for purposes of resale or directly from Defendants; (d) fully insured health plans (*i.e.*, health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of Defendants' generic Clomipramine products were paid in part by a third party payer and whose co-payment was the same regardless of the retail purchase price; (f) pharmacy benefit managers; and (g) any judges or justices involved in this action and any members of their immediate families.

192.   Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the common law of unjust enrichment and the state antitrust, unfair competition, and consumer

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

protection laws of the states and territories listed below (the "End-Payer Damages Jurisdictions")[97] on behalf of the following class (the "Damages Class"):

> All persons and entities in the End-Payer Damages Jurisdictions who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for Defendants' generic Clomipramine products (generic clomipramine hydrochloride 25, 50, or 75mg capsules), other than for resale, from May 2013 through the present.

> This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for cities, towns, municipalities, or counties with self-funded prescription drug plans; (c) all persons or entities who purchased Defendants' generic Clomipramine products for purposes of resale or directly from Defendants; (d) fully insured health plans (i.e., health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of Defendants' generic Clomipramine products were paid in part by a third party payer and whose co-payment was the same regardless of the retail purchase price; (f) pharmacy benefit managers; and (g) any judges or justices involved in this action and any members of their immediate families.

193.     The Nationwide Class and the Damages Class are referred to herein as the "Classes."

194.     While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are thousands of members in each Class.

195.     Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

---

[97] The "End-Payer Damages Jurisdictions" include all States (except Indiana and Ohio), as well as the District of Columbia, Puerto Rico, and the U.S. Virgin Islands.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(a)      Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices of generic Clomipramine and/or engaged in market allocation for generic Clomipramine sold in the United States;

(b)      The identity of the participants of the alleged conspiracy;

(c)      The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)      Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Count;

(e)      Whether the alleged conspiracy violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged in the Second and Third Counts;

(f)      Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Count;

(g)      Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

(h)      The effect of the alleged conspiracy on the prices of generic Clomipramine sold in the United States during the Class Period;

(i)      Whether the Defendants and their co-conspirators actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for generic

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Clomipramine, and/or fraudulently concealed the unlawful conspiracy's existence from Plaintiffs and the other members of the Classes;

(j)     The appropriate injunctive and related equitable relief for the Nationwide Class; and

(k)     The appropriate class-wide measure of damages for the Damages Class.

196.   Plaintiffs' claims are typical of the claims of the members of the Classes. Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for generic Clomipramine purchased indirectly from Defendants and/or their co-conspirators. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.

197.   Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

198.   The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

199.   Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

200.     The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## XIV.   CAUSES OF ACTION

### FIRST COUNT

**Violation of Sections 1 and 3 of the Sherman Act**
**(on behalf of Plaintiffs and the Nationwide Class)**

201.     Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

202.     Defendants and their unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. § 1, 3).

203.     During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially allocate customers, rig bids and raise, maintain and fix prices for generic Clomipramine, thereby creating anticompetitive effects.

204.     The conspiratorial acts and combinations have caused unreasonable restraints in the market for generic Clomipramine.

205.     As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated End-Payers in the Nationwide Class who purchased generic Clomipramine have been harmed by being forced to pay inflated, supracompetitive prices for generic Clomipramine.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

206.    In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth herein.

207.    Defendants' conspiracy had the following effects, among others:

(a)    Price competition in the market for generic Clomipramine has been restrained, suppressed, and/or eliminated in the United States;

(b)    Prices for generic Clomipramine provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

(c)    Plaintiffs and members of the Nationwide Class who purchased generic Clomipramine indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

208.    Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for generic Clomipramine purchased indirectly from Defendants and the co-conspirators than they would have paid and will pay in the absence of the conspiracy.

209.    Defendants' contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

210.    Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the continuing violations alleged herein.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## SECOND COUNT

## Violation of State Antitrust Statutes[98]
## (on behalf of Plaintiffs and the Damages Class)

211.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

212.    During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of generic Clomipramine in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

213.    The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain the prices of generic Clomipramine and to allocate customers for generic Clomipramine in the United States.

214.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including: (a) participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price generic Clomipramine at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to generic Clomipramine provided in the United States; and (b) participating in meetings and trade association conversations among themselves

---

[98] Statutory antitrust violations are alleged herein for the following jurisdictions: Arizona, California, Connecticut, District of Columbia, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

215.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreement to allocate customers, rig bids, and fix prices for generic Clomipramine.

216.    Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the following state antitrust statutes.

217.    [INTENTIONALLY LEFT BLANK]

**Arizona**

218.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Arizona Revised Statutes, § 44-1401, *et seq.* Defendants' combination and conspiracy had the following effects: (1) price competition for generic Clomipramine was restrained, suppressed, and eliminated throughout Arizona; (2) generic Clomipramine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. Defendants' violations of Arizona law were flagrant. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade in violation of Ariz. Rev. Stat. § 44-1401, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. § 44-1401, *et seq.*

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**California**

219.    Defendants have entered into an unlawful agreement in restraint of trade in violation of California Business and Professions Code § 16700 *et seq.* During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of California Business and Professions Code §16720. Defendants, and each of them, have acted in violation of § 16720 to fix, raise, stabilize, and maintain prices of generic Clomipramine at supracompetitive levels. The aforesaid violations of § 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of generic Clomipramine. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above and creating a price floor, fixing, raising, and stabilizing the price of generic Clomipramine. The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) price competition for generic Clomipramine has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for generic Clomipramine provided by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California; and (3) those who purchased generic Clomipramine indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for generic Clomipramine than they otherwise would have paid in the absence of Defendants' unlawful conduct. During the

81

Class Period, Defendants' illegal conduct substantially affected California commerce. As a result of Defendants' violation of § 16720, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to California Business and Professions Code § 16750(a).

**Connecticut**

219(a). Defendants have entered into an unlawful agreement in restraint of trade in violation of the Connecticut Antitrust Act, Conn. Gen. Stat. § 35-35, *et seq.*   Defendants' combinations and conspiracy had the following effects: (1) price competition for generic Clomipramine was restrained, suppressed, and eliminated throughout Connecticut; (2) generic Clomipramine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Connecticut; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine.  During the Class Period, Defendants' illegal conduct substantially affected Connecticut commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.  By reason of the foregoing, Defendants entered into an agreement in restraint of trade in violation of Conn. Gen. Stat. § 35-35, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Connecticut law.

**District of Columbia**

220.   Defendants have entered into an unlawful agreement in restraint of trade in violation of District of Columbia Code Annotated § 28-4501, *et seq.* Defendants' combination and conspiracy had the following effects: (1) generic Clomipramine price competition was

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

restrained, suppressed, and eliminated throughout the District of Columbia; (2) generic Clomipramine prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic Clomipramine in the District of Columbia that were shipped by Defendants or their co-conspirators into the District of Columbia, were deprived of free and open competition, including in the District of Columbia; and (4) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic Clomipramine in the District of Columbia that were shipped by Defendants or their co-conspirators, paid supracompetitive, artificially inflated prices for generic Clomipramine, including in the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of District of Columbia Code Ann. § 28-4501, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. § 28-4501, *et seq.*

**Hawaii**

221.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Hawaii Revised Statutes Annotated § 480-1, *et seq.* Defendants' unlawful conduct had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) generic Clomipramine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and

83

members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Hawaii Revised Statutes Annotated § 480-4, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Hawaii Revised Statutes Annotated § 480-4, *et seq.*

**Illinois**

222.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, *et seq.*) Defendants' combination or conspiracy had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Illinois; (2) generic Clomipramine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under the Illinois Antitrust Act.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Iowa**

223.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code § 553.1, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Iowa; (2) generic Clomipramine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Iowa Code § 553.1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code § 553, *et seq.*

**Kansas**

224.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Kansas Statutes Annotated, § 50-101, *et seq.* Defendants' combined capital, skills or acts for the purposes of creating restrictions in trade or commerce of generic Clomipramine, increasing the prices of generic Clomipramine, preventing competition in the sale of generic Clomipramine, or binding themselves not to sell generic Clomipramine, in a manner that established the price of generic Clomipramine and precluded free and unrestricted competition among themselves in the sale of generic Clomipramine, in violation of Kan. Stat. Ann. § 50-101, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic

85

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Clomipramine price competition was restrained, suppressed, and eliminated throughout Kansas; (2) generic Clomipramine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Kansas Stat. Ann. § 50-101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. § 50-101, *et seq.*

**Maine**

225.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Maine Revised Statutes (Maine Rev. Stat. Ann. 10, § 1101, *et seq.*) Defendants' combination or conspiracy had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Maine; (2) generic Clomipramine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing,

86

Defendants have entered into an agreement in restraint of trade in violation of Maine Rev. Stat. Ann. 10, § 1101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, § 1101, *et seq.*

**Maryland**

225(a). Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maryland Antitrust Act, Maryland Code, Com. Law § 11-204, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Maryland; (2) generic Clomipramine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maryland; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine. During the Class Period, Defendants' illegal conduct substantially affected Maryland commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of the Maryland Antitrust Act. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maryland law.

**Michigan**

226. Defendants have entered into an unlawful agreement in restraint of trade in violation of Michigan Compiled Laws Annotated § 445.771, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Michigan; (2) generic Clomipramine prices were raised,

87

fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Michigan Comp. Laws Ann. § 445.771, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. § 445.771, *et seq.*

**Minnesota**

227.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Minnesota Annotated Statutes § 325D.49, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) generic Clomipramine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Minnesota Stat. § 325D.49, *et seq.*

88

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. § 325D.49, *et seq.*

**Mississippi**

228.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Mississippi Code Annotated § 75-21-1, *et seq.* Trusts are combinations, contracts, understandings or agreements, express or implied when inimical to the public welfare and with the effect of, *inter alia*, restraining trade, increasing the price or output of a commodity, or hindering competition in the production and sale of a commodity. Miss. Code Ann. § 75-21-1. Defendants' combination or conspiracy was in a manner inimical to public welfare and had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) generic Clomipramine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq.*

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Nebraska**

229.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic Clomipramine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes § 59-801, *et seq.*

**Nevada**

230.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Nevada Revised Statutes Annotated § 598A.010, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Nevada; (2) generic Clomipramine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Clomipramine. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nevada Rev. Stat. Ann. § 598A.010, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. § 598A.010, *et seq.*

**New Hampshire**

231.   Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes § 356:1, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) generic Clomipramine prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New Hampshire Revised Statutes § 356:1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes § 356:1, *et seq.*

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**New Mexico**

232.   Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated § 57-1-1, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic Clomipramine prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New Mexico Stat. Ann. § 57-1-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann. § 57-1-1, *et seq.*

**New York**

233.   Defendants have entered into an unlawful agreement in restraint of trade in violation of New York's Donnelly Act, New York General Business Law § 340, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout New York; (2) generic Clomipramine prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

supracompetitive, artificially inflated prices for generic Clomipramine that were higher than they would have been absent Defendants' illegal acts. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of the New York's Donnelly Act, New York General Business Law § 340, *et seq.* The conduct set forth above is a per se violation of the Act. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law § 340, *et seq.*

**North Carolina**

234.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes § 75-1, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic Clomipramine prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of North Carolina

93

Gen. Stat. § 75-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. § 75-1, et. seq.

**North Dakota**

235.    Defendants have entered into an unlawful agreement in restraint of trade in violation of North Dakota Century Code § 51-08.1-01, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) generic Clomipramine prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of North Dakota Cent. Code § 51-08.1-01, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code § 51-08.1-01, *et seq.*

**Oregon**

236.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Oregon Revised Statutes § 646.705, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Oregon; (2) generic Clomipramine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and

94

members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine. During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Oregon Revised Statutes § 646.705, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes § 646.705, *et seq.*

**Rhode Island**

237.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Rhode Island Antitrust Act, Rhode Island General Laws § 6-36-1, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) generic Clomipramine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine. During the Class Period, Defendants' illegal conduct had a substantial effect on Rhode Island commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property on or after July 15, 2013, and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Rhode Island General Laws § 6-36-1, *et seq.* Accordingly,

95

Plaintiffs and members of the Damages Class seek all relief available under Rhode Island General Laws § 6-36-1, *et seq.*

**South Dakota**

238.    Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws § 37-1-3.1, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) generic Clomipramine prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of South Dakota Codified Laws Ann. § 37-1-3.1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. § 37-1-3.1, *et seq.*

**Tennessee**

239.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Tennessee Code Annotated § 47-25-101, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) generic Clomipramine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs

96

and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Tennessee Code Ann. § 47-25-101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. § 47-25-101, *et seq.*

**Utah**

240.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Utah; (2) generic Clomipramine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine. During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, *et seq.*

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated § 76-10-3101, *et seq.*

**Vermont**

241.     Defendants have entered into an unlawful agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Vermont; (2) generic Clomipramine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 § 2453, *et seq.*

**West Virginia**

242.     Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code § 47-18-1, *et seq.* Defendants' anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of West Virginia Antitrust Act. Defendants' combination or conspiracy had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout West

98

Virginia; (2) generic Clomipramine prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine. During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of West Virginia Code § 47-18-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia Code § 47-18-1, *et seq.*

**Wisconsin**

243.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes § 133.01, *et seq.* Defendants' and their co-conspirators' anticompetitive activities have directly, foreseeably and proximately caused injury to Plaintiffs and members of the Classes in the United States. Specifically, Defendants' combination or conspiracy had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) generic Clomipramine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine.   During the Class Period, Defendants' illegal conduct had a substantial effect on the people of Wisconsin and Wisconsin commerce.  As a direct and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Wisconsin Stat. § 133.01, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. § 133.01, *et seq.*

**As to All Jurisdictions Above**

244.    Plaintiffs and members of the Damages Class in each of the above jurisdictions have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiffs and members of the Damages Class have paid more for generic Clomipramine than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

245.    In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiffs and members of the Damages Class.

246.    Accordingly, Plaintiffs and members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## THIRD COUNT

### Violation of State Consumer Protection Statutes[99]
### (on behalf of Plaintiffs and the Damages Class)

247.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

248.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

**Alaska**

249.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Alaska Statute § 45.50.471, *et seq.*  Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Clomipramine were sold, distributed, or obtained in Alaska and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.  The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Alaska law.  Defendants' unlawful conduct had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Alaska; (2) generic Clomipramine prices were raised, fixed, maintained, and

---

[99] Statutory consumer protection violations are alleged herein for the following jurisdictions: Alaska, Arkansas, California, Colorado, Delaware, District of Columbia, Florida, Georgia, Hawaii, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Rhode Island, South Carolina, South Dakota, Utah, Vermont, Virginia, West Virginia, Wisconsin and the U.S. Virgin Islands.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

stabilized at artificially high levels throughout Alaska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine. During the Class Period, Defendants' illegal conduct substantially affected Alaska commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. § 45.50.471, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Arkansas**

250.   Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, *et seq.* Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Clomipramine were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10). Defendants' unlawful conduct had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) generic Clomipramine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**California**

251.   Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq.* During the Class Period, Defendants manufactured, marketed, sold, or distributed generic Clomipramine in California, and committed and continue to commit acts of unfair competition, as defined by § 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above. This claim is instituted pursuant to §§ 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated § 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law. Defendants' conduct as alleged herein violated § 17200. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code §17200, *et seq.*, including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of § 16720, *et seq.* of the California Business and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Professions Code, set forth above. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of § 16720, *et seq.* of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent; (3) Defendants' acts or practices are unfair to purchasers of generic Clomipramine in the State of California within the meaning of § 17200, California Business and Professions Code; and (4) Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code. Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that have been obtained by Defendants as a result of such business acts or practices. During the Class Period, Defendants' illegal conduct substantially affected California commerce and consumers. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future. The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and members of the Damages Class to pay supracompetitive and artificially-inflated prices for generic Clomipramine. Plaintiffs and members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of Defendants as alleged in this Complaint violates § 17200 of the California Business and Professions Code. As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, §§17203 and 17204.

**Colorado**

252.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Colorado Consumer Protection Act, Colorado Rev. Stat. § 6-1-101, *et seq.*  Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as actual or potential consumers of the Defendants' goods and which caused Plaintiffs to suffer injury. Defendants took efforts to conceal their agreements from Plaintiffs. Defendants' unlawful conduct had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Colorado; (2) generic Clomipramine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Colorado; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine. During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colorado Rev. Stat. § 6-1-101, *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute and as equity demands.

**Delaware**

253.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Delaware Consumer Fraud Act, 6 Del. Code §

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

2511, *et seq.*   Defendants agreed to, and did in fact, act in restraint of trade or commerce in Delaware, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Clomipramine were sold, distributed, or obtained in Delaware. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Clomipramine. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Clomipramine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Delaware; (2) generic Clomipramine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Delaware; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine. During the Class Period, Defendants' illegal conduct had a substantial effect on Delaware commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Clomipramine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Clomipramine at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of 6 Del. Code § 2511, *et seq.*, and,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**District of Columbia**

254.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which generic Clomipramine were sold, distributed or obtained in the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce and consumers. The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904. Plaintiffs and members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. Defendants had the sole power to set that price and Plaintiffs and members of the Damages Class had no power to negotiate a lower price. Moreover, Plaintiffs and members of the Damages Class lacked any meaningful choice in purchasing generic Clomipramine because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiffs and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of generic Clomipramine, including their illegal conspiracy to secretly fix the price of generic Clomipramine at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Damages Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

in unconscionably higher prices for purchasers so that there was a gross disparity between the price paid and the value received for generic Clomipramine. Defendants' unlawful conduct had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) generic Clomipramine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine. As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Florida**

255.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.* Defendants' unlawful conduct had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Florida; (2) generic Clomipramine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine. During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers. As a direct

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Georgia**

256.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Georgia Uniform Deceptive Trade Practices Act, Georgia Code § 10-1-370, *et seq.* and the Georgia Fair Businesses Practices Act, Georgia Code Ann. § 10-1-390, *et seq.*   Defendants agreed to, and did in fact, act in restraint of trade or commerce in Georgia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Clomipramine were sold, distributed, or obtained in Georgia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Clomipramine. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Clomipramine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Georgia; (2) generic Clomipramine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Georgia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine. During the Class Period, Defendants' illegal conduct had a substantial effect on Georgia commerce and consumers. As a direct and proximate result of Defendants' violations of

109

law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Clomipramine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Clomipramine at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Georgia law, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

**Hawaii**

257.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated § 480-1, *et seq.* Defendants' unlawful conduct had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) generic Clomipramine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Rev. Stat. § 480-1 *et seq.*, and,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Massachusetts**

258.   Defendants have engaged in unfair competition or unlawful, unfair, unconscionable, or deceptive acts or practices in violation of the Massachusetts Gen. Laws, Ch 93A, § 1, *et seq.* Defendants were engaged in trade or commerce as defined by G.L. 93A. Defendants, in a market that includes Massachusetts, agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Clomipramine were sold, distributed, or obtained in Massachusetts and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," in violation of Massachusetts Gen. Laws, Ch 93A, § 2, 11. Defendants' unlawful conduct had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) generic Clomipramine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine. During the Class Period, Defendants' illegal conduct substantially affected Massachusetts commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in

111

violation of Massachusetts Gen. Laws, Ch 93A, § 2, 11, that were knowing or willful, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute, including multiple damages.

**Michigan**

259.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Michigan Consumer Protection Statute, Mich. Compiled Laws § 445.903, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in Michigan, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Clomipramine were sold, distributed, or obtained in Michigan. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Clomipramine. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Clomipramine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Michigan; (2) generic Clomipramine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine. During the Class Period, Defendants' illegal conduct had a substantial effect on Michigan commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Clomipramine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Clomipramine at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Mich. Compiled Laws § 445.903, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Minnesota**

260.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq.* Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as actual or potential consumers of the Defendants' goods and which caused Plaintiffs to suffer injury. Defendants took efforts to conceal their agreements from Plaintiffs. Defendants' unlawful conduct had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) generic Clomipramine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or

113

deceptive acts or practices in violation of Minn. Stat. § 325D.43, *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute and as equity demands.

**Missouri**

261.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.* Plaintiffs and members of the Damages Class purchased generic Clomipramine for personal or family purposes. Defendants engaged in the conduct described herein in connection with the sale of generic Clomipramine in trade or commerce in a market that includes Missouri. Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which generic Clomipramine were sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Plaintiffs and members of the Damages Class. Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Clomipramine. The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Damages Class as they related to the cost of generic Clomipramine they purchased. Defendants misrepresented the real cause of price increases and/or the absence of price reductions in generic Clomipramine by making public statements that were not in accord with the facts. Defendants' statements and conduct concerning the price of generic Clomipramine were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the Damages Class to believe that they were purchasing

114

generic Clomipramine at prices established by a free and fair market. Defendants' unlawful conduct had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Missouri; (2) generic Clomipramine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine. The foregoing acts and practices substantially affected Missouri commerce and consumers and constituted unlawful practices in violation of the Missouri Merchandising Practices Act. As a direct and proximate result of the above-described unlawful practices, Plaintiffs and members of the Damages Class suffered ascertainable loss of money or property. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "[t]he act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…", as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq.*, 15 CSR 60-8.010, *et seq.*, and 15 CSR 60-9.010, *et seq.*, and Mo. Rev. Stat. § 407.025.

**Montana**

262.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, § 30-14-103, *et seq.*, and § 30-14-201, *et seq.* Defendants' unlawful conduct had the following effects: (1) generic Clomipramine price competition was

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

restrained, suppressed, and eliminated throughout Montana; (2) generic Clomipramine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine. During the Class Period, Defendants marketed, sold, or distributed generic Clomipramine in Montana, and Defendants' illegal conduct substantially affected Montana commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, § 30-14-103, *et seq.*, and § 30-14-201, et. seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Nebraska**

263.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq.*  Defendants' unlawful conduct had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic Clomipramine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine. During the Class Period, Defendants marketed, sold, or distributed generic Clomipramine in Nebraska, and Defendants' illegal conduct substantially affected Nebraska commerce and consumers. As a

116

direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Nevada**

264.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903, *et seq.*   Defendants agreed to, and did in fact, act in restraint of trade or commerce in Nevada, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Clomipramine were sold, distributed, or obtained in Nevada. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Clomipramine. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Clomipramine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Nevada; (2) generic Clomipramine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine. During the Class Period, Defendants' illegal conduct had a substantial effect on Nevada commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or

117

property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Clomipramine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Clomipramine at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Nev. Rev. Stat. § 598.0903, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**New Hampshire**

265.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq.*   Defendants' unlawful conduct had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) generic Clomipramine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine. During the Class Period, Defendants marketed, sold, or distributed generic Clomipramine in New Hampshire, and Defendants' illegal conduct substantially affected New Hampshire commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

A:1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**New Jersey**

266.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Jersey Consumer Fraud Act, N.J. Statutes § 56:8-1, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in New Jersey, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Clomipramine were sold, distributed, or obtained in New Jersey. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Clomipramine. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Clomipramine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout New Jersey; (2) generic Clomipramine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Jersey; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine. During the Class Period, Defendants' illegal conduct had a substantial effect on New Jersey commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

misrepresentations and omissions concerning the price of generic Clomipramine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Clomipramine at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of N.J. Statutes § 56:8-1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**New Mexico**

267.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Clomipramine were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of New Mexico Stat. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiffs and members of the Damages Class and the prices paid by them for generic Clomipramine as set forth in New Mexico Stat. § 57-12-2E. Plaintiffs and members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. Defendants had the sole power to set that price, and Plaintiffs and members of the Damages Class had no power to negotiate a lower price. Moreover, Plaintiffs and members of the Damages Class lacked any meaningful choice in purchasing generic Clomipramine because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiffs and members

120

of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of generic Clomipramine, including their illegal conspiracy to secretly fix the price of generic Clomipramine at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Damages Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for generic Clomipramine. Defendants' unlawful conduct had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic Clomipramine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**New York**

268.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.* Defendants agreed

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic Clomipramine were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants and their co-conspirators made public statements about the prices of generic Clomipramine that either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for generic Clomipramine; and Defendants alone possessed material information that was relevant to consumers, but failed to provide the information. Because of Defendants' unlawful trade practices in the State of New York, New York class members who indirectly purchased generic Clomipramine were misled to believe that they were paying a fair price for generic Clomipramine or the price increases for generic Clomipramine were for valid business reasons; and similarly situated consumers were affected by Defendants' conspiracy. Defendants knew that their unlawful trade practices with respect to pricing generic Clomipramine would have an impact on New York consumers and not just Defendants' direct customers. Defendants knew that their unlawful trade practices with respect to pricing generic Clomipramine would have a broad impact, causing consumer class members who indirectly purchased generic Clomipramine to be injured by paying more for generic Clomipramine than they would have paid in the absence of Defendants' unlawful trade acts and practices. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of consumers in New York State in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) generic Clomipramine price

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

competition was restrained, suppressed, and eliminated throughout New York; (2) generic Clomipramine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine. During the Class Period, Defendants marketed, sold, or distributed generic Clomipramine in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic Clomipramine in New York. Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

**North Carolina**

269.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic Clomipramine were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs and members of the Damages Class could not possibly have been aware. Defendants and their co-conspirators publicly provided pretextual and false

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

justifications regarding their price increases. Defendants' public statements concerning the price of generic Clomipramine created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by Defendants' illegal conspiracy. Moreover, Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic Clomipramine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine. During the Class Period, Defendants marketed, sold, or distributed generic Clomipramine in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic Clomipramine in North Carolina. Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. §

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

75-1.1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**North Dakota**

270.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the North Dakota Unlawful Sales or Advertising Practices Statute, N.D. Century Code § 51-15-01, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in North Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Clomipramine were sold, distributed, or obtained in North Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Clomipramine. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Clomipramine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) generic Clomipramine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Clomipramine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Clomipramine at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of N.D. Century Code § 51-15-01, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Rhode Island**

271.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act, R.I. Gen. Laws § 6-13.1-1, *et seq.* Members of the Damages Class purchased generic Clomipramine for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Clomipramine were sold, distributed, or obtained in Rhode Island. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Clomipramine. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Clomipramine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) generic Clomipramine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3)

126

Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine. Defendants' illegal conduct substantially affected Rhode Island commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Clomipramine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Clomipramine at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Clomipramine they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. § 6-13.1-1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**South Carolina**

272.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) generic Clomipramine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and members of the Damages

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. § 39-5-10, *et seq.*, and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

**South Dakota**

273.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Dakota Deceptive Trade Practices and Consumer Protection Statute, S.D. Codified Laws § 37-24-1, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in South Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Clomipramine were sold, distributed, or obtained in South Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Clomipramine. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Clomipramine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) generic Clomipramine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

(4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine. Defendants' illegal conduct substantially affected South Dakota commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Clomipramine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Clomipramine at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Clomipramine they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws § 37-24-1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Utah**

274.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Utah Consumer Sales Practices Act, Ut. Stat. § 13-11-1, *et seq.*  Members of the Damages Class purchased generic Clomipramine for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Utah, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Clomipramine were sold, distributed, or obtained in Utah. Defendants deliberately failed to disclose material facts to

129

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Clomipramine. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Clomipramine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Utah; (2) generic Clomipramine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine. Defendants' illegal conduct substantially affected Utah commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Clomipramine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Clomipramine at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Clomipramine they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

practices in violation of Ut. Stat. § 13-11-1 *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

**Vermont**

275.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont Statutes § 2451, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Clomipramine were sold, distributed, or obtained in Vermont. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Clomipramine. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Clomipramine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Vermont; (2) generic Clomipramine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Clomipramine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Clomipramine at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vt. Stat. § 2451, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**Virginia**

276.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Virginia Consumer Protection Act of 1977, Va. Code § 59.1-196, *et seq.*  Members of the Damages Class purchased generic Clomipramine to be used for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Virginia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Clomipramine were sold, distributed, or obtained in Virginia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Clomipramine. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Clomipramine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Virginia; (2) generic Clomipramine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Virginia; (3) Plaintiffs and members of the

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine. Defendants' illegal conduct substantially affected Virginia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Clomipramine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Clomipramine at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Clomipramine they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Va. Code § 59.1-196, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**West Virginia**

277.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the West Virginia Consumer Credit and Protection Act, W.Va. Code § 46A-6-101, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes West Virginia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Clomipramine were sold, distributed, or obtained in West Virginia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful

133

activities and artificially inflated prices for generic Clomipramine. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Clomipramine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) generic Clomipramine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine. Defendants' illegal conduct substantially affected West Virginia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Clomipramine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Clomipramine at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Clomipramine they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W.Va. Code § 46A-6-101, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Wisconsin**

278.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Wisconsin Consumer Protection Statutes, Wisc. Stat. § 100.18, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Wisconsin, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Clomipramine were sold, distributed, or obtained in Wisconsin. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Clomipramine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) generic Clomipramine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine. Defendants' illegal conduct substantially affected Wisconsin commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations concerning the price of generic Clomipramine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Clomipramine at prices set by a free and fair market. Defendants' affirmative misrepresentations constitute information important to Plaintiffs and members of the Damages

135

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Class as they related to the cost of generic Clomipramine they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wisc. Stat. § 100.18, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**U.S. Virgin Islands**

279.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the U.S. Virgin Islands Consumer Fraud and Deceptive Business Practices Act, 12A V.I.C. §§ 102, 301-35, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes U.S.V.I., by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Clomipramine were sold, distributed, or obtained in U.S.V.I. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Clomipramine. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Clomipramine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Clomipramine price competition was restrained, suppressed, and eliminated throughout U.S.V.I.; (2) generic Clomipramine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout U.S.V.I.; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for generic Clomipramine. Defendants' illegal conduct substantially affected U.S.V.I. commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of

136

Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Clomipramine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Clomipramine at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Clomipramine they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 12A V.I.C. §§ 102, 301-35, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

### **FOURTH COUNT**

**Unjust Enrichment[100]**
**(on behalf of Plaintiffs and the Damages Class)**

280.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

281.    To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.

282.    Defendants have unlawfully benefited from their sales of Clomipramine because of the unlawful and inequitable acts alleged in this Complaint. Defendants unlawfully

---

[100] Unjust enrichment claims are alleged herein under the laws of all States (except Ohio and Indiana) as well as the District of Columbia, Puerto Rico and the U.S. Virgin Islands.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

overcharged End-payers, who made purchases of or reimbursements for Clomipramine at prices that were more than they would have been but for Defendants' unlawful actions.

283.   Defendants' financial benefits resulting from their unlawful and inequitable acts are traceable to overpayments by Plaintiffs and the Damages Class.

284.   Plaintiffs and the Damages Class have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiffs and the Damages Class.

285.   Defendants have been enriched by revenue resulting from unlawful overcharges for Clomipramine while Plaintiffs and the Damages Class have been impoverished by the overcharges they paid for Clomipramine imposed through Defendants' unlawful conduct. Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.

286.   There is no justification for Defendants' retention of, and enrichment from, the benefits they received, which caused impoverishment to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

287.   Plaintiffs and the Damages Class did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

288.   The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of Clomipramine.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

289.    The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to their unlawful overcharges of Clomipramine are ascertainable by review of sales records.

290.    It would be futile for Plaintiffs and the Damages Class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiffs and the Damages Class with respect to Defendants' sales of Clomipramine.

291.    It would be futile for Plaintiffs and the Damages Class to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased Clomipramine, as the intermediaries are not liable and cannot reasonably be expected to compensate Plaintiffs and the Damages Class for Defendants' unlawful conduct.

292.    The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for Clomipramine is a direct and proximate result of Defendants' unlawful practices.

293.    The financial benefits derived by Defendants rightfully belong to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices during the Class Period, inuring to the benefit of Defendants.

294.    It would be inequitable under unjust enrichment principles under the laws of all States (except Ohio and Indiana) and of the District of Columbia, Puerto Rico and the U.S. Virgin Islands, for Defendants to be permitted to retain any of the overcharges for Clomipramine derived from Defendants' unlawful, unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

295.    Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiffs and the Damages Class. Defendants consciously accepted the benefits and continue to do so as of the date of this filing.

296.    Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and the Damages Class all unlawful or inequitable proceeds they received from their sales of Clomipramine.

297.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to indirect purchases of Clomipramine by Plaintiffs and the Damages Class.

298.    Plaintiffs and the Damages Class have no adequate remedy at law.

299.    By engaging in the foregoing unlawful or inequitable conduct depriving Plaintiffs and the Damages Class of the opportunity to purchase lower-priced generic versions of Clomipramine and forcing them to pay higher prices for Clomipramine, Defendants have been unjustly enriched in violation of the common law of various states, as outlined below:

**Alabama**

300.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clomipramine in Alabama at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges, and have retained this money. Defendants have benefitted at the expense of Plaintiffs and the Damages Class from revenue resulting from unlawful overcharges for Clomipramine.  It is inequitable for Defendants to accept and retain the benefits received without compensating Plaintiffs and the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Alaska**

301.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clomipramine in Alaska at prices that were more than they would have been but for Defendants' actions.   Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.   Defendants appreciated the benefits bestowed upon them by Plaintiffs and the Damages Class. Defendants accepted and retained the benefits bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Arizona**

302.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clomipramine in Arizona at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for Clomipramine. Plaintiffs and the Damages Class have been impoverished by the overcharges for Clomipramine resulting from Defendants' unlawful conduct.  Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.   There is no justification for Defendants' receipt of the benefits causing their enrichment and Plaintiffs' and the Damages Class's impoverishment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges. Plaintiffs and the Damages Class have no remedy at law.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Arkansas**

303.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clomipramine in Arkansas at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges, and have retained this money. Defendants have paid no consideration to any other person in exchange for this money.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**California**

304.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clomipramine in California at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges.  Defendants retained the benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiffs and the Damages Class.

**Colorado**

305.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clomipramine in Colorado at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.  Defendants have benefitted at the expense of Plaintiffs and the Damages Class. Under the circumstances, it would

142

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Connecticut**

306.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clomipramine in Connecticut at prices that were more than they would have been but for Defendants' actions.  Defendants were benefitted in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class. Defendants have paid no consideration to any other person in exchange for this benefit. Defendants retained the benefits bestowed upon them under inequitable and unjust circumstances at the expense of Plaintiffs and the Damages Class.

**Delaware**

307.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clomipramine in Delaware at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Clomipramine.   Plaintiffs and the Damages Class have been impoverished by the overcharges for Clomipramine resulting from Defendants' unlawful conduct.  Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.   There is no justification for Defendants' receipt of the benefits causing their enrichment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.  Plaintiffs and the Damages Class have no remedy at law.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**District of Columbia**

308.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clomipramine in the District of Columbia at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits.

**Florida**

309.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clomipramine in Florida at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefits bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Georgia**

310.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clomipramine in Georgia at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

economic detriment of Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Hawaii**

311.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clomipramine in Hawaii at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Idaho**

312.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clomipramine in Idaho at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit conferred upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Illinois**

313.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clomipramine in Illinois at prices that were more than they would have been

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.  It is against equity, justice, and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

**Iowa**

314.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clomipramine in Iowa at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Clomipramine, which revenue resulted from anticompetitive prices paid by Plaintiffs and the Damages Class, which inured to Defendants' benefit.  Defendants' enrichment has occurred at the expense of Plaintiffs and the Damages Class.  Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Kansas**

315.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clomipramine in Kansas at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiffs

146

and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Kentucky**

316.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clomipramine in Kentucky at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit conferred upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Louisiana**

317.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clomipramine in Louisiana at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Clomipramine.   Plaintiffs and the Damages Class have been impoverished by the overcharges for Clomipramine resulting from Defendants' unlawful conduct.  Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.   There is no justification for Defendants' receipt of the benefits causing their enrichment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.  Plaintiffs and the Damages Class have no other remedy at law.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Maine**

318.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clomipramine in Maine at prices that were more than they would have been but for Defendants' actions.   Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.   Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Maryland**

319.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clomipramine in Maryland at prices that were more than they would have been but for Defendants' actions.   Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.   Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Massachusetts**

320.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clomipramine in Massachusetts at prices that were more than they would have been but for Defendants' actions.   Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges

148

to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the benefit conferred upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Michigan**

321.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clomipramine in Michigan at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.  Defendants retained the benefits bestowed upon them under unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Minnesota**

322.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clomipramine in Minnesota at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated and knowingly accepted the benefits bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

149

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Mississippi**

323.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clomipramine in Mississippi at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges.  Defendants retain the benefit of overcharges received on the sales of Clomipramine, which in equity and good conscience belong to Plaintiffs and the Damages Class on account of Defendants' anticompetitive conduct.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Missouri**

324.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clomipramine in Missouri at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Defendants accepted and retained the benefit bestowed upon them under inequitable and unjust circumstances arising from unlawful overcharges to Plaintiffs and the Damages Class.

**Montana**

325.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clomipramine in Montana at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

economic detriment of Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Nebraska**

326.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clomipramine in Nebraska at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges, and have retained this money. Defendants have paid no consideration to any other person in exchange for this money.  In justice and fairness, Defendants should disgorge such money and remit the overcharged payments back to Plaintiffs and the Damages Class.

**Nevada**

327.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clomipramine in Nevada at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants in the nature of revenue resulting from unlawful overcharges for Clomipramine.  Defendants appreciated the benefits bestowed upon them by Plaintiffs and the Damages Class, for which they have paid no consideration to any other person.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**New Hampshire**

328.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clomipramine in New Hampshire at prices that were more than they would

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.  Under the circumstances, it would be unconscionable for Defendants to retain such benefits.

**New Jersey**

329.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clomipramine in New Jersey at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.  The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from arising from unlawful overcharges to Plaintiffs and the Damages Class.  Defendants have paid no consideration to any other person for any of the unlawful benefits they received from Plaintiffs and the Damages Class with respect to Defendants' sales of Clomipramine.  Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**New Mexico**

330.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clomipramine in New Mexico at prices that were more than they would have been but for Defendants' actions.  Defendants have knowingly benefitted at the expense of Plaintiffs and the Damages Class from revenue resulting from unlawful overcharges for Clomipramine.  To allow Defendants to retain the benefits would be unjust because the benefits

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

resulted from anticompetitive pricing that inured to Defendants' benefit and because Defendants have paid no consideration to any other person for any of the benefits they received.

**New York**

331.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clomipramine in New York at prices that were more than they would have been but for Defendants' actions.   Defendants have been enriched by revenue resulting from unlawful overcharges for Clomipramine, which revenue resulted from anticompetitive prices paid by Plaintiffs and the Damages Class, which inured to Defendants' benefit.   Defendants' enrichment has occurred at the expense of Plaintiffs and the Damages Class.   It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

**North Carolina**

332.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clomipramine in North Carolina at prices that were more than they would have been but for Defendants' actions.   Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.   Plaintiffs and the Damages Class did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.   The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from arising from unlawful overcharges to Plaintiffs and the Damages Class.   The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to unlawful overcharges are ascertainable by review of sales records.   Defendants consciously accepted the benefits conferred upon them.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**North Dakota**

333.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clomipramine in North Dakota at prices that were more than they would have been but for Defendants' actions. Defendants have been enriched by revenue resulting from unlawful overcharges for Clomipramine.   Plaintiffs and the Damages Class have been impoverished by the overcharges for Clomipramine resulting from Defendants' unlawful conduct.  Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.   There is no justification for Defendants' receipt of the benefits causing their enrichment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.   Plaintiffs and the Damages Class have no remedy at law. Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Oklahoma**

334.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clomipramine in Oklahoma at prices that were more than they would have been but for Defendants' actions.  Defendants received money from Plaintiffs and the Damages Class as a direct result of the unlawful overcharges, and have retained this money. Defendants have paid no consideration to any other person in exchange for this money.  Plaintiffs and the Damages Class have no remedy at law.  It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Oregon**

335.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clomipramine in Oregon at prices that were more than they would have been but for Defendants' actions.   Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.   Defendants were aware of the benefit bestowed upon them by Plaintiffs and the Damages Class.   Under the circumstances, it would be unjust for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Pennsylvania**

336.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clomipramine in Pennsylvania at prices that were more than they would have been but for Defendants' actions. Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.   Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Puerto Rico**

337.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clomipramine in Puerto Rico at prices that were more than they would have been but for Defendants' actions.   Defendants have been enriched by revenue resulting from unlawful overcharges for Clomipramine.   Plaintiffs and the Damages Class have been

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

impoverished by the overcharges for Clomipramine resulting from Defendants' unlawful conduct.  Defendants' enrichment and Plaintiffs' and the Damages Class's impoverishment are connected.   There is no justification for Defendants' receipt of the benefits causing their enrichment and Plaintiffs' and the Damages Class's impoverishment, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges. Plaintiffs and the Damages Class have no remedy at law.

**Rhode Island**

338.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clomipramine in Rhode Island at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**South Carolina**

339.    Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clomipramine in South Carolina at prices that were more than they would have been but for Defendants' actions.  The benefits conferred upon Defendants were not gratuitous, in that they comprised revenue created by unlawful overcharges arising from arising from unlawful overcharges to Plaintiffs and the Damages Class.  Defendants realized value from the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances,

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**South Dakota**

340.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clomipramine in South Dakota at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants. Defendants were aware of the benefit bestowed upon them by Plaintiffs and the Damages Class. Under the circumstances, it would be inequitable and unjust for Defendants to retain such benefits without reimbursing Plaintiffs and the Damages Class.

**Tennessee**

341.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clomipramine in Tennessee at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.  It would be futile for Plaintiffs and the Damages Class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiffs and the Damages Class with respect to Defendants' sales of Clomipramine.  It would be futile for

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Plaintiffs and the Damages Class to exhaust all remedies against the entities with which Plaintiffs and the Damages Class have privity of contract because Plaintiffs and the Damages Class did not purchase Clomipramine directly from any Defendant.

**Texas**

342.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clomipramine in Texas at prices that were more than they would have been but for Defendants' actions.  Defendants have received a benefit from Plaintiffs and the Damages Class in the nature of revenue resulting from the unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Defendants.  Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  The circumstances under which Defendants have retained the benefits bestowed upon them by Plaintiffs and the Damages Class are inequitable in that they result from Defendants' unlawful overcharges for Clomipramine.  Plaintiffs and the Damages Class have no remedy at law.

**Utah**

343.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clomipramine in Utah at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**Vermont**

344.     Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clomipramine in Vermont at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants accepted the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Virginia**

345.     Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clomipramine in Virginia at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of the benefit bestowed upon them.  Defendants should reasonably have expected to repay Plaintiffs and the Damages Class. The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of Clomipramine.  Defendants have paid no consideration to any other person for any of the benefits they have received from Plaintiffs and the Damages Class.

**Washington**

346.     Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clomipramine in Washington at prices that were more than they would have

159

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.   Defendants were aware of or appreciated the benefit conferred upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**West Virginia**

347.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clomipramine in West Virginia at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants were aware of or appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Wisconsin**

348.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clomipramine in Wisconsin at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.  Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  Under the circumstances, it would be

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**Wyoming**

349.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clomipramine in Wyoming at prices that were more than they would have been but for Defendants' actions.  Plaintiffs and the Damages Class have conferred an economic benefit upon Defendants, in the nature of revenue resulting from unlawful overcharges to the economic detriment of Plaintiffs and the Damages Class.   Defendants accepted, used and enjoyed the benefits bestowed upon them by Plaintiffs and the Damages Class.   Under the circumstances, it would be inequitable for Defendants to retain such benefits without compensating Plaintiffs and the Damages Class.

**U.S. Virgin Islands**

350.   Defendants unlawfully overcharged End-payers, who made purchases of or reimbursements for Clomipramine in the United States Virgin Islands at prices that were more than they would have been but for Defendants' actions.  Defendants have been enriched by revenue resulting from unlawful overcharges for Clomipramine, which revenue resulted from anticompetitive prices paid by Plaintiffs and the Damages Class, which inured to Defendants' benefit.  Defendants' enrichment has occurred at the expense of Plaintiffs and the Damages Class.  Defendants appreciated the benefit bestowed upon them by Plaintiffs and the Damages Class.  It is against equity and good conscience for Defendants to be permitted to retain the revenue resulting from their unlawful overcharges.  Plaintiffs and the Damages Class have no remedy at law.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## XV.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment for the following relief:

1.      The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable Notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

2.      That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed: (a) an unreasonable restraint of trade or commerce in violation of Sections 1 and 3 of the Sherman Act; (b) a *per se* violation of Sections 1 and 3 of the Sherman Act; (c) an unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and (d) acts of unjust enrichment by Defendants as set forth herein.

3.      Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed under such state laws, and that a judgment in favor of Plaintiffs and members of the Damages Class be entered against Defendants jointly and severally in an amount to be trebled to the extent such laws permit;

4.      Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully obtained;

5.      Plaintiffs and members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment, and the Court establish of a constructive trust consisting of all ill-

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

gotten gains from which Plaintiffs and members of the Damages Class may make claims on a *pro rata* basis;

6.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

7.      Plaintiffs and members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate;

8.      Plaintiffs and members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

9.      Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## XVI.   JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure, of all issues so triable.

April 1, 2019

Respectfully submitted,

Roberta D. Liebenberg, Esquire
Fine, Kaplan and Black, R.P.C.
One South Broad Street, 23rd Floor
Philadelphia, PA  19107
(215) 567-6565
rliebenberg@finekaplan.com

**Lead Counsel for the End-Payer
Plaintiffs**

Gregory S. Asciolla, Esquire
Labaton Sucharow LLP
140 Broadway
New York, NY  10005
(212) 907-0700
gasciolla@labaton.com

Elizabeth J. Cabraser, Esquire
Lieff Cabraser Heimann & Bernstein LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
(415) 956-1000
ecabraser@lchb.com

Jayne A. Goldstein, Esquire
Shepherd Finkelman Miller & Shah, LLP
1625 N. Commerce Parkway, Suite 320
Fort Lauderdale, FL 33326
(886) 849-7545
jgoldstein@sfmslaw.com

Joseph R. Saveri, Esquire
Joseph Saveri Law Firm, Inc.
555 Montgomery Street, Suite 1210

Michael M. Buchman, Esquire
Motley Rice LLC
600 Third Avenue, Suite 2101
New York, NY  10016
(212) 577-0040
mbuchman@motleyrice.com

James R. Dugan, II, Esquire
The Dugan Law Firm, APLC
365 Canal Street, Suite 1000
New Orleans, LA 70130
(504) 648-0180
jdugan@dugan-lawfirm.com

Mindee J. Reuben, Esquire
Lite DePalma Greenberg, LLC
1835 Market Street, 27th Floor
Philadelphia, PA  19103
(267) 314-7980
mreuben@litedepalma.com

Dena C. Sharp, Esquire
Girard Sharp LLP
601 California Street, Suite 1400

164

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

San Francisco, CA  94111
(415) 500-6800
jsaveri@saverilawfirm.com

Heidi M. Silton, Esquire
Lockridge Grindal Nauen P.L.L.P.
100 Washington Avenue South
Suite 2200
Minneapolis, MN  55401
(612) 339-6900
hmsilton@locklaw.com

Adam J. Zapala, Esquire
Cotchett, Pitre & McCarthy, LLP
840 Malcolm Road, Suite 200
Burlingame, CA  94010
(650) 697-6000
azapala@cpmlegal.com

San Francisco, CA 94108
(415) 981-4800
chc@girardsharp.com

Bonny E. Sweeney, Esquire
Hausfeld LLP
600 Montgomery Street, Suite 3200
San Francisco, CA  94111
(415) 633-1908
bsweeney@hausfeld.com

### End-Payer Plaintiffs' Steering Committee

Audrey A. Browne, Esquire
    American Federation of State, County
and Municipal Employees District Council
37 Health & Security Plan
125 Barclay Street, Room 313
New York, NY 10007
(212) 815-1304
abrowne@dc37.net

**Attorneys for Plaintiff American
Federation of State, County and
Municipal Employees District
Council 37 Health & Security Plan**

Lee Albert, Esquire
Glancy Prongay & Murray, LLP
122 East 42nd Street, Suite 2920
New York, NY 10168
(212) 682-5340
lalbert@glancylaw.com

### Additional End-Payer Plaintiffs' Counsel

PUBLIC VERSION
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of April, 2019, the foregoing Consolidated Amended End-Payer Class Action Complaint was filed with the Clerk of Court who will electronically enter this filing on the docket.  Thereafter, via ECF notifications, the filing will be served on all interested parties registered for electronic filing and be available for viewing and downloading from the Court's ECF system.


Roberta D. Liebenberg