**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL No. 2724<br>16-MD-2724 |
| *IN RE: CLOBETASOL CASES* | EPP CASE: 16-CM-27242 |
| *IN RE: CLOMIPRAMINE CASES* | EPP CASE: 16-CM-27242 |
| THIS DOCUMENT RELATES TO:<br><br>*END-PAYER PLAINTIFFS'*<br>*BELLWETHER ACTION* | HON. CYNTHIA M. RUFE |

**BELLWETHER DEFENDANTS' MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR MOTION FOR PARTIAL RECONSIDERATION, OR IN THE**
**ALTERNATIVE, MOTION TO PERMIT CERTAIN SUPPLEMENTAL REPORTS**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................................... 1

BACKGROUND ..................................................................................................................... 4

LEGAL STANDARD.............................................................................................................. 5

ARGUMENT .......................................................................................................................... 6

I.  The Court Should Reconsider Its Erroneous Partial Exclusion of Dr. Trish's Testimony, Which Overlooks Key Portions of the Record. ................................................ 6

    A.  Dr. Trish's Opinions on Spread Pricing Are Methodologically Sound and Directly Connected to the Bellwether Drugs. ........................................................... 7

        i.  Dr. Trish Conducted Analysis Demonstrating Specifically If and How PBMs Captured Profit From Clomipramine and Clobetasol Sales. ........................................................................................................ 7

        ii.  Dr. Trish Properly Opined Regarding How PBMs Leveraged Consolidation, Complexity, and Opacity to Increase End-Payor Drug Costs. ..................................................................................................... 11

    B.  Dr. Trish's Background Materials are Reliable and Relevant. ............................. 13

II.  This Court Should Grant Reconsideration of the Partial Exclusion of Dr. Hughes. ........ 15

    A.  Dr. Hughes' Opinions on Injury and Pass-Through That Are Based on Individual Transaction Analyses are Reliable and Entirely Consistent with Third Circuit Precedent.................................................................................. 15

    B.  Dr. Hughes' Opinion on CVS............................................................................... 18

III.  The Court Applied the Incorrect Standard for a Rebuttal Expert. .................................... 20

IV.  In The Alternative, Defendants Should Be Permitted to Submit Supplemental Reports from Dr. Trish and Dr. Hughes. ......................................................................... 25

CONCLUSION..................................................................................................................... 30

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*ADANI Exps., Ltd. v. AMCI Corp.*,
  2009 U.S. Dist. LEXIS 4146 (W.D. Pa. Jan. 21, 2009).........................................................5

*Am. Diabetes Ass'n v. Friskney Family Tr., LLC*,
  2015 U.S. Dist. LEXIS 184214 (E.D. Pa. July 21, 2015)....................................................21

*Am. Empire Surplus Lines Ins. Co. v. J.R. Contracting & Env't Consulting, Inc.*,
  2024 U.S. Dist. LEXIS 190872 (S.D.N.Y. Oct. 21, 2024) ...........................................21, 24

*Apex Fin. Options, LLC v. Gilbertson*,
  2022 U.S. Dist. LEXIS 36634 (D. Del. Mar. 1, 2022) ...................................21, 22, 23, 25

*Breidor v. Sears, Roebuck & Co.*,
  722 F.2d 1134 (3d Cir. 1983)...........................................................................................10, 20

*Cisson v. C. R. Bard, Inc.*,
  2013 U.S. Dist. LEXIS 190848 (S.D. W. Va. July 1, 2013)...................................................1

*City of Pomona v. SQM N. Am. Corp.*,
  750 F.3d 1036 (9th Cir. 2014) .............................................................................................13

*DeMarines v. KLM Royal Dutch Airlines*,
  580 F.2d 1193 (3d Cir. 1978)...............................................................................................27

*Duplantier v. Mastex Indus.*,
  2008 U.S. Dist. LEXIS 127520 (E.D. Tex. June 20, 2008)...................................................5

*Feit v. Great-West Life & Annuity Ins. Co.*,
  460 F. Supp. 2d 632 (D.N.J. 2006) ................................................................................11, 13

*Hannan v. City of Philadelphia*,
  No. 05-cv-02863 (E.D. Pa. Nov. 7, 2007) ............................................................................5

*In re Energy Future Holdings Corp.*,
  904 F.3d 298 (3d Cir. 2018)...................................................................................................5

*In re Graphics Processing Units Antitrust Litig.*,
  253 F.R.D. 478 (N.D. Cal. 2008)..........................................................................................18

*In re Hydrogen Peroxide Antitrust Litig.*,
  552 F.3d 305 (3d Cir. 2008)..................................................................................................24

*In re J&J Talcum Powder Prods. Mktg.*,
  2024 U.S. Dist. LEXIS 23446 (D.N.J. Feb. 9, 2024) ..........................................................30

*In re Paoli R.R. Yard PCB Litig.*,
    35 F.3d 717 (3d Cir. 1994)......................................................................................11, 14

*In re Plastics Additives Antitrust Litig.*,
    2010 U.S. Dist. LEXIS 90135 (E.D. Pa. Aug. 31, 2010)....................................................17

*In re Processed Egg Prods. Antitrust Litig.*,
    312 F.R.D. 124 (E.D. Pa. 2015)...........................................................................15, 17

*In re Zoloft Prod. Liab. Litig.*,
    2015 U.S. Dist. LEXIS 1598 (E.D. Pa. Jan. 7, 2015) .................................................28, 29

*In re Zyprexa Prods. Liab. Litig.*,
    489 F. Supp. 2d 230 (E.D.N.Y. 2007) .........................................................................21, 22

*J.P. Columbus Warehousing v. United Fire & Cas. Co.*,
    2021 U.S. Dist. LEXIS 58633 (S.D. Tex. Feb. 18, 2021) .....................................................6

*Kimmel v. Cavalry Portfolio Services, LLC*,
    2011 U.S. Dist. LEXIS 83008 (E.D. Pa. July 27, 2011)........................................................5

*Koninklijke Philips N.V. v. Zoll Lifecor Corp.*,
    2017 U.S. Dist. LEXIS 116337 (W.D. Pa. May 12, 2017).................................................14

*Maloney v. Microsoft Corp.*,
    2011 U.S. Dist. LEXIS 127870 (D.N.J. Nov. 4, 2011).....................................................13

*Max's Seafood Cafe by Lou-Ann, Inc. v. Quinteros*,
    176 F.3d 669 (3d Cir. 1999)..........................................................................................5

*Meyers v. Pennypack Woods Home Ownership Ass'n*,
    559 F.2d 894 (3d Cir. 1977).............................................................................26, 27, 28, 29

*Millea v. Ford Motor Co.*,
    2014 U.S. Dist. LEXIS 103604 (W.D. Ky. July 30, 2014)...................................................5

*Nat'l Fire & Marine Ins. Co. v. Newtown Square, LLC*,
    2024 U.S. Dist. LEXIS 71192 (E.D. Pa. Apr. 18, 2024) ...................................................21

*Navelski v. Int'l Paper Co.*,
    244 F. Supp. 3d 1275 (N.D. Fla. 2017)............................................................................21

*Rhoads Indus. v. Shoreline Found., Inc.*,
    2021 U.S. Dist. LEXIS 124066 (E.D. Pa. July 2, 2021)....................................................23

*Sabatini v. Its Amore Corp.*,
    455 Fed. App'x 251 (3d Cir. 2011)..................................................................................5

*Sheet Metal Workers Local 441 Health & Welfare Plan v. GlazoSmithKline, PLC*,
    2010 U.S. Dist. LEXIS 105646 (E.D. Pa. Sept. 30, 2010) .........................................18, 19

*TAKTL, LLC v. IWR, N. Am., LLC*,
    2024 U.S. Dist. LEXIS 181564 (W.D. Pa. Oct. 4, 2024) ...................................................11

*United States v. Iglesias*,
    U.S. Dist. LEXIS 42252 (E.D. Pa. Mar. 5, 2021)..................................................................5

*United States v. Mitchell*,
    365 F.3d 215 (3d Cir. 2004)........................................................................... *passim*

*United States v. Velasquez*,
    64 F.3d 844 (3d Cir. 1995)..........................................................................2, 19, 24

*Vista Healthplan, Inc. v. Cephalon, Inc.*,
    2015 U.S. Dist. LEXIS 74846 (E.D. Pa. June 10, 2015) ...................................................24

*Walsh/Granite v. HDR Eng'g, Inc.*,
    2020 U.S. Dist. LEXIS 272282 (W.D. Pa. June 15, 2020)................................................21

*Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop.*,
    2021 U.S. Dist. LEXIS 107778 (E.D. Pa. June 9, 2021) ......................................18, 25, 26

*Wisconsin v. Indivior Inc. (In re Suboxone (Buprenorphine Hydrochloride &*
    *Naloxone) Antitrust Litig.*,
    2020 U.S. Dist. LEXIS 219949 (E.D. Pa. Nov. 24, 2020)............................................12, 13

*Withrow v. Spears*,
    967 F. Supp. 2d 982 (D. Del. 2013)................................................................................22

*Worbetz v. Ward North America, Inc.*,
    54 Fed. App'x 526 (3d Cir. 2002)..................................................................................5

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012)..........................................................................................29

**RULES**

Fed. R. Civ. P. 16(b)(4).................................................................................................25

Fed. R. Civ. P. 23(b) .....................................................................................................15

Fed. R. Civ. P. 23(b)(3).................................................................................................24

Fed. R. Civ. P. 26(e) .....................................................................................................25

Fed. R. Civ. P. 54...........................................................................................................5

Fed. R. Civ. P. 54(b) ......................................................................................................4

Fed. R. Civ. P. 59(e) ......................................................................................................4

Fed. R. Civ. P. 403 .......................................................................................................14

Fed. R. Civ. P. 702....................................................................................................13, 14

Fed. R. Evid. 703 ......................................................................................................12, 13

Local Rule of Civil Procedure 7.1(g)...............................................................................4

**MISCELLANEOUS**

Ohio's Medicaid Managed Care Pharmacy Services, *Auditor of State Report*
(August 16, 2018) ................................................................................................28

Oregon Health Authority, *Pharmacy Benefit Managers Poor Accountability and
Transparency Harm Medicaid Patients and Independent Pharmacies*
(August 2023) ....................................................................................................28

## INTRODUCTION

The Bellwether Defendants[1] respectfully request that this Court reconsider and revise portions of its December 3, 2024, Opinion granting End-Payer Plaintiffs' ("EPPs") motions to partially exclude the opinions of two experts, Dr. Erin Trish and Dr. James Hughes.  ECF No. 3171. The Opinion overlooked key analysis in these experts' reports and testimony, which was supported by tested methodologies that easily satisfy *Daubert*, particularly for rebuttal expert opinions.  The resulting exclusions are thus improper and would unfairly prejudice Defendants throughout this case—on inextricably intertwined issues such as class certification, liability, and damages—creating a lopsided record that would mislead the trier of fact.

Moreover, the Court's rulings risk unfairly prejudicing other Defendants in this multidistrict litigation ("MDL") proceeding, where rulings on experts may inform numerous other cases. Reconsideration of an order excluding expert testimony merits especially close consideration in a Bellwether case, where "allowing the jury to hear the entirety of the evidence . . . is prudent and essential to the efficient and just resolution of the" case.  *See Cisson v. C. R. Bard, Inc.*, 2013 U.S. Dist. LEXIS 190848, *6-9 (S.D. W. Va. July 1, 2013) (reversing exclusion of expert testimony and citing as "the sole reason" that "this is the first bellwether trial.").

***Dr. Trish.*** The Opinion says Dr. Trish failed to show "if and how PBMs . . . capture[d] the profit," such that any increased costs to EPPs could not be attributed to Defendants.  Op. 35.  Yet that is precisely what Dr. Trish did.  In chart after chart and page after page of analysis, she painstakingly tracked how pharmacy benefit managers ("PBMs") used many tools, including spread pricing—PBMs' practice of charging EPPs higher prices than the prices PBMs pay to pharmacies,

---

[1] Bellwether Defendants comprise Mylan Inc., Mylan Pharmaceuticals Inc., Sandoz Inc., Fougera Pharmaceuticals Inc., Taro Pharmaceuticals U.S.A., Inc., Wockhardt USA LLC, Morton Grove Pharmaceuticals, Inc., Actavis Holdco U.S., Inc., and Actavis Pharma, Inc.

1

so as to increase PBMs' revenue and profits and lead to increased costs to EPPs—quite apart from any list or net price increases by the manufacturer Defendants.  Trish Reps. §§ VII-X.

Indeed, as just one example, which the Opinion never mentions, Dr. Trish showed that 10-12% of all transactions managed by just one PBM involved the PBM paying *zero* dollars to the pharmacy but charging EPPs on average more than $100 for Clobetasol and Clomipramine products.  For these transactions, as Dr. Trish explained, the alleged overcharges borne by EPPs were captured entirely by the PBM; this capture is not accounted for by Plaintiffs' expert, Dr. McClave, in his damages model, but instead is erroneously attributed to damages.  In other words, in this one example alone, Dr. Trish identified numerous instances where PBMs captured *all* the profit from the increased prices paid by EPPs for Bellwether drug sales and explained how they did so (*id*. ¶¶ 153-54; EPP *Daubert* Hearing Tr. 42:10-18 (Sept. 26, 2024)), belying the finding that she failed to conduct such analysis.  *In fact, Dr. Trish's analysis of those transactions was so extensive that Plaintiffs' experts did not attempt to rebut it, and Plaintiffs did not even seek to exclude it.*

Moreover, "when all experts are qualified," it is reversible error to allow Plaintiffs' expert, Dr. McClave, to testify about spread pricing while barring Defendant's expert, Dr. Trish, from rebutting him, *United States v. Mitchell*, 365 F.3d 215, 245 (3d Cir. 2004) (citation omitted) (courts "may not make winners and losers through its choice of which side's experts to admit"); *United States v. Velasquez*, 64 F.3d 844, 848 (3d Cir. 1995).  Each of these errors decidedly supports reconsideration of the Opinion as to Dr. Trish.

**Dr. Hughes.**  The Court's analysis of Dr. Hughes is equally problematic.  For starters*,* the Court excludes his entire opinion on class-wide impact because, in its view, "his evaluation of injury is flawed."  Op. 24.  But Dr. Hughes repeatedly stressed, in his report, deposition, and hearing testimony, that he assessed injury on a "transaction-by-transaction basis"—the Court's very

standard—and he provided "about ten examples" of such analysis in his report. EPP *Daubert* Hearing Tr. 167:14-168:11 (Sept. 24, 2024). Without grappling with this testimony, the Court focused on a *general* definition, about which Dr. Hughes was questioned at his deposition, citing its disagreement with *that* definition to justify excluding several of his opinions—even though his opinions in this case rely on the *specific*, transaction-by-transaction definition. As Dr. Hughes testified at deposition and at the *Daubert* hearing, he applied that specific definition in all of his analyses, such as the analysis of injury flowing from CVS purchases, where the issue is *not* whether CVS was injured but rather that EPPs' expert has not excluded the unimpacted transactions where CVS purchased Clomipramine from Mylan. *See infra* ¶ II(A).

For these reasons, the Court should also reconsider and revise its Opinion as to Dr. Hughes.

In addition, for both Dr. Trish and Dr. Hughes, the Opinion improperly requires that Defendants' experts conduct the very affirmative analyses and create the very models that, under Third Circuit law, are *EPPs*' burden. The burden of proof here is squarely on Plaintiffs, and a host of courts, including ones in the Third Circuit, have held that rebuttal experts need not independently prove the *absence* of class-wide injury or antitrust impact—they need only critique EPPs' experts' opinions. Here, Defendants' experts challenged EPPs' experts' reliance on unsupportable causal inferences, assumptions about industry dynamics and pricing, and failure to account for the impact of independent decision-makers, such as retailers and PBMs, in the supply chain. Such testimony should have been permitted.

In the alternative, should the Court decline to revisit the Opinion, the Court should permit submission of supplemental reports by Dr. Trish and Dr. Hughes to address the purported shortcomings cited by the Court. That would advance the MDL's goals of ensuring that all reliable

evidence is heard and fostering clarity and efficiency in later cases, without prejudicing Plaintiffs or delaying the class certification hearing, summary judgment, or trials in these Bellwether cases.

## BACKGROUND

The Clomipramine and Clobetasol Bellwether cases involve allegations that certain generic drug manufacturer Defendants engaged in anticompetitive conduct.  EPPs seek to certify classes of indirect purchasers of each drug who allegedly were economically harmed by Defendants' purported price coordination.  EPPs have submitted expert reports claiming to show common, class-wide injury and overcharge damages flowing directly from the alleged list price increases.

Defendants in turn offered rebuttal testimony, including from Dr. Trish and Dr. Hughes, that identified material shortcomings in EPPs' experts' analysis and conclusions.  Dr. Trish, an expert in health economics and the pharmaceutical supply chain, opined that PBMs exert substantial influence on the final prices paid by EPPs, independent of manufacturer list-price changes.  Dr. Trish demonstrated that, for a substantial share of class members, the alleged overcharges they incurred were levied by PBMs, and that Plaintiffs' experts' class damages models fail to capture this and instead incorrectly assume that the overcharges allegedly levied by Defendant manufacturers were directly passed through on a class-wide basis as indirect overcharges to EPPs.  Dr. Hughes, a seasoned antitrust economist with long experience in the pharmaceutical industry, opined that EPPs' experts have no reliable means to show class-wide injury or damages and failed to account for the complexity of the relevant supply chains, making it impossible to assess EPPs' allegations without individualized, transaction-level inquiry.

## LEGAL STANDARD

"Motions for reconsideration are governed by Local Rule of Civil Procedure 7.1(g) and are considered motions to 'alter or amend' a judgment under Federal Rule of Civil Procedure 59(e)."[2] *Hannan v. City of Philadelphia*, No. 05-cv-02863 (E.D. Pa. Nov. 7, 2007) (Rufe, J.).  Reconsideration is appropriate "to correct a clear error of law or fact or to prevent manifest injustice." *Max's Seafood Cafe by Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999).  Though the Third Circuit has not "adopted strict or precise definitions for clear error of law or fact or manifest injustice in the context of a motion for reconsideration," *United States v. Iglesias*, U.S. Dist. LEXIS 42252, *4 (E.D. Pa. Mar. 5, 2021) (internal quotation marks omitted), courts in the Circuit have granted reconsideration where the law was misapplied due to a misunderstanding of facts, *e.g.*, *In re Energy Future Holdings Corp.*, 904 F.3d 298, 311 (3d Cir. 2018), where portions of a party's briefing and testimony were overlooked, *e.g.*, *Worbetz v. Ward North America, Inc.*, 54 Fed. App'x 526, 533 (3d Cir. 2002), where the court realized that its earlier analysis would have worked a manifest injustice, *e.g.*, *Sabatini v. Its Amore Corp.*, 455 Fed. App'x 251, 254-55 (3d Cir. 2011), or simply where evidence was available but not the focus of the court's attention, *e.g.*, *Kimmel v. Cavalry Portfolio Services, LLC*, 2011 U.S. Dist. LEXIS 83008, *7 (E.D. Pa. July 27, 2011).

Courts have reversed orders excluding expert testimony on reconsideration.  *E.g.*, *ADANI Exps., Ltd. v. AMCI Corp.*, 2009 U.S. Dist. LEXIS 4146, *4-10 (W.D. Pa. Jan. 21, 2009) (reversing ruling that defendants' expert was not qualified to testify on the coal industry); *Millea v. Ford Motor Co.*, 2014 U.S. Dist. LEXIS 103604, *11-13 (W.D. Ky. July 30, 2014) ("In retrospect, the

---

[2] In addition, Federal Rule of Civil Procedure 54(b) provides that "any order or other decision . . . may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."  Should the Court determine that Rule 54 is the proper procedural device under which to bring an interlocutory motion for reconsideration, Bellwether Defendants move under Rule 54 in the alternative.

Court believes it read the basis for Zinke's opinion too narrowly, without giving reasonable inferences to the expert. After further consideration, it appears there is a reasonable basis for the expert's opinion."); *Duplantier v. Mastex Indus.*, 2008 U.S. Dist. LEXIS 127520, *1-2 (E.D. Tex. June 20, 2008) ("Plaintiff has shown good cause for the Court to reconsider its previous order striking Heidebrecht."); *J.P. Columbus Warehousing v. United Fire & Cas. Co.*, 2021 U.S. Dist. LEXIS 58633, *4-8 (S.D. Tex. Feb. 18, 2021) (reversing grant of motion to exclude despite some "concerns about the basis of Becker's broader opinion").

In addition, "the same standards of reliability and helpfulness should be applied to both sides," *Mitchell*, 365 F.3d at 245 (citing *Velasquez*, 64 F.3d at 848-49), and applying those standards to favor one side's expert's is a reversible "error … of law" (*Velasquez*, 64 F.3d at 848, 852).

## ARGUMENT

### I.  The Court Should Reconsider Its Erroneous Partial Exclusion of Dr. Trish's Testimony, Which Overlooks Key Portions of the Record.

Defendants respectfully request that the Court reconsider its partial exclusion of Dr. Trish's opinion regarding spread pricing and certain opinions regarding industry background.

As to spread pricing, the Court found that Dr. Trish's opinion was "impermissibly speculative" and that "further analysis" was required. Op. 35. But she extensively addressed the very issues highlighted in the Court's Opinion, including "if and how PBMs did actually capture [] profit" on the two Bellwether drugs at issue. *Id.* Further, by assessing the weight due Dr. Trish's analysis, rather than evaluating the soundness and reliability of her methodology, the Opinion misapplied *Daubert*. Finally, by allowing EPPs' expert to testify on spread pricing while rejecting Dr. Trish's rebuttal and demanding more affirmative analysis, the Court broke from Third Circuit precedent on rebuttal expert testimony and impermissibly shifted the burden of proof.

6

As to industry background materials, the Court's assessment of Dr. Trish's use of what the Court called "post-conspiracy materials" was likewise erroneous.[3]  As detailed below, Dr. Trish sufficiently connected these materials to EPPs' claimed harm *during the relevant period.*  Her discussion of the PBM industry background and changes that occurred impacting the relevant period shows the changing influence of PBMs on prices paid by different EPPs during the relevant period, compared to the benchmark period used by Plaintiffs' experts.  The failure of Plaintiffs' experts' damages models to account for PBMs' separate influence on some EPP prices invalidates their models as methods for assessing injury and damages on a class-wide basis and would assist the fact-finder in evaluating EPPs' claims.

A.    **Dr. Trish's Opinions on Spread Pricing Are Methodologically Sound and Directly Connected to the Bellwether Drugs.**

This Court's decision to exclude Dr. Trish's opinions on spread pricing rests on the premise that she failed "to demonstrate if and how PBMs did actually capture [certain] profit," creating "too large a gap between Dr. Trish's presented data and her opinions critiquing EPPs' experts." Op. 34, 35.  That premise is incorrect.  Dr. Trish conducted extensive analysis supporting her opinions.  But even if she had not, the Opinion would still warrant reconsideration because, under binding precedent, rebuttal experts need only critique Plaintiffs' expert reports.

i.    **Dr. Trish Conducted Analysis Demonstrating Specifically If and How PBMs Captured Profit From Clomipramine and Clobetasol Sales.**

The Opinion cites one paragraph (¶ 152) of Dr. Trish's report in asserting that Dr. Trish did not "conduct analysis to demonstrate if and how PBMs did actually capture [certain] profit." Op. 35.  But the preceding paragraph (¶ 151) provides just that analysis.  Specifically, Dr. Trish analyzed Clomipramine and Clobetasol data from two leading PBMs to show empirically that

---

[3] Defendants do not here seek reconsideration of the ruling on brand rebates and other pricing tools, Op. 32, but reserve their right to appeal.

spreads charged for Bellwether drugs varied independently of Defendants' list prices.  Trish Reps. 9-10, ¶¶ 124-29; Exs. 6-10.  As her report explained, spread refers to the practice of PBMs charging EPPs higher prices for the products than the prices they pay to pharmacies, and this spread is retained by PBMs as profit, so analyzing spread *by definition* means analyzing PBMs' profit.  Trish Reps. ¶ 72; EPP *Daubert* Hearing Tr. 30:24-31:1 (Sept. 26, 2024) ("The PBM is charging the end-payer more than they're paying the pharmacy. And so that difference is called spread, and the PBM retains that spread as its profit.").  As she showed, these PBMs captured profit from sales of those drugs, including periods in which PBM profit increased while manufacturer list prices fell.  Trish Reps. Exs. 21–22.  By calculating both the total change in spread and average spread per claim, she showed that PBMs did in fact capture profits on the Bellwether drugs.[4]  Thus, the record clearly shows that she undertook the requisite analysis and highlighted empirical evidence that contradicts the assumption underlying Plaintiffs' experts' damages models—namely, that alleged overcharges by manufacturer Defendants are indirectly passed through to EPPs.  Thus, when Dr. Trish was asked, "Did you analyze PBM's use of spread pricing to see whether it impacted . . . Clomipramine and Clobetasol?," she unequivocally stated: "Yes, I did."  EPP *Daubert* Hearing Tr. 34-36 (Sept. 26, 2024).

The Court also omitted Dr. Trish's studies quantifying that one of the largest PBMs captured 100% of end-payer payment as profit on "10 to 12 percent of the transactions."  Trish Reps.

---

[4] Trish Reps. 9-10 ("[T]he total dollar amount of spread obtained by two PBMs for clobetasol increased by more than eight-fold from $20 million in Dr. McClave's benchmark period to $166 million during the proposed Class Period, while total spread obtained by these PBMs for clomipramine increased from $0.7 million during the benchmark period to $37 million during the proposed Class Period.  I find that the average spread per claim follows a similar pattern, indicating that the total spread increase is not driven solely by an increase in the number of claims.  For clobetasol, the average spread per claim increased from $2.67 to $21.57, while the average spread per claim for clomipramine experienced an even higher increase, from $2.17 to $71.51.").

¶¶ 153-54; EPP *Daubert* Hearing Tr. 42:11-18 (Sept. 26, 2024) ("[A]bout 10 to 12 percent of the transactions [of the PBM] across these two at-issue products were falling into [ ] you could deem it 100 percent spread type of category, where the entire amount that the end-payer paid is dictated by the PBM and is kept by the PBM. . . . [T]hey're not paying anything to the pharmacy on this claim."). Moreover, between 12 to 20 percent of that PBM's customers *only* had 100% spread profit transactions —in other words, the PBM captured every cent paid by the TPP as profit. *Id.* 43:22-44:2 ("every single transaction that they're [ ] involved in, all of the money . . . that they paid for these drugs, went only to the PBM and was dictated only by the PBM within [that PBM's] data."); Trish Dep. Tr. 275:8-287:1, 280:21-294:2.

This analysis unambiguously speaks to whether "PBMs did actually capture [] profit." Op. 35. It also shows that there are many transactions where the PBM captured the entirety of Plaintiffs' estimated end-payer overcharges, yet Plaintiffs' damages model nevertheless assumes, without support, that the manufacturer Defendants' conduct caused the entire price increase. In fact, the analysis specifically addresses the Court's request for analysis to support "Dr. Trish's opinions on overcharge pass through." *Id.* And unlike other aspects of her spread pricing analyses—e.g., calculations showing that PBM spread varied independent of changes in list prices, or showing a drastic reduction in cost per claim in those instances where a PBM ceased employing spread pricing—*Plaintiffs never sought to exclude this particular analysis of some PBMs capturing 100% of the profit, and Plaintiffs' experts did not endeavor to rebut it*. Trish *Daubert* Mtn. Ex. 1.

Dr. Trish also explained exactly "how" PBMs captured the profit. Both her report and her testimony extensively analyzed how PBMs increased their profits and the share of total end-payer payments accruing to PBMs through increased spreads, either by increasing the costs paid by end payors (without corresponding increases to pharmacies), decreasing reimbursements to

pharmacies (without corresponding decreases to end payors), or a combination of both. Trish Reps. ¶ 152; *see also id.* ¶¶ 15-16, § VIII.A, § X.B.2.d; Trish Dep. Tr. 234:19-22 ("If [the PBM is] vertically integrated with a pharmacy or—then they are able to basically capture the revenue on the pharmacy side of the equation."); *id.* 222:12-19 ("[This putative class member] is just one example that I identified in the data and showed that for this particular instance, for this particular firm, when they switched from a spread pricing model [to a pass-through pricing model], they observed a change or a reduction on the order of 76 percent of their cost per claim for clobetasol ointment purchased from [their] PBM."). If there is any uncertainty as to whether a PBM increased end-payer costs or decreased pharmacy reimbursements on any particular transaction, that goes to weight—it does not mean Dr. Trish failed to "conduct analysis to demonstrate if and how PBMs did actually capture that profit." Op. 34-35. As she showed, whichever mechanism was at play, the use of spread pricing resulted in increased profits to the PBM and higher prices to end-payors on Clomipramine and Clobetasol, independent of a change in manufacturer pricing. Trish Reps. ¶ 152 ("In either case, the larger PBM spread increases end payor costs relative to what they would be with a smaller PBM spread, independent of any change in manufacturer WAC.").

In sum, Dr. Trish conducted extensive analyses that went overlooked, some of which were not even challenged by Plaintiffs or their experts.[5] These analyses more than satisfy *Daubert*, and the Opinion should be revised.

---

[5] In sharp contrast, Dr. McClave failed to properly account for spread pricing in his model or even to look at spread pricing: "Q. So you did not undertake any investigation or analysis to isolate the impact of spread pricing with respect to clobetasol or clomipramine purchases; correct? MR. PESSIN: Object to form. A. I am not thinking of any analysis that I've undertaken."). McClave Dep. Tr. 230:13-19. To credit Dr. McClave's testimony, Op. 14-15, while excluding Dr. Trish's rebuttal—particularly as to an issue so closely intertwined to, among other things, class certification—would be precisely the type of improper championing prohibited by the Third Circuit. *See Mitchell*, 365 F.3d at 245.

###### ii.    Dr. Trish Properly Opined Regarding How PBMs Leveraged Consolidation, Complexity, and Opacity to Increase End-Payor Drug Costs.

The Court also faulted Dr. Trish for not directly connecting her critique of EPPs' experts on the issues of PBM industry complexity, consolidation, and opacity in pricing to the drugs at issue. Op. 34. "Unless Dr. Trish can demonstrate that complexity, consolidation, profits, and pass-through had a direct tie to the cost of clobetasol and clomipramine," the Court observed, "her opinions are impermissibly speculative." *Id.* 35. But again, she performed precisely this analysis and tied it directly to Clobetasol and Clomipramine. *Supra* at 10.

PBMs indisputably increased end-payor drug costs. Studies cited by Dr. Trish from the FTC, states, trade associations, economists, and industry analysts all agree on this, and she is unquestionably qualified to evaluate those studies—which cite industry consolidation, complexity, and opacity in pricing as ways that enabled PBMs to increase end-payor costs, Trish Reps. ¶ 16, and thus confirm the logical basis for her opinions. And "[w]here there is a logical basis for an expert's opinion testimony, the credibility and weight of that testimony is to be determined by the jury, not the trial judge." *Breidor v. Sears, Roebuck & Co.*, 722 F.2d 1134, 1138-39 (3d Cir. 1983).

In rejecting Dr. Trish's opinion as speculative, the Court cited *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3d Cir. 1994). But *Paoli* held only that opinions may not be based on "unsupported speculation." *Id.* at 742. Dr. Trish's opinions are supported by ample studies and data. She relies on industry background and detailed analyses of the data for the Bellwether drugs to emphasize PBMs' potential and realized ability to independently affect end-payer prices. She concludes that Plaintiffs' experts' analyses are unreliable because they ignore this industry context and speciously assume that any increases in end-payer prices during the class period are solely and directly attributed to Defendants' alleged conduct. Accordingly, any claim that Dr. Trish's opinions are speculative not only is unfounded, but goes to weight, not admissibility. *TAKTL, LLC v. IWR, N.*

11

*Am., LLC*, 2024 U.S. Dist. LEXIS 181564, *31-32 (W.D. Pa. Oct. 4, 2024) ("[experts'] alleged reliance on facts that are . . . speculative" go to "weight," not "admissibility"); *Feit v. Great-West Life & Annuity Ins. Co.*, 460 F. Supp. 2d 632, 641 (D.N.J. 2006) ("[V]ulnerabilities affect the weight of the testimony, not its admissibility").

As to Dr. Trish's identification of factors affecting the industry as a whole, and whether those factors specifically impacted the prices of Clomipramine and Clobetasol, the answer is yes. *See generally* Trish Reps. §§ VI.F., IX.[6] The factors she identified—consolidation, complexity, and opacity—explain PBMs' economic *ability* to independently affect end-payer prices. Dr. Trish then clearly showed that, for a substantial number of putative Class members, PBMs increased end-payer drug costs for Clomipramine and Clobetasol, and captured some or the entirety of the increase in prices that the putative Class members incurred during the class period. Trish Reps. § X.B.2.b. As another example, Dr. Trish showed that the combined margin of PBMs and pharmacies increased both in dollar terms and as a share of end-payer costs for Clobetasol 0.05% Solution from 2015 to 2018, when the list price was constant or declining. Trish Reps. Ex. 17.

Dr. McClave, by contrast, attributed the full increase in end-payer costs, including those attributable to PBMs and pharmacies' increasing profit margins, to manufacturers' prices—and thus inflated damages. The existence of these instances alone shows that Plaintiffs' experts' methodology cannot reliably assess injury and estimate damages on a class-wide basis.

In sum, Dr. Trish did the very detailed analysis that the Court said she failed to do, and tied it specifically to the drugs at issue. For that reason alone, partial reconsideration should be granted.

---

[6] Unlike Dr. Trish, Plaintiffs' expert, Dr. McClave, sought to ignore the impact of PBMs, conceding at his deposition that he did nothing to "isolate the impact of spread pricing with respect to clobetasol or clomipramine purchases," McClave Dep. Tr. 230:13-19. It is the proper function of a rebuttal expert to identify and testify about factors the opposing expert failed to account that may impact the opposing expert's conclusions. *See infra* at 20-25.

### B.    Dr. Trish's Background Materials are Reliable and Relevant.

Finally, the Court incorrectly found that certain materials that Dr. Trish relied on are "un-related" to her opinions or "prejudicial" because they were "post-conspiracy materials."  Op. 31-33.  The Court thus rejected her reliance on agency investigations (Trish Reps. nn.139, 238-43 (FTC investigation), nn.145-48, 244-48 (state investigations/findings)), passed or proposed legislation (*id.* nn.123, 258-61 (Congressional hearing and considerations)), private company actions related to PBMs (*id.* nn.255-57 (changes by private payors and pharmacies)), and academic publications (*id.* nn.95, 153, Appendix B, p. 1).  But as Dr. Trish explained, these materials discuss practices widely used *during* the class periods.  EPP *Daubert* Hearing Tr. 33:1-34:16 (Sept. 26, 2024).  Thus, these materials *do* concern the relevant time period, and experts commonly rely on such sources. Moreover, as discussed below, EPPs did not even seek to exclude all of the materials encompassed by the Opinion.

Under Federal Rule of Evidence 703, experts have wide leeway when it comes to what they can rely on to reach an opinion.  *Wisconsin v. Indivior Inc. (In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 2020 U.S. Dist. LEXIS 219949, *26 (E.D. Pa. Nov. 24, 2020) ("[U]nder Federal Rule of Evidence 703, an expert may rely on any facts or data of a type reasonably relied upon by experts in the particular field in forming opinions, even if those underlying facts or data are themselves inadmissible") (internal quotation marks omitted).  If the EPPs (or the Court) question the value of the underlying material, that issue goes to weight, not admissibility.  *Maloney v. Microsoft Corp.*, 2011 U.S. Dist. LEXIS 127870, *5-6 (D.N.J. Nov. 4, 2011) ("Although the expert testimony must be reliable, this standard for admissibility is considerably lower than the level of absolute correctness.") (citation omitted); *Feit*, 460 F. Supp. 2d at 641 ("[V]ulnerabilities affect the weight of the testimony, not its admissibility."); *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014) ("The test 'is not the correctness of the

expert's conclusions but the soundness of [the] methodology,' and when an expert meets the threshold established by Rule 702, the expert may testify and the fact finder decides how much weight to give that testimony.").

This is most notable for Section IX of Dr. Trish's report, which examined publicly available evidence showing how PBMs use the complexity and opacity of the supply chain to boost profits. For starters, EPPs did not even seek to exclude all these materials—only a select subset. EPPs' Memo ISO Mot. Exclude Trish 5. Moreover, EPPs did not contest cited materials on the same topics published *during* the class periods, or those concerning *resolved* investigations. *Id.* 7 ("Dr. Trish cannot be permitted to opine on issues when the basis for her statements is founded on information *that post-dates the Class Periods . . .* because the disconnect between the opinions and data is too great.") (emphasis added). Thus, the EPPs' complaint about this material is not that the subject thereof (PBM conduct and its impact on end-payor prices) is irrelevant or prejudicial; it is only that some material was *published* after the class periods. But that is a red herring, as the so-called "post-conspiracy" materials specifically evaluate *facts and business practices used widely during* those periods. Trish *Daubert* Opp. 23-24; Trish Reps. nn.123, 258-61, 139, 238-43, 147-48, 244-48, 255-57. Thus, it is entirely appropriate for Dr. Trish to consider such publications. *See* DPP *Daubert* Op. 33, Dkt. 3174 ("Exclusion is only required where 'the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury.'")

The Court also suggested that Dr. Trish's use of such materials might prejudice EPPs. Op. 32. But that is not a proper consideration at this stage of the case, particularly where such a ruling risks unfairly prejudicing the Bellwether Defendants and future defendants in the MDL. Whether an opinion is "prejudicial" is the standard for Rule 403, *not* Rule 702. And as the Third Circuit has explained, "pretrial Rule 403 exclusions should rarely be granted. . . . Excluding evidence as

14

being more prejudicial than probative at the pretrial stage is an extreme measure that is rarely necessary, because no harm is done by admitting it at that stage." *Paoli*, 916 F.2d at 859; *see Koninklijke Philips N.V. v. Zoll Lifecor Corp.*, 2017 U.S. Dist. LEXIS 116337, *93 (W.D. Pa. May 12, 2017) (The "Third Circuit has expressed that trial courts should be cautious" in applying Rule 403 before trial.)  Indeed, EPPs themselves acknowledge "that the risk of prejudice at this [pretrial] stage. . . is less of a concern," and that the prejudice standard pertains to Rule 403, *not* 702.  *See* EPPs' Memo ISO Mot. to Exclude Trish 5, n.4.  Moreover, even if Rule 403 did apply here, the Court's view that the material is "potentially" prejudicial falls far short of that Rule's standard for exclusion, which requires a showing that *unfair* prejudice substantially outweighs any probative value.  Thus, Defendants respectfully submit that excluding these materials contravenes Rule 702 and Third Circuit precedent and request this Court reconsider its partial exclusion of Dr. Trish with respect to her background materials.

## II.     This Court Should Grant Reconsideration of the Partial Exclusion of Dr. Hughes.

Defendants also respectfully submit that the Court misapplied the *Daubert* framework in partially excluding Dr. Hughes' opinions on injury and pass-through, CVS, and Dr. McClave's regression model—all critical issues intertwined with class certification, the merits, and damages. Portions of Dr. Hughes' report and testimony not discussed by the Court speak to the very "under-standing of antitrust injury" that the Court deemed necessary, and those analyses fully honor the requirements of Third Circuit precedent.  Op. 22-23.

### A.     Dr. Hughes' Opinions on Injury and Pass-Through That Are Based on Individual Transaction Analyses are Reliable and Entirely Consistent with Third Circuit Precedent.

Under settled precedent, to show that EPPs were injured by Defendants' alleged conduct, EPPs must prove that Defendants unlawfully conspired to raise prices, and that the resulting over-charges passed through each and every level of the supply chain down to the EPPs.  *In re Processed*

*Egg Prods. Antitrust Litig.*, 312 F.R.D. 124, 149-50 (E.D. Pa. 2015) ("[B]ecause the Plaintiffs are indirect purchasers, they must demonstrate that . . . all (or virtually all) retailers passed on the overcharge to Plaintiffs[.]").  EPPs nonetheless insist that analyzing pass-through is unnecessary. According to them, causation may be proven simply by showing a correlation between Defendants' list price increases and the average prices ultimately paid by putative class members. Defs' Opp. to EPPs' Mot. Class Cert. at 4, 7.  Dr. Hughes explained why that is not so.

Specifically, he explained that EPPs' experts lack any reliable methodology for using common proof to demonstrate injury and damages on a class-wide basis under Rule 23(b), as they fail to account for particular complexities within the supply chain.  Hughes Clom. Rep. ¶ 11; Hughes Rep. ¶ 13.  While there can be four or more points in the Clomipramine or Clobetasol supply chain where a price is individually negotiated, EPPs' experts propose no reliable methodology to avoid such "individualized inquiry into all the different stages of the generic drug distribution system.". EPP *Daubert* Hearing Tr. 169:3-5 (Sept. 24, 2024); Defs' Opp. to EPPs' Mot. Class Cert. 7.

The Court, however, found Dr. Hughes' "definition of antitrust injury" to be "directly at odds with Third Circuit law."  Op. 22.  "Courts do not consider whether antitrust injury occurs on an overall basis," the court stated—"a court's inquiry . . . is limited to determining whether a single overcharge occurred." *Id*.  But while Dr. Hughes acknowledged a general approach to evaluating whether a payor has been injured,[7] his report, deposition, and *Daubert* hearing testimony not discussed by the Court both confirm that he expressly considered injury on a "*transaction-by-transaction* basis."  EPP *Daubert* Hearing Tr. 167:16-18 (Sept. 24, 2024) (emphasis added); *see also*

---

[7] Under this "general" theory, he explained, one could look to whether an entity is better or worse off overall in the but-for world, as compared to the actual world.  Op. 20.  The Court excluded this opinion for purposes of class certification (but acknowledged the issue is relevant for damages), *id.* 22, and here too, while Defendants reserve their rights for appeal, they do not here seek reconsideration.

Hughes Dep. Tr. 91:11-94:2, 96:9-97:3, 101:12-102:8; Hughes Clom. Rep. Exs. 12, 13, 16, 18, 21-27; Hughes Clob. Rep. Exs. 8, 13, 14, 17, 19-27.  For example, he reviewed the prices paid by both EPPs and the pharmacy, and analyzed whether the EPPs were injured in individual transactions.  EPP *Daubert* Hearing Tr. 167:16-168:21 (Sept. 24, 2024).  Indeed, as his direct testimony explained, his Clomipramine and Clobetasol reports provide no less than *ten* separate and distinct analyses assessing injury to end payers.  Based on those analyses, he concluded that individualized inquiry was required to properly assess the effect of the challenged conduct on end payor reimbursements, and all of those analyses were conducted on a transaction-by-transaction basis.  *Id.* 168:5-11.

That Dr. Hughes acknowledged *other* ways of analyzing injury does not justify excluding the portions of his opinions that *do* expressly track the Court's standard—namely, whether "[a]ntitrust injury occurs when a purchaser incurs a single overcharge."  Op. 21.

Further, citing a paragraph of Dr. Hughes' report stating that only a few claims involving Clobetasol incurred higher drug costs during the relevant period, the Court called it "not clear that even where he examined injury on a more granular basis that his analysis is based on the presumption that one overcharge leads to antitrust injury."  *Id.* 22-23.  But the point of Dr. Hughes' example was not that the end payer was uninjured.  The point was that, if most but not all prices are not higher—and there is no one prevailing price—this highlights the need for individualized analysis of the causal link between the alleged conduct and the observed prices.  Respectfully, that question is distinct from whether an entity was injured—and goes to predominance.  When "the evidence shows that prices did not behave similarly for all products and customers," then an expert's "pricing structure analysis . . . cannot serve as proof of impact common to the class."  *In re Plastics Additives Antitrust Litig.*, 2010 U.S. Dist. LEXIS 90135, *55 (E.D. Pa. Aug. 31, 2010).

17

Finally, the Opinion confuses Dr. Hughes' opinions on premiums as a form of TPP health plans passing on any overcharges to actual end payers (who are not class members) with whether the alleged injury was passed through from the manufacturer to the TPP.  Op. 20-21.  If the Court meant to exclude Dr. Hughes' opinion on *both* issues, that was legal error.[8]  His opinion that an assessment of injury needs to account for any pass-through from *manufacturers* to *members of the proposed indirect purchaser classes* is separate and distinct from his testimony about whether the class members themselves passed on any overcharges in the form of premiums.  Hughes Rep. ¶ 101.  And the Court did not say how his testimony to the former, which is consistent with precedent, *see In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. at 149-50, would confuse the finder of fact.

### B.      Dr. Hughes' Opinion on CVS

The Court also erred in holding that, "because [Dr. Hughes'] evaluation of injury is flawed," he "cannot opine on whether purchasers from CVS were injured."  Op. 24.  As discussed (at 18-20), Dr. Hughes agreed that "[a]ntitrust injury occurs when a purchaser incurs a single overcharge"—the Court's standard.  Op. 21.[9]  The Opinion focuses entirely on his *general* theory of injury, not applied here, and incorrectly says it impacts his analysis as to CVS.  Op. 24.

The Court also criticizes Dr. Hughes for not conducting "empirical analysis" of "whether Defendants' conduct impacted TPP prices for clomipramine at Mylan."  *Id.* 24.  But again, rebuttal

---

[8] Defendants do not seek to revisit the Court's exclusion of Dr. Hughes' "opinions that injury is offset when an otherwise injured EPP passes overcharges on through increased insurance premiums."  Op. 19.  Defendants reserve their appeal rights, but agree with the Court that any such pass-through is at least relevant to damages.  *Id.* 21, 23.

[9] Dr. Hughes' analysis applied the correct standard of injury, even if he acknowledged another theory of injury that was then excluded.  This should be no different than the Court excluding Dr. Leitzinger's so-called alternative damages model, but allowing him to testify to his primary model.  *See* DPP *Daubert* Op. 39, 44, Dkt. 3174.

experts like Dr. Hughes "have a less demanding task, since they have no burden to produce models or methods of their own; they need only attack those of plaintiffs' experts." *E.g.*, *Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop.*, 2021 U.S. Dist. LEXIS 107778, \*47 (E.D. Pa. June 9, 2021) (internal citations omitted); *supra* at 11-12 (collecting cases).

Moreover, it is undisputed that CVS's prices for Clomipramine purchased from Mylan did not increase. EPP *Daubert* Hearing Tr. 16:13-16 (Sept. 24, 2024). Thus, any price increase experienced by EPPs from CVS for Clomipramine purchases from Mylan is a result of CVS or its PBM's conduct, and EPPs cannot show injury on those transactions. *See Sheet Metal Workers Local 441 Health & Welfare Plan v. GlazoSmithKline, PLC*, 2010 U.S. Dist. LEXIS 105646, \*63 (E.D. Pa. Sept. 30, 2010) (Stengel, J.) ("[T]o show antitrust impact to indirect purchasers, the plaintiff must show: (1) that *direct purchasers* paid supra-competitive prices . . . and (2) that some or all of the inflated cost paid by direct purchasers was *passed through to indirect purchasers*."); *see In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 504 (N.D. Cal. 2008) ("indirect-purchaser plaintiffs must demonstrate that defendants overcharged their direct purchasers for graphics products and that those direct purchasers passed on the overcharges to plaintiffs. In so doing, they must find a way to account for the decision-making of a variety of resellers and manufacturers").

In any event, Dr. Hughes' analysis *did* demonstrate that the Pharmacy Acquisition Cost that CVS paid to buy Clomipramine directly from Mylan did not increase during the class period. This accounted for more than 94% of CVS's entire Clomipramine purchases. Hughes Clom. Rep. ¶ 136. As he explained, any such increased end payer costs were not caused by a manufacturer because the causation link was broken at the direct purchaser level. *Id.* ¶¶ 137-38. That analysis is consistent with precedent in this Circuit, *e.g.*, *Sheet Metal Workers*, and should not be excluded.

Finally, the Court erred in barring Dr. Hughes' opinions on the basis that "CVS did not purchase clomipramine solely from Mylan during the Class Period." Op. 24. CVS purchased only a *de minimis* amount of Clomipramine from other manufacturers. Defs' Sur-Reply Op. to EPPs' Mot. Class Cert. 33. But more importantly, the issue here is not simply whether CVS was injured, but whether any such injury was passed on to CVS, and then to the end payer. Because EPPs forgo a traditional pass-through analysis, they do not disaggregate the unimpacted sales and do not meet their class certification burden. *Id.* Dr. Hughes should be allowed to explain why that is so.

## III.    The Court Applied the Incorrect Standard for a Rebuttal Expert.

Courts use the same *Daubert* standard to assess the admissibility of rebuttal experts as they use for plaintiffs' experts, but also recognize that "[i]f Plaintiffs' expert testimony is helpful to the trier of fact, then [the] rebuttal of that testimony would also be helpful." *Am. Empire Surplus Lines Ins. Co. v. J.R. Contracting & Env't Consulting, Inc.*, 2024 U.S. Dist. LEXIS 190872, *17 (S.D.N.Y. Oct. 21, 2024). The issue here is, therefore, whether testimony from Dr. Trish and Dr. Hughes "will 'explain, repel, counteract or disprove the evidence of the adverse party'"—full stop. *Am. Diabetes Ass'n v. Friskney Family Tr., LLC*, 2015 U.S. Dist. LEXIS 184214, *5 (E.D. Pa. July 21, 2015). Because "[D]efendants' experts have a less demanding task"—"they have no burden to produce models or methods of their own" and "need only attack those of plaintiffs' experts"—requiring further analysis in effect shifts the burden of proof from plaintiffs to defendants. *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 285 (E.D.N.Y. 2007); *Apex Fin. Options, LLC v. Gilbertson*, 2022 U.S. Dist. LEXIS 36634, *8 (D. Del. Mar. 1, 2022) (Since "the burden of proving damages rests with the plaintiffs," "defendants' criticism of the plaintiffs' methodology" is "relevant even in the absence of a substitute for the plaintiff's analysis."). Thus, it is black-letter law that a rebuttal expert need not provide affirmative or competing analysis, "but may limit his or her opinion to criticizing the other party's analysis and conclusions." *Walsh/Granite v. HDR*

20

*Eng'g, Inc.*, 2020 U.S. Dist. LEXIS 272282, *23-24 (W.D. Pa. June 15, 2020) (citing *Navelski v. Int'l Paper Co.*, 244 F. Supp. 3d 1275 (N.D. Fla. 2017)); *Nat'l Fire & Marine Ins. Co. v. Newtown Square, LLC*, 2024 U.S. Dist. LEXIS 71192, *14 (E.D. Pa. Apr. 18, 2024).

The Court here thus erred in excluding the opinions of Dr. Trish and Dr. Hughes on the basis that they did not, in its view, perform certain analyses. As to Dr. Trish, the Opinion stated that "[her] opinions on overcharge pass through and that [EPPs']¹⁰ price increases flowed from PBMs, and not from the manufacturers' alleged price increases, requires further analysis." Op. 35. As Dr. Trish points, that is exactly what Plaintiffs' experts failed to do: "Plaintiffs' damages expert, fails to account for the effect of these PBM strategies with respect to the bellwether drugs, independent from Defendants' alleged conduct, rendering his damages estimation unreliable." Trish Reps. ¶ 71. But rebuttal experts need not provide "further analysis" beyond critiquing Plaintiffs' experts. The Court's contrary view would impermissibly shift the burden of proof to Defendants. *Zyprexa*, 489 F. Supp. 2d at 285; *Apex*, 2022 U.S. Dist. LEXIS 36634, *8-9.

Furthermore, EPPs' experts opined that the prices paid by end-payers "move together" with generic drug manufacturers' list price increases. McClave Clobetasol Rep. 13-18, 23-28; McClave Clomipramine Rep. 11-14, 17-20; Lamb Clobetasol Rep. ¶¶ 25, 157, 164; Lamb Clomipramine Rep. ¶¶ 21, 174, 180; Craft Clobetasol Rep. ¶¶ 67, 71; Craft Clomipramine Rep. ¶¶ 67, 71. To rebut that view, Dr. Trish had no obligation to offer an alternative affirmative analysis; her report was proper in aiming simply to "contradict or rebut evidence on the same subject matter identified[] by [EPPs' experts].'" *Withrow v. Spears*, 967 F. Supp. 2d 982, 1001-02 (D. Del. 2013).

---

¹⁰ The Opinion appears to contain a typo in stating that "*Defendants'* price increases flowed from PBMs, and not from the manufacturers' alleged price increases…" (emphasis added). Op. 35.

21

Dr. Trish did exactly what the case law says rebuttal experts are permitted to do. For example, Dr. Trish criticized Dr. McClave's methodology because not all prices did "move together," and he did not account for intervening actions taken by independent actors in the supply chain, including spread pricing. As she testified: "I disagree with [Dr. McClave's] characterization of this market. There are many different entities . . . [a]nd these intermediaries meaningfully affect the costs that are paid for drugs, and in this case generic drugs, by end-payers. And there's many different links that are broken throughout that chain." EPP *Daubert* Hearing Tr. 22:9-17 (Sept. 26, 2024). She gave "numerous examples . . . in which changes in the PBMs' spreads applied to the bellwether drugs, resulted in increased end payor costs without changes in manufacturer list prices[]," noting that, "[b]y ignoring changes in the margins charged by pharmacies and PBMs, Dr. McClave overstates the extent of damages he attributes to generic drug manufacturer conduct, if any, for end payors." Trish Reps. ¶ 143.

Dr. Trish also analyzed PBM Bellwether data for named Plaintiff BCBSLA, finding that spread pricing for Clomipramine and Clobetasol exhibited large fluctuations without any change in manufacturers' list prices, contradicting EPPs' experts' claims that end-payer prices "move together" with list-price changes. *Id.* ¶¶ 151-52. "[O]ne example is from Blue Cross Blue Shield of Louisiana. When you look at two different claims that came—that were for that same end-payer, I believe they were paid to the same pharmacy for the same drug, I think even on the same day. And what you see is that on one of them, the spread was more than half of the cost of the drug, more than 50 percent. And on the other one, the spread was less than a quarter, less than 25 percent. So that's very clear evidence contradicting this notion that Dr. McClave is putting forth that spread should be a fixed percentage of the end-payer cost. It's simply not true. It's not

consistent with what we observe in the data that were produced as part of the record of these matters." EPP *Daubert* Hearing Tr. 40:4-16 (Sept. 26, 2024).

The Opinion does not mention these analyses, but they are precisely the type of rebuttal testimony that courts permit. As another court in this district recently explained in denying the plaintiffs' *Daubert* motion to exclude a rebuttal expert whose report did "not contain any independent damages calculations" or "alternative damages figures," it was enough that the expert had "good grounds" to "appl[y] his experience and training to opine as to whether [the affirmative reports were] sound." *Rhoads Indus. v. Shoreline Found., Inc.*, 2021 U.S. Dist. LEXIS 124066, *93-95 (E.D. Pa. July 2, 2021). Other courts agree. *E.g.*, *Apex*, 2022 U.S. Dist. LEXIS 36634, *8 (denying plaintiffs' *Daubert* motion because "as a rebuttal witness it was enough for [him] to critique [plaintiffs' expert's] analysis; it was not necessary for him to offer an alternative approach"); *Am. Empire*, 2024 U.S. Dist. LEXIS 190872, *2 ("Rebuttal [expert] evidence" is "admissible when it will explain, repel, counteract or disprove the evidence of the adverse party").[11]

As with Dr. Trish, the Opinion required more of Dr. Hughes than is required of rebuttal experts. First, in stating that, "[i]f Dr. Hughes's opinion is that EPPs' experts' reports are flawed

---

[11] Additionally, there is no basis for applying a more lenient standard for EPPs' experts than Defendants'. For example, despite having far less experience than Dr. Trish in studying PBMs, Dr. McClave concluded that spread pricing either ***did not*** impact EPPs' damages or that he properly accounted for it. Op. 14-15. But the Court did not require Dr. McClave to show "how" (*compare id.* 35 (criticizing Dr. Trish for not showing "how" PBMs capture profit)) or to provide "further analysis" addressing Dr. Trish's critiques (*compare id.* (partially excluding Dr. Trish for not including "further analysis" on overcharge pass through)). *Id.* 14-15. "[T]he same standards of reliability and helpfulness should be applied to both [sides' experts]," and "a district court *may not make winners and losers through its choice of which side's experts to admit*, when all experts are qualified." *Mitchell*, 365 F.3d at 245 (citing *Velasquez*, 64 F.3d at 848-49) (emphasis added); *see also Breidor v. Sears, Roebuck & Co.*, 722 F.2d 1134, 1138-39 (3d Cir. 1983); DPP *Daubert* Op. 39, Dkt. 3171 ("It is not the Court's role under *Daubert* . . . to resolve disagreements between experts."). Violating this principle is a reversible "error of law." *Velasquez*, 64 F.3d at 848-49 (reversing the exclusion of expert testimony that "called into doubt the reliability and credibility" of the other expert's testimony).

because they cannot remove allegedly uninjured plaintiffs, *his own analysis must be able to reliably identify whether a class member has suffered injury,*" Op. 24 (emphasis added), the Court improperly placed the burden of proof on Defendants.  To satisfy predominance, it is EPPs that must establish economic impact for damages "for every class member through proof common to the class."  *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008); *Vista Healthplan, Inc. v. Cephalon, Inc.*, 2015 U.S. Dist. LEXIS 74846, *66 (E.D. Pa. June 10, 2015) ("Without a means of identifying these uninjured persons using common evidence, every class member would need to be reviewed on an individualized basis to see if they were impacted by Defendants' alleged anticompetitive actions.").  EPPs cannot merely "demonstrate an 'intention' to try the case in a manner that satisfies the [Rule 23(b)(3) predominance requirement." *Hydrogen Peroxide*, 52 F.3d at 321.  EPPs' expert Dr. McClave has done nothing to exclude these unimpacted transactions—which amount to roughly 25% of the overall transactions claimed by EPPs—from his methodology or damages model.  And it was legal error for the Court to require Dr. Hughes— a rebuttal expert—to do so.  *Apex*, 2022 U.S. Dist. LEXIS 36634, *9 ("as a rebuttal witness it was enough for Mr. Brown to critique Dr. Nantell's analysis; it was not necessary for him to offer an alternative approach").

In addition, while the Opinion does not specify whether Dr. Hughes is entirely prohibited from offering any criticisms of Dr. McClave's regression model (which would unfairly prejudice Defendants both as to class certification and EPPs' claims for billions of dollars), it would be error to exclude any of Dr. Hughes' critiques of Dr. McClave's regression model on the basis that Dr. Hughes should have "conducted his own analysis to verify the validity of his alternative [proposed benchmark period]."  Op. 29.  Dr. Hughes' critiques of Dr. McClave's regression model highlighted that (1) his benchmark period failed to properly account for industry factors that, quite

24

apart from WAC increases, could have affected prices, and (2) he did not consider the period after the proposed class period, which may be "as or more appropriate than using the period before [it]." Hughes Clom. Rep. ¶ 177.  Dr. Hughes was not proposing an "alternative benchmark period," Op. 29, and thus had no obligation to verify one—he was highlighting the problems with *EPPs'* proposed benchmark period by comparing prices before the class period with afterwards.  Hughes Clom. Rep. ¶¶ 178-79 ("I do not attempt to re-estimate Dr. McClave's regression specifications *or propose an alternative benchmark period methodology*, but rather to illustrate the significance of selecting a proper benchmark.").  Because rebuttal experts need only "critique plaintiffs' expert's methodologies and point out potential flaws in the plaintiff's experts' reports," the Court legally erred in excluding Dr. Hughes' opinions.  *E.g., Winn-Dixie Stores, Inc.*, 2021 U.S. Dist. LEXIS 107778, *48.

## IV.    In The Alternative, Defendants Should Be Permitted to Submit Supplemental Reports from Dr. Trish and Dr. Hughes.

As explained above, there are substantial grounds for the Court to revisit its Opinion partially excluding Dr. Trish's and Dr. Hughes' opinions.  In the event that the Court does not revise the Opinion, however, Defendants alternatively request permission, under Federal Rules of Civil Procedure 16(b)(4) and 26(e), to submit supplemental reports from Dr. Trish and Dr. Hughes.

For Clomipramine and Clobetasol to serve as effective Bellwethers, the most efficient way forward is to allow supplemental reports on an issue with broad potential implications for both the Bellwether and non-Bellwether cases alike.  In the Third Circuit, courts ask whether to allow expert disclosures outside of court-ordered deadlines under the *Pennypack* factors: "(1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) disrupt[ion] to the orderly and efficient trial of the case or of other cases in the court, and (4) bad faith or willfulness." *Meyers v. Pennypack Woods*

25

*Home Ownership Ass'n*, 559 F.2d 894, 904-05 (3d Cir. 1977). Courts also consider the importance of the issues, and excluding "critical evidence" is considered "an extreme sanction." *Id.* at 905.

Each *Pennypack* factor supports allowing Dr. Trish and Dr. Hughes to submit supplemental reports here. On the first two factors, EPPs could claim no prejudice or surprise. Defendants do not propose starting over with new experts or theories. They would still rely on Dr. Trish and Dr. Hughes—whom EPPs have already deposed and cross-examined at length—and the supplemental reports would cover the general topics that have already been addressed by both sides' experts. Moreover, Defendants would agree to an additional deposition limited to the supplemental reports. And in accordance with the Opinion, Drs. Trish and Hughes would only address the Court's perceived shortcomings with their *existing* opinions. *See DeMarines v. KLM Royal Dutch Airlines*, 580 F.2d 1193, 1202 (3d Cir. 1978) (finding expert testimony should not be excluded where important and objector will not be surprised by it). Although Defendants disagree that the existing analyses are insufficient, these experts should be allowed to address any "analytical gap between the data and the opinion[s] proffered," as perceived by the Court. Op. 34.

This is not a case where an expert's opinion has been barred as methodologically unsound or unsupportable; rather, the Court identified discrete areas where it believes further analysis is needed. For example, it found Dr. Trish's opinion that "[i]ncreased PBM spreads may correspond to an increase in end payor costs, or alternatively, they may correspond to instances in which the PBM's reimbursement to the pharmacy declined, but those savings were captured by the PBM and not the end payor" to be unsupported. *Id.* But the Court was clear about how she could fix it: by "conduct[ing] analysis to demonstrate if and how PBMs did actually capture that profit." *Id.* 35. While Defendants ask the Court to reconsider this ruling, as Dr. Trish did just that, she can, if

permitted, provide more extensive analysis supporting her opinion.[12]  The same is true of the Court's finding that her "opinions on overcharge pass through and that Defendants' price increases flowed from PBMs" call for "further analysis."  *Id.*  Dr. Trish can—and should be allowed to—offer analysis that makes guidance from these Bellwether cases as comprehensive as possible.

The third *Pennypack* factor likewise supports allowing supplemental reports, as modifying the existing Bellwether schedule would be unnecessary.  There is ample time for Drs. Trish and Hughes to prepare supplemental reports and to sit for short depositions limited to those reports.

Further, the supplemental reports would not require any changes to the parties' completed Bellwether summary judgment briefing.  In *Zoloft*—which ultimately required a much longer extension to the trial schedule—this Court found that an extension was warranted.  *In re Zoloft Prod. Liab. Litig.*, 2015 U.S. Dist. LEXIS 1598, *5-6 (E.D. Pa. Jan. 7, 2015).  And here there would be much less delay, if any, as Defendants ask only to submit a targeted supplemental report from the *same* experts.  Moreover, these reports to address the Opinion would in fact *help* "the orderly and efficient trial of [] *other cases in the court*."  *Pennypack*, 559 F.2d at 904-05.  Allowing both sides to present expert testimony on, for example, the critical issue of spread pricing will provide clarity and guidance for the remaining cases—exactly the reason for this Bellwether approach.  The

---

[12] For example, Dr. Trish can estimate the shares of total end-payor payments for the two Bellwether drugs attributable to PBM spread in the class period, as well as the shares of total increases in end payor payments attributable to increased PBM spread in the class period.  Second, Dr. Trish can also estimate the shares of at-issue transactions and putative class members that, due to an increase in PBM spread, experienced an increase in payments for the Bellwether drugs in the class period without any increase in the net prices charged by manufacturers.  She can also estimate the even larger share of at-issue transactions and putative class members that, due to an increase in PBM spread, experienced a larger increase in payments for the Bellwether drugs in the Class period than the increase in net prices charged by manufacturers.  Third, to show that Dr. McClave's damages methodology does not properly account for PBM spread, Dr. Trish can estimate the shares of Dr. McClave's estimated damages for the two Bellwether drugs that are attributable to PBM spread in the class period.

alternative—in which Defendants in future cases are left trying to fill the gaps on spread pricing on a piecemeal basis in non-Bellwether expert reports and potentially with entirely new expert opinions—would do the opposite.

As to the fourth factor—bad faith—EPPs cannot reasonably argue that Defendants purposefully withheld certain analyses, or acted in bad faith, as Dr. Trish and Dr. Hughes each submitted detailed and well-supported reports informing Plaintiffs of their respective opinions. *See Zoloft*, 2015 U.S. Dist. LEXIS 1598, *8 (finding no bad faith or "deliberate strategy" on behalf of the party). Defendants, along with Dr. Trish and Dr. Hughes, intended in good faith to include in their reports everything needed to support their opinions.

On the importance of the evidence, as in *Zoloft*, this Court should "weigh heavily the indisputable fact that the evidence is of critical importance to [the party], as [t]he decision to admit or exclude scientific evidence and testimony strongly affects the ability of a party to prevail." *Id.* at *7. There is currently an asymmetry in the Court's allowing Plaintiffs' experts to testify on certain issues but barring Defendants' experts from responding. Spread pricing, for example, is an important issue for both these Bellwether cases and the remaining cases.[13] Spread pricing is closely intertwined with not only class certification, but also the amount of damages at issue, if any. *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 298 (3d Cir. 2012) (applying *Pennypack* and holding that the district court abused its discretion in not permitting a supplemental report

---

[13] The following exemplar reports and presentations highlight the widespread issue of spread pricing in the industry far beyond just the Bellwether drugs: Oregon Health Authority, *Pharmacy Benefit Managers Poor Accountability and Transparency Harm Medicaid Patients and Independent Pharmacies* (August 2023) (discussing spread pricing at 1, 4, 7, 11, 16, 17, 19, 20); Ohio's Medicaid Managed Care Pharmacy Services, *Auditor of State Report* (August 16, 2018) (discussing spread pricing at 4-5,14, 22, 23, 31); Antonio Ciaccia, *The Hidden Costs of Savings*, *available at* https://www.dhhs.nh.gov/sites/g/files/ehbemt476/files/documents2/savingspresent032524.pdf (discussing spread pricing at 15, 17, 23, 26, 30).

given the importance of expert testimony regarding antitrust damages).  Clarity on the amount of damages actually at issue is of course critical for the parties to assess claim value and settlement potential—clarity that is the very point of Bellwether cases.

This Court's decision in *Zoloft* allowed plaintiffs, post-*Daubert*, to submit an entirely new report from an entirely new expert.  But the need to put on a complete case supported by expert testimony is not unique to plaintiffs—defendants should be afforded the same opportunity to put forward their defense.  This is particularly true where, as here, there would be minimal disruption to the schedule, there are no new experts, and doing so would positively benefit the entire MDL. As the Court explained in *Zoloft*: "This MDL Court must consider the broader ramifications of barring an attempt to present [additional expert testimony]," and be "confident that all of the implications for the MDL as a whole have been addressed."  2015 U.S. Dist. LEXIS 1598, *5, 8. Other courts likewise recognize the importance of allowing supplementation in both the MDL and Bellwether context:

> Striking [the supplemental] expert opinions could undermine the goals of reaching the merits of not only the bellwether cases, but also the tens of thousands of cases that are waiting for this MDL to progress.  Given the importance of the issues at stake in this litigation, as well as the number of individuals on all sides of this litigation who have been waiting for many years to reach the merits of the claims at issue, the last *Pennypack* factor weighs against striking the experts and opinions.

*In re J&J Talcum Powder Prods. Mktg.*, 2024 U.S. Dist. LEXIS 23446, *15 (D.N.J. Feb. 9, 2024).

Accordingly, Defendants respectfully request in the alternative that they be allowed to file a supplemental report from Drs. Trish and Hughes and will coordinate with Plaintiffs on a prompt schedule for the supplemental reports.

## CONCLUSION

For the foregoing reasons, partial reconsideration should be granted and the Court's *Daubert* Opinion should be revised.  Alternatively, Defendants should be permitted to file supplemental reports from Drs. Trish and Hughes.


Dated: December 16, 2024                                Respectfully submitted,

                                                                     **WILSON SONSINI GOODRICH &
                                                                     ROSATI, P.C.**

                                                                     s/ *Chul Pak*
                                                                     Chul Pak
                                                                     1301 Avenue of the Americas, 40th Floor
                                                                     New York, New York 10019
                                                                     Telephone: (212) 999-5800
                                                                     Facsimile: (866) 974-7329
                                                                     Email: cpak@wsgr.com

                                                                     Seth C. Silber
                                                                     Jeffrey C. Bank
                                                                     Wilson Sonsini Goodrich & Rosati, P.C.
                                                                     1700 K Street NW, Fifth Floor
                                                                     Washington, DC 20006
                                                                     Telephone: (202) 973-8800
                                                                     Fax: (866) 974-7329
                                                                     Email: ssilber@wsgr.com
                                                                     Email: jbank@wsgr.com

                                                                     *Counsel for Mylan Defendants*

**PROSKAUER ROSE LLP**

Christopher E. Ondeck
Stephen R. Chuk
1001 Pennsylvania Ave. N.W.
Suite 600 South
Washington, DC 20004
Telephone: (202) 416-6697
Fax: (202) 416-6899
Email: condeck@proskauer.com
Email: schuk@proskauer.com

Grant J. Esposito
David J. Fioccola
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Telephone: (212) 969-3010
Fax: (212) 969-2900
Email: gesposito@proskauer.com
Email: dfioccola@proskauer.com

Bart H. Williams
Kyle A. Casazza
Susan L. Gutierrez
Shawn S. Ledingham, Jr.
**PROSKAUER ROSE LLP**
2029 Century Park East, Suite 2400
Los Angeles, CA 90067-3010
Telephone: (310) 284-5659
Fax: (310) 557-2193
Email: bwilliams@proskauer.com
Email: kcasazza@proskauer.com
Email: sgutierrez@proskauer.com
Email: sledingham@proskauer.com

*Counsel for Defendants Sandoz Inc. and*
*Fougera Pharmaceuticals Inc.*

**BAKER BOTTS LLP**

John M. Taladay
Christopher P. Wilson
JoAnna Adkisson
700 K Street NW
Washington, DC 20001
Telephone: (202) 639-7700
Fax: (202) 639-7890
Email: john.taladay@bakerbotts.com
Email: christopher.wilson@bakerbotts.com
Email: joanna.adkisson@bakerbotts.com

**CLARK HILL PLC**

Lauri A. Kavulich
2001 Market St, Suite 2620
Philadelphia, PA 19103
Telephone: (215) 640-8500
Fax: (215) 640-8501
Email: lkavulich@clarkhill.com

Lindsay S. Fouse
301 Grant St, 14th Floor
Pittsburgh, PA 15219
Telephone: (412) 394-7711
Fax: (412) 394-2555
Email: lfouse@clarkhill.com

*Counsel for Defendant Taro Pharmaceuticals*
*U.S.A., Inc.*

31

**KELLEY DRYE & WARREN LLP**

Clifford Katz
Damon Suden
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Telephone: (212) 808-7800
Fax: (212) 808-7897
Email: ckatz@kelleydrye.com
Email: dsuden@kelleydrye.com

*Counsel for Defendants Wockhardt USA LLC and Morton Grove Pharmaceuticals, Inc*

**KASOWITZ BENSON TORRES LLP**

Seth Davis
Sheron Korpus
Seth A. Moskowitz
David M. Max
1633 Broadway
New York, NY 10019
Telephone: (212) 506-1700
Fax: (212) 506-1800
Email:skorpus@kasowitz.com
Email: smoskowitz@kasowitz.com
Email: sdavis@kasowitz.com
Email: dmax@kasowitz.com

*Counsel for Defendants Actavis Holdco U.S., Inc. and Actavis Pharma, Inc.*