**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION** | **MDL NO. 2724 16-MD-2724** <br> **HON. CYNTHIA M. RUFE** |
| **IN RE: CLOMIPRAMINE CASES** | **LEAD CASE: 16-CM-27240** <br> **EPP CASE:   16-CM-27242** |
| **THIS DOCUMENT RELATES TO:** <br><br> *ALL END-PAYER ACTIONS* | |

**END-PAYER PLAINTIFFS' RESPONSE IN OPPOSITION TO**
**(1) DEFENDANT TARO PHARMACEUTICALS U.S.A., INC.'S SUPPLEMENTAL BRIEF IN**
**SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND**
**(2) MYLAN DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION**
**FOR SUMMARY JUDGMENT**
**(CLOMIPRAMINE)**

PUBLIC VERSION – FILED WITH REDACTIONS
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

**TABLE OF CONTENTS**

I.  INTRODUCTION ..............................................................................................................1

II.  ARGUMENT…………………………………………………………………………...2

    A.  Kellum's Testimony Creates a Credibility Question for the Jury............................2

    B.  Kellum's post-Fifth Amendment Testimony Contradicts the Record and Raises Issues of Material Fact..................................................................................2

    C.  Kellum's Attempt to Downplay His and Sandoz's Role in the Conspiracy Fail ......................................................................................................6

    D.  EPPs Showed Substantial Plus Factors...................................................................8

    E.  Evidence Demonstrates Mylan's Role in the Clomipramine Conspiracy ...............8

    F.  Mylan's Contention that Price Increases were "Sequential" and "Not Parallel" Is Still Irrelevant ...................................................................................................9

    G.  Defendants Misapply the Summary Judgment Standard ......................................10

    H.  Taro's Improper "Joinder" Should Be Rejected ...................................................10

III.  CONCLUSION...............................................................................................................10

PUBLIC VERSION – FILED WITH REDACTIONS
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Baby Food Antitrust Litig.*,
  166 F.3d 112 (3d Cir. 1999)..................................................................................................10

*In re Blood Reagents Antitrust Litig.*,
  266 F. Supp. 3d 750 (E.D. Pa. 2017) ......................................................................................8

*In re Chocolate Confectionary Antitrust Litig.*,
  999 F. Supp. 2d 777 (M.D. Pa. 2014) ...................................................................................10

*In re Chocolate Confectionary Antitrust Litig.*,
  801 F.3d 383 (3d. Cir. 2015)........................................................................................7, 8, 10

*In re Flat Glass Antitrust Litig.*,
  385 F.3d 350 (3d Cir. 2004).........................................................................................4, 8, 10

*In re Generic Pharms. Pricing Antitrust Litig.*,
  338 F. Supp. 3d 404 (E.D. Pa. 2018) .....................................................................................10

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*
  475 U.S. 574 (1986)..................................................................................................................4

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*,
  998 F.2d 1224 (3d Cir. 1993).......................................................................................1, 8, 10

*In re Processed Egg Prods. Antitrust Litig.*,
  881 F.3d 262 (3d Cir. 2018).....................................................................................................1

**Other Authorities**

Fed. R. Civ. P. 56(a) ......................................................................................................................1

PUBLIC VERSION – FILED WITH REDACTIONS
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## I.    INTRODUCTION

End-Payer Plaintiffs ("EPPs") in the Clomipramine bellwether case respectfully submit this response to Defendants Mylan Inc., Mylan Pharmaceuticals, Inc.'s (together, "Mylan"), and Taro Pharmaceutical U.S.A., Inc.'s ("Taro") supplemental briefs in further support of their motions for summary judgment (ECF Nos. 385, 387) ("Mylan Supp." and "Taro Supp.").

EPPs have marshaled compelling evidence showing Taro, Mylan, and Sandoz conspired with each other to impose and maintain a massive 1500%+ price increase on Clomipramine. *See* EPP's Opposition to Defendants' Motions for Summary Judgment (ECF No. 336) ("EPPs' Opposition" or "EPPs' Opp."). In the face of this overwhelming evidence, Taro and Mylan attempt to leverage the recent, self-serving testimony of Armando Kellum, a former Sandoz executive who pled guilty for price fixing other drugs and invoked the Fifth Amendment in his prior testimony about Clomipramine. But Kellum's recent testimony does nothing to prevent Taro and Mylan from facing a jury. His denials of the conspiracy are at odds with overwhelming evidence to the contrary and call into question his candor under oath. ███████████████████████████████ ███████████████████████████████████████████████████████████████, but those witnesses *did* remember and confirmed the conspiracy existed. Kellum's lack of "awareness" (Taro Supp. at 3) is not evidence and proves nothing.

At best, Kellum's testimony only highlights disputes of material fact that render summary judgment inappropriate. *In re Processed Egg Prods. Antitrust Litig.*, 881 F.3d 262, 268 (3d Cir. 2018) ("[s]ummary judgment is appropriate when 'there is no genuine dispute as to any material fact'") (quoting Fed. R. Civ. P. 56(a)). Only a jury should assess his credibility and the weight of his denials in light of contradicting evidence. That is why courts routinely deny summary judgment where credibility determinations are central. *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1230 (3d Cir. 1993) ("[A]t the summary judgment stage, a court is not to weigh the evidence or make credibility determinations. Instead, these tasks are left for the fact finder."). Because Defendants fail to meet the high burden for summary judgment—even with their supplemental briefing—their motion should be denied.

PUBLIC VERSION – FILED WITH REDACTIONS
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

## II.    ARGUMENT

### A.    Kellum's Testimony Creates a Credibility Question for the Jury

Although Kellum may have resolved his criminal liability with the Department of Justice, he remains a defendant in the State Attorneys General ("State AGs") action pending before Judge Shea in Connecticut. To mitigate the catastrophic personal liability that he was facing in that case,



[2] Kellum's recent testimony should be assessed against this backdrop by a jury that can consider the motives behind his new statements.

### B.    Kellum's post-Fifth Amendment Testimony Contradicts the Record and Raises Issues of Material Fact

Kellum's denials of the Clomipramine conspiracy[3] are contradicted by direct evidence, including testimony of former Sandoz employees who were personally involved in the conspiracy and described Kellum's role in it. In fact, testimony by Chris Bihari, Sandoz's then Director of National Accounts, shows that Taro's Ara Aprahamian provided Taro's Clomipramine pricing information so "that Sandoz would follow the price increase and *keep the price high in the market*."[4] Bihari provided that information to Kellum and Mike Vezza, also at Sandoz.[5] He

---

[1] Exhibit ("Ex.") 216, attached hereto, excerpts of Deposition of Armando Kellum (April 7-10, 2025) ("Kellum Tr.") 558:13-559:14.

[2] Ex. 216, Kellum Tr. 559:16-560:20.

[3] Taro Supp. at 1; Mylan Supp. at 3.

[4] EPPs' Opp. Ex. 9, Bihari Tr. 780:25-781:24 (emphasis added).

[5] EPPs' Opp. Ex. 9, Bihari Tr. 780:15-782:19.

PUBLIC VERSION – FILED WITH REDACTIONS
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

testified that there was an agreement between Sandoz and Taro to keep the price of Clomipramine high and that *Kellum participated* in the agreement.[6] The evidence of the conspiracy is detailed and specific. For instance, on April 30, 2013, Aprahamian and Bihari had two phone calls, each time closely followed by Bihari calling Kellum.[7] Kellum claims not to recall what he discussed with Bihari on the phone.[8] But Bihari memorialized the points of his conversation with Aprahamian in his Notebook,[9] which he confirmed contained the fact that Taro was increasing prices on certain drugs, including Clomipramine, effective May 1, 2013.[10] He testified that Aprahamian provided the information so that "Sandoz would follow the price increase and keep the price increase high in the market and to not take any of Taro's share."[11]

Mike Vezza, Sandoz's then Associate Director of Pricing and Analysis, corroborated Bihari's claims. He too testified that Sandoz and Taro had an agreement that Sandoz would follow Taro's Clomipramine price increases and keep them high by not competing for customers.[12] And he *confirmed* Kellum was aware of the agreement and was an active participant in the conspiracy.[13] Kellum asserts that Vezza was uninvolved in any conspiracies at Sandoz,[14] but Vezza himself acknowledged his participation in widespread conduct at Sandoz, explaining that "we wanted to increase our prices and have the prices *stick* and to achieve better prices."[15]

A third witness, Della Lubke, Sandoz's then Director of National accounts, testified that she spoke with Jim Nesta, Vice President of Sales at Mylan, about Mylan's Clomipramine price increases, and in exchange for that information, she informed Nesta that Sandoz would follow

---

[6] EPPs' Opp. Ex. 9, Bihari Tr. 794:9-795:17 (emphasis added). *See also* EPPs' Opp. at 35.
[7] EPPs' Opp. Ex. 32, Phone Record Summary Exhibit ("Ex.") (Pl. Ex. 6612).
[8] Ex. 216, Kellum Tr. 1100:3-21.
[9] EPPs' Opp. Ex. 72, Bihari Notebook 2 at 27 (Pl. Ex. 6536).
[10] EPPs' Opp. Ex. 9, Bihari Tr. 780:15-781:24.
[11] EPPs' Opp. Ex. 9, Bihari Tr. 780:15-781:24.
[12] EPPs' Opp. Ex. 11, Vezza Tr. 1064:17-1065:20.
[13] EPPs' Opp. Ex. 11, Vezza Tr. 1179:10-22.
[14] *See, e.g.*, Ex. 216, Kellum Tr. 1060:7-25 (testifying that Vezza ███████████ ████████████████████████████████████████████████████).
[15] EPPs' Opp. Ex. 11, Vezza Tr. 1178:3-1179:9 (emphasis added).

PUBLIC VERSION – FILED WITH REDACTIONS
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Mylan's price increase, which Sandoz did on July 22, 2013.[16] Both Bihari and Lubke testified that they gathered competitively sensitive information from Taro and Mylan, respectively, *at the behest Kellum* or Vezza, and provided the information to them.[17] These facts, which EPPs set forth in Opposition, are "customary indications of traditional conspiracy" and show that Defendants "got together and exchanged assurances" of their common illegal plan. *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 361 (3d Cir. 2004). They also exclude the possibility that Defendants acted independently. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.* 475 U.S. 574, 588 (1986).

EPPs also set forth compelling circumstantial evidence that supports an inference of a conspiracy, contrary to Taro and Mylan's arguments. Unrefuted evidence shows that after years of keeping Clomipramine prices low and stable, Defendants abruptly raised their Clomipramine prices by exorbitant amounts within a short three-month period starting in May of 2013. EPPs' Opp. at 39-41. Defendants not only spoke to each other and exchanged competitive information, they confirmed their plan to follow price increases, maintain those high prices, and not compete for customers *in advance* of carrying out these actions. For instance, on March 29, 2013, within an hour of Aprahamian receiving a spreadsheet that provided sales data for Clomipramine,[18] he had two phone calls with Bihari.[19] When asked whether he told Bihari he was evaluating a potential price increase for Clomipramine, Aprahamian asserted his Fifth Amendment right.[20] Aprahamian and Bihari had at least fifteen phone calls between April 2, 2013 and April 26, 2013, [21] prior to the April 30, 2013 call in which Aprahamian told Bihari that Taro was increasing prices on certain drugs effective May 1, 2013, including Clomipramine.[22] Bihari testified that he understood Aprahamian provided the information so that "Sandoz would follow the price increase and keep

---

[16] EPPs' Opp. Ex. 10, Lubke Tr. 775:15-776:15.
[17] EPPs' Opp. Ex. 9, Bihari Tr. 803:20-804:10.; Ex. 10, Lubke Tr. 687:21-688:9.
[18] EPPs' Opp. Exs. 167, 168, 169, TARO_000134922-24 (Pl. Exs. 9244, 9244A, 9244B).
[19] EPPs' Opp. Ex. 172, Phone Record Summary Ex. (Pl. Ex. 9245).
[20] EPPs' Opp. Ex. 12, Aprahamian Tr., 186:1-18.
[21] EPPs' Opp. Ex. 173, Phone Record Summary Ex. (Pl. Ex. 5195); Ex. 9, Bihari Tr. 778:19-779:18; Ex. 174, Phone Record Summary Ex. (Pl. Ex. 9246).
[22] Ex. 72, Bihari Notebook 2 at 27 (Pl. Ex. 6536); Ex. 9, Bihari Tr. 780:15-782:19.

PUBLIC VERSION – FILED WITH REDACTIONS
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

the price high in the market."[23] Sandoz indeed followed Taro's price increase, declined to bid on key customers to keep prices high, and then coordinated with Taro to obtain Rite Aid's business. EPPs' Opp. at 37, 42-43.

Lubke testified that Taro's upcoming Clomipramine price increase was "something [she] would have talked about" with Doug Statler at Taro when she spoke to him on the phone on April 17, 2013, *two weeks* before Taro's price increase.[24] Moreover, Aprahamian and Mylan's Michael Aigner had four phone calls Between March 8, 2013 and April 22, 2013.[25] When asked whether these calls concerned Clomipramine, both men invoked the Fifth Amendment.[26] And following an April 4, 2013, phone call between Aprahamian and Aigner, Mylan removed Clomipramine from its "Customer Focus List," citing the fact that this was a "Taro price increase item."[27] At this point, Taro had not made price increase announcements to its customers, so the only way Mylan would know it was a "price increase item" was through Taro. Defendants' supplemental briefs ignore this evidence.

Defendants also ignore another essential aspect of the conspiracy: they kept Clomipramine prices high by not competing for customers. The only customer addressed in their briefs is Rite Aid—



.[28] According to Bihari's testimony, Kellum directed Bihari on July 16, 2013 to obtain Taro's Rite Aid pricing information from Taro,[29] and after Bihari

---

[23] EPPs' Opp. Ex. 9, Bihari Tr. 780:15-781:24.
[24] EPPs' Opp. Ex. 10, Lubke Tr. 905:20-906:16.
[25] *See* EPPs' Opp. Exs. 74, 53, 174, Phone Record Summary Exs. (Pl. Exs. 2458, 9242, 9246).
[26] EPPs' Opp. Ex. 12, Aprahamian Tr., 179:16-215:4; Ex. 15, Aigner Tr. 128:10-131:2.
[27] EPPs' Opp. Ex. 75, Phone Record Summary Ex. (Pl. Ex. 3515); Ex. 14, Nesta Tr. 211:14-216:14; Ex. 158, MYL-000007649-650 (Pl. Ex. 3513) (April 8, 2013 email); Ex. 76, MYL-000007653 (Pl. Ex. 3514) (attachment to Pl. Ex. 3513).
[28] Ex. 216, Kellum Tr. 1194:15-1196:5; *see also* EPPs' Opp. 27-31.
[29] EPPs' Opp. Ex. 9, Bihari Tr. 802:6-804:10.

PUBLIC VERSION – FILED WITH REDACTIONS
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

obtained Taro's dead net Clomipramine prices for Rite Aid from Aprahamian (which he recorded in his Notebook[30]), he provided the information to Vezza and Kellum.[31] Kellum did not recall *any* of his conversations with Bihari regarding Rite Aid,[32] yet evidence from multiple sources all indicate that coordination between Taro and Sandoz occurred. EPPs' Opp. 27-31.

EPPs also set forth evidence showing that Defendants declined to bid for other customers or ceded customers to each other to ensure Clomipramine prices remained high. This conduct affected CVS, ABC, Kaiser, Publix, and others. *See* EPPs' Opp. at 42-45; 95-96.

[redacted].[34]

### C.    Kellum's Attempt to Downplay His and Sandoz's Role in the Conspiracy Fail

Defendants have utilized Kellum to whitewash key evidence of the Clomipramine conspiracy, but their efforts fail to support their motion. For instance, Kellum tried to minimize the roles of Bihari, Vezza, and Lubke by [redacted]"[35] But as shown above, all three witnesses implicated Kellum as a participant in the conspiracy and a receiver of information garnered from competitors. [redacted].[37] He did not recall the contents of a

---

[30] EPPs' Opp. Ex. 72, Bihari Notebook 2, at 43 (Pl. Ex. 6536).
[31] EPPs' Opp. Ex. 11, Vezza Tr. 1120:20-1125:13; Ex. 9, Bihari Tr. 802:6-804:10.
[32] Ex. 216, Kellum Tr. 1181:4-1182:17.
[33] EPPs' Opp. Ex. 189, SDZMDL-3807318 (Pl. Ex. 2219) ([redacted]); Ex. 96, SDZCTAG-01598507 (Pl. Ex. 2499) ([redacted]; Ex. 11, Vezza Tr. 1111:7-1112:7 ([redacted]); Ex. 11, Vezza Tr. 1065:11-20 ([redacted]).
[34] EPPs' Opp. Ex. 96, SDZCTAG-01598507 (Pl. Ex. 2499); Ex. 100, SDZCTAG-01598516 (Pl. Ex. 0048) ("[redacted].).
[35] Ex. 216, Kellum Tr. 51:14-52:13; 150:7-18; Taro Supp. at 3.
[36] Ex. 216, Kellum Tr. 1099:1-10.
[37] Ex. 216, Kellum Tr. 1099:25-1100:21.

PUBLIC VERSION – FILED WITH REDACTIONS
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

phone call with Lubke right after Lubke spoke with Mylan's Nesta,[38] yet Lubke testified that her calls with Nesta were likely to discuss Clomipramine price increases, and her calls shortly after to Kellum, including on May 8, 2013, were likely to pass on "actionable information" obtained from Nesta.[39] Kellum's lack of memory does nothing to negate the existence of the conspiracy in the face of evidence confirming otherwise.

Kellum's alternative explanations for Sandoz's conduct also fail. His statement ███ ██████████████████████████████████████████████████████ (Taro Supp. at 4; Mylan Supp. at 4) does not negate the existence of the conspiracy—it is just as probative of Sandoz's motive to conspire. Kellum *admitted* that he knew Bihari and Aprahamian were communicating and that Bihari told him Aprahamian could provide pricing information.[40] Yet he claimed he learned of Taro's price increases through compendia or customers, calling information from Bihari about Taro's price increases "██████." Mylan Supp. at 2. That not only flies in the face of contrary evidence, it ignores two essential parts of the conspiracy—to *follow* Taro's price increases and *keep the prices high in the market by not competing for customers*,[41] the very point, for example, of Aprahamian's phone call with Bihari on April 30, 2013.[42] Similarly, Defendants' and Kellum's reliance on Sandoz's pricing committee and the "████████" of its members as evidence of independent decision making do not salvage their motion. Evidence shows that Kellum was both a participant in the conspiracy and drove the pricing process at Sandoz.[43] In fact, it was Kellum that recommended the price increases to the pricing committee.[44]

As set forth in EPPs' Opposition, antitrust defendants are not "entitled to summary judgment merely by showing that there is a plausible explanation for their conduct." *In re*

---

[38] Ex 216, Kellum Tr. 1142:13-1144:14.

[39] EPPs' Opp. Ex. 10, Lubke Tr. 769:23-772:24.

[40] Ex. 216, Kellum Tr. 1094:20-1095:25.

[41] EPPs' Opp. Ex. 9, Bihari Tr. 794:9-22 (emphasis added).

[42] EPPs' Opp. Ex. 9, Bihari Tr. 780:15-781:24.

[43] *See, e.g.*, EPPs' Opp. Ex. 204, SDZCTAG-06473019 (Pl. Ex. 5202); Ex. 10, Lubke Tr. 545:15-21 (Lubke testified that Kellum "drove the whole process.").

[44] Ex. 216, Kellum Tr. 1193:20-1194:13; EPPs' Opp. Ex. 204, SDZCTAG-06473019 (Pl. Ex. 5202).

PUBLIC VERSION – FILED WITH REDACTIONS
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

*Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 397 (internal citation and quotations omitted); *In re Blood Reagents Antitrust Litig.*, 266 F. Supp. 3d 750, 767-68 (E.D. Pa. 2017) (same). Kellum's testimony only reinforces disputes of material facts and calls into question both his veracity and memory. Courts routinely deny summary judgment in these situations where credibility determinations are central. *Petruzzi's*, 998 F.2d at 1230.

### D.    EPPs Showed Substantial Plus Factors

Mylan's argument that Kellum's testimony "confirms" Plaintiffs "cannot show plus factors" (Mylan Supp. at 4) is also wrong. Mylan disregards the wealth of evidence implying a traditional conspiracy and completely ignores the additional, substantial plus factors asserted by EPPs—Defendants' motive to conspire, actions taken against their independent self-interests and conduct that was an abrupt change from their previous behavior, all unexplained by market forces. EPPs' Opp. at 59-71. The Third Circuit has made clear that "there is no finite set" of plus factors (*Flat Glass*, 385 F.3d at 360), and they can include "(1) evidence that the defendant had a motive to enter into a price fixing conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) evidence implying a traditional conspiracy." *Chocolate Confectionary*, 801 F.3d at 398 (internal citation and quotations omitted). Kellum did nothing to disprove these plus factors. In fact, he admitted ███████████████████████████████████████████████ ████████████████████████████████████████████████.[45]

### E.    Evidence Demonstrates Mylan's Role in the Clomipramine Conspiracy

Mylan argues that evidence "indisputably shows" it did not participate in the conspiracy (Mylan Supp. at 3), but that is simply wrong. Phone calls between Aprahamian and Mylan's Aigner preceded Taro's price increase announcement on April 29, 2013. In fact, between March 8, 2013 and April 22, 2013, Aprahamian and Aigner had four phone calls.[46] When asked whether these calls concerned Clomipramine, both men pled the Fifth Amendment.[47] Mylan knew about Taro's yet-to-be-announced price increase—it eliminated Clomipramine from its customer focus list on

---

[45] Ex. 216, Kellum Tr. 1106:5-11.
[46] *See* EPPs' Opp. Exs. 74, 53, 174, Phone Record Summary Exs. (Pl. Exs. 2458, 9242, 9246).
[47] EPPs' Opp. Ex. 12, Aprahamian Tr., 179:16-215:4; Ex. 15, Aigner Tr., 128:10-131:2.

PUBLIC VERSION – FILED WITH REDACTIONS
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

April 8, 2013 (in advance of Taro's price increase announcement) because it was a "Taro price increase item."[48] As discussed above, Lubke and Mylan's Nesta had multiple conversations in which they shared competitively sensitive information about Clomipramine, including price increases, which Lubke reported to Kellum.[49] Mylan contends that Lubke's communications with Nesta could not have amounted to an agreement. Mylan Supp. at 4. But Lubke testified that she shared competitive information from Nesta with Vezza, Kellum, and Connie Pak—all of whom were involved in pricing—so that Sandoz could follow Mylan's price increases.[50] She also testified that the competitive intelligence she obtained from Nesta was "actionable information, purposeful for the purpose of increasing profits, of being able to act on information."[51] Kellum's testimony that he had no knowledge of Lubke's communications with Nesta is not surprising; he admitted that he avoided asking about the source of competitive intelligence, especially when he knew that it was likely to originate from an illicit source.[52] Lubke testified that she did nothing to hide the source of her information and did not recall anyone asking her how she got it.[53] In short, Kellum's testimony does little to disprove that Mylan's participated in the Clomipramine conspiracy.

### F.    Mylan's Contention that Price Increases were "Sequential" and "Not Parallel" Is Still Irrelevant

That Kellum ████████████████████████████ ████████████ (Mylan Supp. at 4) is irrelevant factually and as a matter of law. Mylan made the same erroneous argument in its moving brief (ECF No. 385, at 26), and continues to ignore this Court's holding that plaintiffs are not required to plead simultaneous or identical prices

---

[48] EPPs' Opp. Ex. 158, MYL-000007649 (Pl. Ex. 3513) (April 8, 2013 email); Ex. 76, MYL-000007653-54 (Pl. Ex. 3514).

[49] EPPs' Opp. Ex. 10, Lubke Tr. at 769:23-772:2; Ex. 198, Phone Record Summary Ex. (Pl. Ex. 3496).

[50] EPPs' Opp. Ex. 10, Lubke Tr. 650:6-651:21, 774:2-777:7; Ex. 114, SDZMDL-005208875 (Pl. Ex. 3497).

[51] EPPs' Opp. Ex. 10, Lubke Tr. 801:13-802:2.

[52] See, e.g., Ex. 216, Kellum Tr. 960:5-21.

[53] See Ex. 10A, attached hereto, containing supplemental excerpts from the Deposition of Della Lubke, 687:4-692:16. Lubke said, "the only way she could get this information would be to reach out to Jim Nesta." Id. 692:17-24.

PUBLIC VERSION – FILED WITH REDACTIONS
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

to demonstrate parallel conduct. *In re Generic Pharms. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 441 & n.208 (E.D. Pa. 2018) (internal citations and quotations omitted). Parallel pricing merely requires a "pattern of parallel price increases." *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 122 (3d Cir. 1999). It "does not require absolutely uniform pricing decisions; it is sufficient that the price increases are reasonably proximate in time and value." *In re Chocolate Confectionary Antitrust Litig.*, 999 F. Supp. 2d 777, 787 (M.D. Pa. 2014) (quoting *Baby Food*, 166 F.3d at 132). The evidence is plain that Taro and Mylan increased their Clomipramine WAC and AWP in May of 2013, followed by Sandoz in July of 2013, all by the same amount per capsule, leading to enormous price increases to end-payers. *See* EPPs' Opp. at 75-76.

### G.   Defendants Misapply the Summary Judgment Standard

When deciding summary judgment, courts must evaluate the record "in the light most favorable to the nonmovant, drawing reasonable inferences in its favor." *Chocolate Confectionary,* 801 F.3d at 396 (citing *Flat Glass*, 385 F.3d at 357). Moreover, a court "should not tightly compartmentalize the evidence put forward by the nonmovant, but instead should analyze it as a whole to see if together it supports an inference of concerted action." *Petruzzi's*, 998 F.2d at 1230. Taro and Mylan upend this standard, asking the court to draw inferences in their favor and not assess the record as a whole. But "defendants [are] not entitled to summary judgment simply because they demonstrated a plausible rationale for their behavior." *Petruzzi's*, 998 F.2d at 1232. When viewing the evidence as a whole and in the light most favorable to EPPs, Defendants' summary judgment motion fails.

### H.   Taro's Improper "Joinder" Should Be Rejected

As in its opening brief, Taro repeats its improper "joinder," adopting the "reasoning" set forth in Mylan's supplemental brief. (Taro Supp. n.2, 5). The Court should deny this improper joinder for the reasons set forth in EPPs' Opposition. *See* EPPs' Opp. at 103-105.

## III.   CONCLUSION

For the reasons set forth above, the Court should deny Defendants' motions for summary judgment and improper joinders.

PUBLIC VERSION – FILED WITH REDACTIONS
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER

Dated: May 1, 2025

Respectfully submitted,

*/s/ Roberta D. Liebenberg*

Roberta D. Liebenberg
Paul Costa
Adam J. Pessin
Jeffrey Gittleman
**FINE, KAPLAN AND BLACK, R.P.C.**
One South Broad Street, 23rd Floor
Philadelphia, PA 19107
Telephone: (215) 567-6565
rliebenberg@finekaplan.com
pcosta@finekaplan.com
apessin@finekaplan.com
jgittleman@finekaplan.com

*Liaison and Lead Counsel for the End-Payer Plaintiffs*

Gregory S. Asciolla
Geralyn J. Trujillo
Jonathan S. Crevier
**DICELLO LEVITT LLP**
485 Lexington Avenue, Suite 1001
New York, NY 10017
Tel: (646) 933-1000
gasciolla@dicellolevitt.com
gtrujillo@dicellolevitt.com
jcrevier@dicellolevitt.com

*Member of Plaintiffs' Steering Committee for End-Payer Plaintiffs*

11

PUBLIC VERSION – FILED WITH REDACTIONS
REDACTED PURSUANT TO MDL 2724 PROTECTIVE ORDER